**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE PROTHENA CORPORATION PLC SECURITIES LITIGATION | Case No. 1:18-cv-06425-ALC<br><br><u>CLASS ACTION</u><br><br>AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS<br><br><u>DEMAND FOR JURY TRIAL</u> |

# TABLE OF CONTENTS

Page


I. SUMMARY OF THE ACTION ....... 1

II. JURISDICTION AND VENUE ....... 6

III. PARTIES ....... 7

A. Lead Plaintiffs ....... 7

B. Defendants ....... 7

C. Other Relevant Parties ....... 9

IV. SUBSTANTIVE ALLEGATIONS ....... 9

A. Prothena Is a Development-Stage Biotechnology Company ....... 9

B. NEOD001's Inflated Approval Prospects Drive Prothena's Valuation During the Class Period ....... 10

C. AL Amyloidosis Background and NEOD001 ....... 12

D. FDA/EMA Regulation and Study Protocols ....... 14

E. NT-proBNP As a Surrogate Endpoint in AL Amyloidosis Trials ....... 19

F. Prothena Creates "Best Response" Metric ....... 21

G. Defendants' Use of "Best Response" Is Misleading and not Validated by the ALA Community ....... 26

H. Defendants Are Confronted With But Conceal Their Best Response Concerns ....... 40

I. Defendants Quietly Amend PRONTO's Secondary Endpoint Over Doubts Concerning Use of "Best Response" ....... 44

J. PRONTO and VITAL Data Contradicted Defendants' Positive Statements Concerning NEOD001's Approval Prospects ....... 46

K. Defendants Knew or Should Have Known that "Best Response" Was Misleading and that NEOD001 Was Not Effective ....... 46

L. The Truth Is Revealed and Defendants Admit to High "Between Patient Variability" in NT-proBNP in PRONTO ....... 48

V. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS ....... 50

VI. ADDITIONAL ALLEGATIONS SUPPORTING THE INDIVIDUAL DEFENDANTS' SCIENTER ....102

A. Defendants Acted Knowingly and/or Recklessly .... 103

B. Defendants' Motive and Opportunity to Commit Securities Fraud.... 116

C. Defendants Benefitted Financially from the Fraud.... 118

VII. LOSS CAUSATION AND ECONOMIC LOSS ....122

VIII. APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET....127

IX. NO SAFE HARBOR ....128

X. CLASS ACTION ALLEGATIONS ....129

XI. CLAIMS FOR RELIEF ....130

COUNT I For Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Against All Defendants ....130

COUNT II For Violation of Section 20(a) of the Exchange Act Against the Individual Defendants ....131

PRAYER FOR RELIEF ....132

JURY DEMAND....132

Lead Plaintiff Granite Point Capital, Granite Point Capital Master Fund, LP, Granite Point Capital Panacea Global Healthcare, Granite Point Capital Scorpion Focused Ideas Fund (collectively, "Granite Point") and Simon James (together, Lead Plaintiffs), individually and on behalf of all others similarly situated, allege the following based on personal knowledge as to Lead Plaintiffs and Lead Plaintiffs' own acts, and upon information and belief as to all other matters based upon the investigation conducted by and through Lead Plaintiffs' attorneys, which included, among other things, a review of press releases and other public statements issued by Prothena Corporation plc ("Prothena" or the "Company"), Prothena's filings with the U.S. Securities and Exchange Commission ("SEC"), media and analyst reports about the Company, review of trade journals and information regarding the pharmaceutical industry, interviews with former employees of Prothena, and consultation with an expert in study design and pharmaceutical regulation. Lead Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I. SUMMARY OF THE ACTION

1. This is a securities class action on behalf of all persons or entities that purchased Prothena's publicly traded common stock between October 15, 2015, and April 20, 2018, inclusive (the "Class Period"). The claims asserted herein are alleged against Prothena and certain of the Company's senior executives (collectively, "Defendants"), and arise under Sections 10(b) and 20(a) of the Securities and Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5, promulgated thereunder, 17 C.F.R. § 240.10b-5.

2. Prothena is a development-stage biotechnology company. During the Class Period, Prothena's principal asset was NEOD001, a drug designed to treat amyloid light chain amyloidosis ("AL amyloidosis"), a disorder that causes proteins to change shape and interfere with proper organ function. It is currently treated with chemotherapy or other plasma cell-

directed therapy that aims to stop the production of the misfolded proteins that accumulate into amyloid plaque and compromise the heart and other organs. However, existing therapies do not clear soluble and insoluble amyloid already in circulation in the blood, an unmet need that Prothena purported NEOD001 sought to address.

3. If NEOD001 worked, it would change the future of the Company. NEOD001 was estimated by analysts to bring in over $1 billion in revenue annually, allowing the Company to generate positive cash flow for the first time in its history. Thus, Prothena began the approval process for NEOD001 by conducting the human clinical studies and drug trials necessary for approval by the Federal Drug Administration ("FDA") and European Medicines Agency ("EMA"). This matter arises from Defendants' misrepresentations and material omissions regarding NEOD001's clinical trial results and prospects for approval.

4. Throughout the Class Period, Defendants cited the "best response" endpoint results of Prothena's ongoing Phase 1/2 clinical study of NEOD001 as evidence that the drug was effective, and as a basis for launching Phase 2 and Phase 3 studies which were necessary for the drug's approval. Specifically, Prothena measured a substance called N-terminal pro b-type Natriuretic Peptide ("NT-proBNP") that is produced in the heart and released when the heart is stretched and working hard to pump blood. While lowering NT-proBNP by 30 percent after a predetermined amount of time (a "response") can suggest that treatment is working, Prothena measured NT-proBNP monthly over the course of a patient's *entire treatment* and if, at any point, NT-proBNP showed a "response," Prothena would claim this as a successful treatment-derived outcome. However, Prothena misrepresented the clinical acceptance and validity of this "best response" endpoint, dismissed red flags concerning NEOD001's efficacy, and withheld relevant trial data suggesting that NEOD001 was not an effective treatment for AL amyloidosis.

5. Defendants' misrepresentations were premised on misleading, apples-to-oranges comparisons of NEOD001's "best response" rate to AL amyloidosis studies that did not employ a "best response" analysis. Indeed, contrary to Defendants' numerous assertions, these prior studies of AL amyloidosis did not report a "best response" analysis at all. The impact of these false comparisons was, in turn, amplified by Defendants' continued reliance on a cherry-picked measure of the natural variability of NT-proBNP, a biomarker used as a critical endpoint in all the NEOD001 trials and central to Defendants' claims concerning NEOD001's efficacy and prospects for approval throughout the Class Period.

6. The Class Period begins on October 15, 2015, when Prothena issued a press release announcing the start of its late-stage Phase 2b "PRONTO" study and the expansion of its ongoing Phase 1/2 clinical trial for NEOD001. The press release explained that the Phase 2b PRONTO study was "a global trial of NEOD001 in previously-treated patients with AL amyloidosis and persistent cardiac dysfunction." During the Company's October 15, 2015, conference call to discuss the launch of the PRONTO clinical trial, Prothena's then President and Chief Executive Officer, Dr. Dale Schenk ("Schenk"), highlighted to investors that the PRONTO trial was "informed by the results of our ongoing Phase 1/2 trial" presented earlier that year, which "showed that 60% of renal evaluable patients treated with NEOD001 achieved a response, and 57% of cardiac evaluable treated patients achieved a response." Schenk compared the Phase 1/2 results favorably to prior studies by third parties, stating that "these best response rates for . . . cardiac evaluable patients were more than double the published historical rates reported in multiple AL amyloidosis studies," supporting NEOD001's efficacy in treating the condition.

7. On July 5, 2016, Prothena announced new data from the expanded Phase 1/2 clinical trial of NEOD001. This included "best response" rates of 53% in total cardiac patients.

According to Prothena, the 53% cardiac best response rate "compared favorably" to cardiac response rates of 0% to 15% from available published historical data in patients previously-treated with chemotherapy or other plasma cell directed therapy, and were consistent with the Company's prior "best response" study results. During a conference call held that same day to discuss the new data, Schenk confirmed that these results went beyond "reassuring safety and tolerability findings" and demonstrated "improvements in all three organ systems measured in this study: cardiac, renal, and peripheral nerves." Also during the call, Defendant Dr. Gene Kinney ("Kinney"), the Company's then-Chief Operating Officer and Chief Scientific Officer, cited the new Phase 1/2 results as a proxy for the likely success of Prothena's late-stage studies, including the Phase 2b "PRONTO" study, by underscoring "the relevance of the new Phase 1/2 results to our ongoing late-stage studies."

8. Throughout the Class Period, Defendants continued to tout the interim results of the Company's Phase 1/2 study while concealing substantial risks that undermined the validity of the late-stage Phase 2b PRONTO and Phase 3 VITAL studies. For example, on September 12, 2016, during the Morgan Stanley Global Healthcare Conference, Defendant Tran B. Nguyen ("Nguyen"), the Company's Chief Financial Officer, stated that the "exciting findings" from the Phase 1/2 expansion study supported PRONTO and VITAL. Analysts generally accepted Defendants' positive statements regarding NEOD001's efficacy and the Phase 1/2 study results, and viewed the Company's Phase 1/2 study results as indicative of the likely success of the ongoing Phase 2b and Phase 3 trials.

9. In truth, Prothena's "best response" analyses did not present a fair representation of the efficacy of NEOD001, particularly when compared to prior studies. What Prothena referred to as the "best response" rate was selected by the Company from among all the data

points in their study. In other words, Prothena would cherry-pick the best response of a clinical patient among the available data points for each patient during the trial, and then misleadingly compare that result to the existing studies that used a NT-proBNP measurement at the end of a predetermined length of time as the sole data point for evaluating whether a clinically meaningful result was achieved. Thus, Prothena's use of "best response" created a false impression that NEOD001 was effective because it did not show an improvement over time, but rather allowed Prothena to cherry pick only the best data point during the course of the study that likely resulted from the natural variability of NT-proBNP. Importantly, Prothena never disclosed the full results of its Phase 1/2 testing – namely, the month-to-month response rate of each patient during the study – which would have permitted investors to conduct a fair comparison of its data against the historical data.

10. Defendants' statements created an unfounded optimism concerning NEOD001's approval prospects that artificially inflated the market for Prothena securities. Even trained analysts were fooled by Defendants' misrepresentations—for example, on December 5, 2016, a Credit Suisse analyst noted that the final Phase 1/2 study results helped "de-risk the ongoing PRONTO and VITAL studies." With the Prothena's stock artificially inflated by Defendants' statements, Prothena raised more than $275,000,000 from investors in two public offerings during the Class Period.

11. Further, the steering committee for the Phase 2b trial of NEOD001, comprised of experts in the field, was skeptical of the "best response" endpoint and advocated for the inclusion of an alternate endpoint that would show actual and sustained reductions in levels of NT-proBNP, a metric that Defendants stopped releasing for the Phase 1/2 trial. In response, on or

before October 22, 2017, Defendants quietly amended the Phase 2 trial to include this alternate endpoint.

12. Defendants also had real time access to blinded data from the Phase 2b trial and analyses of this data were presented to Defendants. *See* Sections IV.J.-K., *infra*. These analyses would have strongly suggested that NEOD001 was not successful at reducing levels of NT-proBNP and that NEOD001 was not effective for the treatment of AL amyloidosis. *Id.*

13. On June 29, 2017, and November 8, 2017, Defendants were confronted by analysts with specific concerns about the viability of the "best response" endpoint and proposals for disclosing information that would alleviate investor concerns, but Defendants did not disclose this information. Instead, the truth about NEOD001 was revealed many months later on April 23, 2018. Before the market opened, Prothena stunned investors by announcing that it was ending all development of NEOD001 after data from its Phase 2b PRONTO trial showed that NEOD001 failed to reach either its primary or secondary endpoints, and was substantially less effective than a placebo. During a call to discuss the results that same day, Defendants conceded the central criticism of analysts concerning the "best response" endpoint and also admitted that the "best response" endpoint had ***not*** been validated by the AL amyloidosis community, contrary to their prior statements on the topic. *See* Section VII, *infra*. In response to this news, Prothena stock fell 69%, causing investors to suffer hundreds of millions of dollars in damages.

## II. JURISDICTION AND VENUE

14. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

15. Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District. Many of the acts charged herein, including the preparation and/or dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District. Prothena transacts business in this District, and the Company's stock trades in this District on the NASDAQ Stock Market ("NASDAQ").

16. In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III. PARTIES

### A. Lead Plaintiffs

17. Lead Plaintiff Granite Point is a hedge fund that manages approximately $246 million in assets. As set forth in the previously filed Certification, Granite Point, through several controlled investment funds, purchased Prothena securities on the NASDAQ at artificially inflated prices during the Class Period and suffered damages as a result of the violations of the federal securities laws. ECF No. 14-1.

18. Lead Plaintiff Simon James is an individual residing in Edwalton, England. As set forth in the previously filed Certification, Mr. James purchased Prothena securities on the NASDAQ at artificially inflated prices during the Class Period and suffered damages as a result of the violations of the federal securities laws. *Id*

### B. Defendants

19. Defendant Prothena Corporation plc ("Prothena") is a clinical-stage neuroscience company focused on the discovery and development of novel therapies targeting progressive and

life-threatening diseases. Prothena is incorporated in Ireland with its U.S. operations headquartered in the city of San Francisco, California.

20. Defendant Kinney served as President, Chief Executive Officer, and a Director at Prothena since September 2016. Prior to that, Kinney served as the Company's Chief Operating Officer and Chief Scientific Officer ("CSO") since the Company's founding in 2012.

21. Defendant Nguyen was, at all relevant times, Prothena's Chief Financial Officer. Nguyen joined Prothena as its Chief Financial Officer in 2013. Prior to joining Prothena, Mr. Nguyen was Vice President, Chief Financial Officer (from 2010 to 2011) and then Senior Vice President, Chief Financial Officer of Somaxon Pharmaceuticals, Inc., from 2011 until its sale in 2013. He was Vice President, Chief Financial Officer at Metabasis Therapeutics, Inc., from 2009 until its sale in 2010. From 2007 to 2009, Mr. Nguyen was a Vice President in the Healthcare Investment Banking group at Citi Global Markets, Inc., and from 2004 to 2007 he served in various capacities as a healthcare investment banker at Lehman Brothers, Inc..

22. Defendant Sarah Noonberg, M.D., Ph.D. ("Noonberg") was Prothena's Chief/Medical Officer ("CMO") from May 16, 2017 until February 2, 2018. Prior to joining Prothena, she served as Group Vice President and Head of Global Clinical Development at BioMarin Pharmaceuticals Inc. from 2015 to 2017, where she was responsible for development strategy and execution across a diverse clinical portfolio. From 2007 to 2015, Dr. Noonberg held several positions at Medivation, Inc. where, as Senior Vice President of Early Development and Vice President of Clinical Development, she led programs across all phases of development, included enzalutamide (XTANDI) for the treatment of chemotherapy-naïve metastatic prostate cancer.

23. Defendants Kinney, Nguyen, and Noonberg are also collectively referred to hereinafter as the "Individual Defendants." The Individual Defendants, because of their positions with Prothena (collectively, "Defendants"), possessed the power and authority to control the contents of the Company's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors. Each of the Individual Defendants was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information, each of the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.

### C. Other Relevant Parties

24. Dale Schenk (deceased), was Prothena's Co-founder, President and Chief Executive Officer until September 26, 2016, when he left the Company on medical leave. Defendant Kinney was subsequently appointed President and Chief Executive Officer. Schenk is credited as one of the pioneers of vaccine therapy in the treatment of Alzheimer's disease and a strong proponent of the "amyloid hypothesis," which advocates for the use of anti-amyloid treatments in Alzheimer's disease. Schenk's statements and knowledge of their falsity are imputed to Defendant Prothena.

## IV. SUBSTANTIVE ALLEGATIONS

### A. Prothena Is a Development-Stage Biotechnology Company

25. Prothena was founded in 1986 under the name of Athena Neurosciences as a biotechnology company focused on the treatment of neurological diseases. Athena was acquired

by Elan Corporation, plc in 1996, and its discovery and development activities were incorporated into Elan. Prothena was established in December 2012 when it separated from Elan Corporation, plc with a substantial portion of its drug discovery platform. The Company's common stock trades on the NASDAQ under ticker symbol "PRTA."

26. At the time of its separation from Elan and during the Class Period, Prothena's lead drug candidate was NEOD001, a humanized monoclonal antibody, which Prothena suggested binds and neutralizes amyloid in amyloid light chain (AL) amyloidosis. Unlike existing therapies, NEOD001 was specifically designed to target this form of amyloid, which is believed to contribute to organ dysfunction and failure in patients with AL amyloidosis.

**B. NEOD001's Inflated Approval Prospects Drive Prothena's Valuation During the Class Period**

27. During the Class Period, analysts consistently referred to NEOD001 as a "high-value asset" and a "potential[] blockbuster" for the Company if approved for the treatment of AL amyloidosis. For example, on January 20, 2016, Credit Suisse projected that NEOD001 would account for 100% of Prothena's revenue in 2021 and 2022, with an estimated $1.8 billion in peak sales. Similarly, on April 12, 2017, Piper Jaffrey referred to NEOD001 as Prothena's "lead drug" and projected revenue from it to be approximately $739 million annually in the U.S. alone by 2022.

28. Analysts also viewed NEOD001's strong approval prospects as the driving force in their valuation of Prothena. For example, on February 3, 2014, Credit Suisse set a $35 price target for the Company principally based on its view that there was a 30-35% probability that NEOD001 would be approved. On March 6, 2014 RBC set a $38 price target for the Company principally based on its view that there was a 30% probability that NEOD001 would be approved.

29. Prior to and during the Class Period, analysts consistently increased their price targets for Prothena based on the probability that NEOD001 would be approved following Defendants' false and misleading statements regarding allegedly positive data supporting the efficacy of NEOD001. For example, on March 18, 2014, RBC raised its price target for Prothena to $52 "based on increased probability (40% from 30% previously)" supported by "evidence already of early cardiac biomarker responses." Similarly, on April 23, 2014, Credit Suisse set a $53 price target based on a 40-45% probability of success. On July 22, 2015, RBC set a $75 price target for the Company principally based on its view that there was a 68% probability that NEOD001 would be approved. On November 2, 2016, RBC set a $95 price target based principally on "a 75% probability for lead program in AL amyloidosis to become a $1B indication." On February 14, 2017, Credit Suisse set a $66 price target for the Company principally based on its view that there was a 70% probability that NEOD001 would be approved. On July 10, 2017, Jefferies set a $100 price target based on its view that "the Phase IIb pivotal study (PRONTO) for NEOD-001 in amyloidosis has a high chance of working (65-70%)," with "significant upside potential." These probabilities of success estimates materially impacted Prothena's stock price during the Class Period and were inflated by Defendants' false and misleading statements concerning NEOD001's approval prospects.

30. NEOD001 also accounted for a significant portion of the Company's R&D expenses during the Class Period. According to the Company's 2017 Form 10-K, spending for R&D related to NEOD001 increased from a $33.87 million in 2015 to $101.49 million in 2017. Over that period, spending on NEOD001 grew from 58% of the Company's total R&D expenses to 75%. As a biotechnology company without any significant recurring revenue source, these amounts were material, as they reflected the majority of Prothena's finite R&D budget.

**C. AL Amyloidosis Background and NEOD001**

31. Amyloid light-chain (LC) amyloidosis (AL amyloidosis), a rare, progressive and fatal disease, is the most common form of systemic amyloidosis, and it affects an estimated 8–12 per 1,000,000 persons annually. Systemic amyloidosis is characterized by the accumulation of abnormal, misfolded protein (amyloid) in various tissue and organs that produce patient-specific clinical manifestations depending on the organ impacted. Progressive amyloid deposition and proteotoxic effects of amyloid proteins lead to organ failure, which is especially catastrophic when the heart is affected, and is the primary cause of death. As many as 70% of patients with AL amyloidosis have predominantly cardiac amyloid deposition.

32. There are currently no approved therapies for AL amyloidosis and there are no approved treatments to directly target and remove the amyloids that have already formed in patients. Thus, current treatments for AL amyloidosis are limited to off-label uses of other treatments that help limit the production of additional amyloid. One of the most common treatments to reduce the production of amyloid in patients with AL amyloidosis is the use of chemotherapeutic drugs to reduce the plasma cells that produce the abnormal light chain. Eligible patients may also receive organ and/or autologous stem cell transplants. These treatment strategies, however, are intended to reduce production of new abnormal light chains and do not target or remove the amyloids that have already formed in the patient's body. Thus, patients with AL amyloidosis have both a hematologic malignancy that causes the plasma cells to produce the harmful amyloids and present with progressive dysfunction of one or more organs. Amyloid involvement of the heart carries the worst prognosis of any involved organ and, according to Defendants, "leads to death in most cases in this disease."

33. The therapeutic armamentarium has expanded in recent years from melphalan-prednisone as single resource in 1997 to several effective therapies including high-dose

dexamethasone-based regimens combined with melphalan (MDex), thalidomide (ThalDex), and cyclophosphamide-thalidomide (CTDex), high-dose melphalan followed by rescue with autologous stem cell transplantation (SCT), to the new agents such as lenalidomide and bortezomib.

34. Standard treatment with melphalan and prednisolone or with cyclophosphamide and dexamethasone has been replaced with newer drugs used for the treatment of multiple myeloma—bortezomib, carfilzomib and ixazomib or thalidomide, lenalidomide and pomalidomide. High-dose melphalan supported by autologous stem cell transplantation remains the therapeutic option for patients with low-risk status. These new treatment options prolong survival from months to years and improve the prognosis in a majority of patients.

35. NEOD001 was touted by Prothena as a humanized monoclonal antibody, or drug, specifically designed to target amyloid in this disease. Antibodies similar to NEOD001 intended to target AL amyloidosis have been available since at least 2000, but have generally performed poorly in clinical testing. Among other things, AL amyloid deposits are too diverse for a single antibody to work consistently across patient populations, and organ-specific obstructions have hindered the ability of AL amyloid antibodies to achieve meaningful responses. Moreover, radioimaging studies have shown that even where candidate drugs appeared to have meaningful responses, i.e., binding between antibodies and amyloid deposits somewhere in the body, there is no effect on AL amyloid deposits in the heart, kidneys, or other vital organs.

36. Prothena claimed that its AL amyloidosis antibody, NEOD001, had unique characteristics that made it a potential cure for the disease. For example, Defendant Kinney explained during a November 8, 2017, Credit Suisse Health Care Conference, "what you're trying to do there is attack that plasma cell clone. And if you think of this almost like a bathtub

analogy, you're trying to turn off the faucet. But what we see is that the bathtub's already full. Otherwise, you wouldn't have a diagnosis, the misfolded material is already there, it's already in the tissue causing dysfunction. And so what's needed is an approach that can actually clean out the bathtub, and that's what NEOD001 is designed to do."

**D. FDA/EMA Regulation and Study Protocols**

37. The development of a drug like NEOD001 is regulated by the FDA in the U.S. and the EMA in Europe. In order to be able to market NEOD001, Prothena would need approval from these authorities. The FDA Center for Drug Evaluation and Research (CDER) is the watchdog for potential medications seeking approval for use in the United States. In order for CDER to begin evaluating a drug, pharmaceutical companies must first conduct extensive testing and document the results. Those results are sent to the CDER, who assigns a team of doctors, chemists, pharmacologists, and other scientists to review the evidence. From initial formulating to FDA approval, most drugs take around 10 years to make it to the market and over $350 million in investment.

38. Once a company develops a drug, the drug undergoes around three and a half years of laboratory testing, before an application is made to the FDA to begin human testing. Only one in 1,000 of the compounds that enter laboratory testing will ever make it to human testing. If the FDA gives the green light, the "investigative" drug will then enter three phases of clinical trials:

(a) Phase 1 generally uses 20-80 volunteers to establish a drug's safety and profile and typically takes about 1 year to complete;

(b) Phase 2 generally employs 100-300 patient volunteers to assess the drug's effectiveness and typically takes about 2 years to complete;

(c) Phase 3 generally involves 1000-3000 patients in clinics and hospitals who are monitored carefully to determine effectiveness and identify adverse reactions and typically takes about 3 years to complete.

39. The company then submits an application (usually about 100,000 pages) to the FDA for approval, a process that can take up to two and a half years. After final approval, the drug becomes available for physicians to prescribe.

40. In 2012, the FDA granted NEOD001 "orphan drug" status and, in December 2014, granted NEOD001 "Fast Track" designation. The orphan drug designation program provides orphan status to drugs and biologics which are defined as those intended for the safe and effective treatment, diagnosis or prevention of rare diseases/disorders that affect fewer than 200,000 people in the U.S., or that affect more than 200,000 persons but are not expected to recover the costs of developing and marketing a treatment drug. Orphan designation qualifies the sponsor of the drug for various development incentives, including tax credits for qualified clinical testing. A marketing application for a prescription drug product that has received orphan designation is not subject to a prescription drug user fee unless the application includes an indication for other than the rare disease or condition for which the drug was designated.

41. A drug that receives Fast Track designation is eligible for 1) more frequent meetings with FDA to discuss the drug's development plan and ensure collection of appropriate data needed to support drug approval; 2) more frequent written communication from FDA about such things as the design of the proposed clinical trials and use of biomarkers; 3) eligibility for Accelerated Approval and Priority Review, if relevant criteria are met; 4) Rolling Review, which means that a drug company can submit completed sections of its Biologic License Application

("BLA") for review by FDA, rather than waiting until every section of the BLA is completed before the entire application can be reviewed. BLA review usually does not begin until the drug company has submitted the entire application to the FDA.

42. Prothena sponsored three separate trials of NEOD001.

**(a) The Phase 1/2 Study**

43. Prothena launched NEOD001 Phase 1 clinical testing in patients with AL amyloidosis in April of 2013. Phase 1 of the trial lasted until 2016 and enrolled 27 patients who received escalating doses of intravenous NEOD001 once every 28 days. The primary objective of the Phase 1 clinical trial was to evaluate the safety and tolerability of NEOD001 in patients with AL amyloidosis and to determine the appropriate dose levels for further testing in order to initiate a Phase 2 and Phase 3 studies. The Phase 1 study was an open label study, meaning both the researchers and participants knew which treatment was being administered.

44. In 2013, Prothena expanded its Phase 1 study, re-designating it as the Phase 1/2 study, to focus on certain potential efficacy endpoints and, concurrent with the VITAL Amyloidosis Study described below, enrolled up to an additional 42 patients with AL amyloidosis and selected persistent organ dysfunction in an open-label expansion portion of the Phase 1/2 study, all of whom received 24 mg/kg intravenously every 28 days. The expansion phase of the Phase 1/2 study was designed to evaluate the safety, tolerability, pharmacokinetics[1] and immunogenicity[2] of NEOD001 as well as the specific clinical activity against cardiac, renal, and neuropathy endpoints.

---

[1] Pharmacokinetics is defined as the study of the time course of drug absorption, distribution, metabolism, and excretion.

[2] Immunogenicity is the ability of a particular substance to provoke an immune response in the body of a human and other animal. In other words, immunogenicity is the ability to induce a humoral and/or cell-mediated immune response.

45. Starting on or about April 23, 2014, Prothena began reporting interim clinical data from the Phase 1/2 study, highlighting that the study had achieved "encouraging cardiac biomarker responses" with "eight of nine evaluable patients with AL amyloidosis with cardiac involvement [having] either achieved responses (N=5) or . . . considered stable (N=3)."

46. As described by CEO Schenk at the time, the "the encouraging signals observed in this ongoing Phase 1 study, both in safety and tolerability and in the cardiac biomarker responses" were the catalyst for the subsequent Phase 3 and Phase 2b studies of NEOD001 initiated by Prothena. This measure of "response" was a creation of Defendants' termed "best response." *See* Section IV.F., *infra*.

**(b) The VITAL Amyloidosis Study (Phase 3)**

47. In December 2014, Prothena initiated the VITAL Amyloidosis Study ("VITAL"), a Phase 3 clinical trial for NEOD001 in patients with AL amyloidosis. VITAL was initiated on the basis of "positive data" in the ongoing Phase 1/2 trial. The double-blinded trial was designed to support global regulatory approvals and to enroll approximately 230 newly-diagnosed patients with AL amyloidosis and cardiac dysfunction. Patients were randomized on a 1:1 basis to receive 24 mg/kg of NEOD001 or placebo via intravenous infusion every 28 days, with both groups receiving concurrent standard of care therapy. The primary endpoint of VITAL was event-based, with all-cause mortality or cardiac hospitalizations as qualifying events. In other words, VITAL sought to explore whether the placebo or treatment arm would live longer based on criteria such as hospitalization and death. Secondary endpoints of the study included evaluation of the cardiac biomarker NT-proBNP "best response," renal biomarker proteinuria, six-minute walk test, and multiple quality of life evaluations. VITAL completed enrollment in May of 2017.

### (c) The PRONTO Amyloidosis Study (Phase 2b)

48. In October 2015, Prothena announced plans to initiate PRONTO, a Phase 2b global, multi-center, randomized, double-blind, placebo-controlled clinical trial for NEOD001 in patients with AL amyloidosis and persistent cardiac dysfunction. PRONTO was initiated based on "positive interim data" from the ongoing Phase 1/2 trial. PRONTO was designed to enroll approximately 100 patients with a primary diagnosis of AL amyloidosis and persistent cardiac dysfunction despite previous treatment with off-label, plasma cell directed therapy. Patients were randomized on a 1:1 basis to receive 24 mg/kg of NEOD001 or placebo via intravenous infusion every 28 days. The primary endpoint of PRONTO was cardiac "best response" as assessed by NT-proBNP measured over 12 months. Prothena designed the study to detect a relative difference of 26.5% in NT-proBNP "best response" rate between the treatment and placebo groups. In other words, if the treatment group had a 50% "best response" rate (in line with the Phase 1/2 study results), then Prothena wanted to see a placebo group "best response" rate of 36.5 (or worse) to validate NEOD001's efficacy.

49. Prothena claimed that PRONTO, when combined with the ongoing Phase 1/2 study, could expedite NEOD001 approval: "[t]he PRONTO trial was designed to align with feedback from the European Medicines Agency ("EMA") related to The VITAL Amyloidosis Study, a global Phase 3 registration directed trial. When combined with data from the ongoing NEOD001 Phase 1/2 trial, the PRONTO trial has the potential to expedite patient access." Indeed, because PRONTO's primary endpoint was NT-proBNP "best response," a biomarker touted as a proxy for long-term survival, the study was scheduled to conclude before any anticipated readout on VITAL, which relied an event-based composite endpoint of all-cause mortality.

50. In other words, VITAL could take a long time to conclude because results were dependent on the death or hospitalization of study participants, whereas PRONTO, which relied on a biomarker as a proxy for survival, would conclude much sooner and on a defined timeline. Thus, so Prothena claimed, positive results on PRONTO could be used to support registration in Europe pursuant to unreleased "written feedback" that Prothena had received from the EMA. The FDA, on the other hand, had refused to validate NT-proBNP "best response" as a primary endpoint. PRONTO enrollment completed in March 2017, and was scheduled to readout in April 2018.

**E. NT-proBNP As a Surrogate Endpoint in AL Amyloidosis Trials**

51. In 2013, Prothena expanded its Phase 1 trial of NEOD001 to test for levels of NT-proBNP. NT-proBNP is a substance that is produced in the heart and released when the heart is stretched and working hard to pump blood. Tests for NT-proBNP measure the substance's levels in the blood and have historically been used to detect and evaluate heart failure. BNP was initially called brain natriuretic peptide because it was first found in brain tissue (and to distinguish it from a similar protein made in the atria, or upper chambers, of the heart, termed ANP). BNP is actually produced primarily by the left ventricle of the heart (the heart's main pumping chamber). It is associated with blood volume and pressure and with the work that the heart must do in pumping blood throughout the body. Small amounts of a precursor protein, pro-BNP, are continuously produced by the heart. Pro-BNP is then cleaved by the enzyme called corin to release the active hormone BNP and an inactive fragment, NT-proBNP, into the blood.

52. When the left ventricle of the heart is stretched, the concentrations of BNP and NT-proBNP produced can increase markedly. This situation indicates that the heart is working harder and having more trouble meeting the body's demands. This may occur with heart failure as well as with other diseases that affect the heart and circulatory system. Heart failure is a

somewhat misleading term. It does not mean that the heart has stopped working; it just means that it is not pumping blood as effectively as it should be. The increase in circulating NT-proBNP will reflect this diminished capacity.

53. NT-proBNP is also relevant to amyloidosis, and certain measures of NT-proBNP have been used to measure "response" to treatment and are generally believed to be positively correlated with increased overall survival. Numerous studies demonstrate that baseline NT-proBNP levels predict clinical outcomes in patients with newly diagnosed AL amyloidosis. In the context of interventional therapy, a number of independent studies have also established that the NT-proBNP "response," defined as a decrease in NT-proBNP of >30% and >300 ng/l in evaluable patients (those whose baseline NT-proBNP levels were ⩾650 ng/l), predicts clinical outcome and survival.[3] On the basis of these results, in 2012 the International Society of Amyloidosis established and validated NT-proBNP response as an indicator of organ response and as a surrogate marker of survival in AL amyloidosis. Thus, the international AL amyloidosis expert community is in agreement that NT-proBNP is analytically validated and clinically qualified as a biomarker for use as a surrogate end point for survival in patients with AL amyloidosis, and that both lowering NT-proBNP and achieving NT-proBNP response are treatment objectives.

54. NT-proBNP is biologically variable, meaning that its levels will naturally change from hour to hour, day to day, and week to week for any given individual. Because NT-proBNP is naturally variable from day-to-day, a clinically meaningful "response" that is positively correlated with survival is defined by the AL amyloidosis community as a decrease of >30% in

[3] Levels of NT-proBNP are generally measured in concentrations of nanograms per liter or ng/l. A nanogram is one billionth of a gram.

NT-proBNP levels from baseline.[4] Similarly, "progression" of the disease is defined as a 30% increase. Patients who do not "respond" or "progress" are considered stable, as reflected in the table below.

**For Patients with Baseline NT-proBNP ≥650 pg/mL**




55. Prothena's expanded Phase 1/2 Study incorporated a version of "response" as an exploratory endpoint in order to gain insight into the potential efficacy of NEOD001 as it relates to lowering NT-proBNP and achieving a "response." Prothena called its version of the latter metric "best response."

**F. Prothena Creates "Best Response" Metric**

56. On March 6, 2014, during a conference call to discuss Prothena's FY2013 financial results, in response to a question concerning potential Phase 2/3 study endpoints, Kinney (who was CSO at the time) observed that "the NT-proBNP is also something that's of interest. There is some data out there suggesting that it does seem to be associated with overall survival in the patient population. Obviously, we want to explore the different approaches, both as guided by the Phase 1 data, but then also with robust discussions with regulatory authorities, to make sure that we are on the same path and that the next study is a productive study."

---

[4] Specifically, a decrease in NT-proBNP of >30% and >300 ng/l in evaluable patients (those whose baseline NT-proBNP levels were ⩾650 ng/l), predicts clinical outcome and survival

57. Subsequently, on March 18, 2014, in a press release, Prothena announced that it would be presenting interim data on the Phase 1/2 study at the XIV International Symposium of Amyloidosis on April 29, 2014. The abstract, titled "Preliminary Cardiac Biomarker Responses Demonstrated in an Ongoing Phase I Study of NEOD001 in Patients With AL Amyloidosis and Persistent Organ Dysfunction" presented both dose response (a measure of the magnitude of the change in NT-proBNP levels based on the dosage administered) and a time series of levels of NT-proBNP for study participants. While presented in percentage form, the data nevertheless allowed investors some ability to independently assess the efficacy of NEOD001 by providing insight into whether NT-proBNP levels declined in proportion to the dose of NEOD001 administered and whether patients saw a sustained decrease in NT-proBNP levels. According to an analyst from Credit Suisse, the market was "disappointed by the lack of dose response and other issues that increase the risk" that the NEOD001 trials may fail.

58. As shown in the chart below, the concern regarding dose response was warranted, insofar as *lower* doses of NEOD001 were perceived to be associated with deeper cardiac "responses." In other words, because therapeutic effect is generally positively correlated with increased dosage (the more you take the stronger the response), the market was disappointed that NEOD001 did not exhibit such a correlation.

## NT-proBNP

- 9 patients had NT-proBNP levels ≥650 pg/mL at baseline and a post-baseline NT-proBNP determination

### Table 2. NT-proBNP % Change from Baseline by Visit in Patients with Baseline Value ≥650 pg/mL

>30% decrease of NT-proBNP | Stable | >30% increase of NT-proBNP | Discontinued

| Organ Involvement at Diagnosis | Best Hem Resp | Months Since Last PCD Tx | NEOD001, mg/kg | Predose Cycle | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 |
| Cardiac, renal | VGPR | <6 | 0.5 | -5.27 | -14.94 | -26.19 | -34.06 | -26.90 | -28.18 | DC | DC | DC | DC |
| Cardiac, renal | VGPR | >6 | 0.5 | -42.07 | -39.27 | -28.19 | -44.25 | -24.97 | -32.64 | -69.12 | -22.90 | 318.65[a] | 249.02[a] |
| Cardiac, renal | CR | <6 | 1.0 | -56.04 | -56.41 | -44.89 | -45.07 | -60.13 | -37.92 | -72.03 | -60.78 | -54.37 | |
| Renal | VGPR | >6 | 1.0 | -46.59 | -2.92 | -46.68 | -46.77 | -55.54 | DC | DC | DC | DC | DC |
| Cardiac, tongue | CR | <6 | 1.0 | -21.20 | -40.55[b] | -38.40[b] | -31.95[b] | 11.83 | -8.60 | -2.00 | -19.51 | | |
| Cardiac, renal | PR | <6 | 2.0 | 112.71 | 19.76 | 56.88 | 53.12 | DC | DC | DC | DC | DC | DC |
| Cardiac, renal | CR | <6 | 4.0 | 18.21 | -1.54 | 6.89 | -7.41 | 15.84 | | | | | |
| Cardiac | CR | <6 | 4.0 | 16.00 | 25.12 | -10.18 | -10.57 | | | | | | |
| Cardiac, GI | CR | <6 | 8.0 | -32.31 | 25.37 | | | | | | | | |

CR = complete response; DC = discontinued; GI = gastrointestinal; hem resp = hematologic response; PCD = plasma cell dyscrasia; PR = partial response, Tx = treatment; VGPR = very good partial response. Data as of 3/11/14, interim, unaudited data. [a]Intercurrent illness. Patient did not receive Cycle 11 or 12 doses. [b]Did not meet the requirement for "per-protocol" response, both a >30% decrease and >300 pg/mL decrease in NT-proBNP level.

59. Based on this "increase[d] risk" that analysts observed, Prothena's stock dropped by over 40% between April 28 and April 30, 2014. To stem the bleeding, Prothena scheduled a special call to discuss the interim data for May 2, 2014.

60. During the special call, Prothena management reframed the data to focus on "best response," dodging discussion of the lack of dose response and stating that of the 9 evaluable patients, 8 had a cardiac biomarker "response" or were stable, as illustrated in the chart presented by the Company below:




61. During the call, CSO Kinney explained with respect to NT-proBNP, that published research suggested "that levels of NT-proBNP at baseline are prognostic with respect to clinical outcomes and in fact, changes in NT-proBNP following intervention are also prognostic with respect to clinical outcomes." CSO Kinney added this "very stringent criteria," which was "developed by a consensus panel of AL experts," was being used in the Phase 1/2 Study and that "[o]f course this response criteria takes into account normal assay (variation due to testing sensitivity) and patient variability (natural variability as discussed above)." This spin was a far cry from statements just months earlier that "[t]here is some data out there suggesting that [NT-proBNP] does seem to be associated with overall survival," as CSO Kinney and Defendants had now embraced changes in NT-proBNP as a ***direct proxy*** of therapeutic effect. Significantly, this was the last time Prothena would present data that measured NT-proBNP levels over a given period of time for all study participants and on a patient-by-patient basis.

62. CSO Kinney also attempted to dispel concerns raised by an analyst during the question and answer portion of the call that the decline in NT-proBNP levels and the "response rate" were caused by recent plasma cell directed therapy as opposed to NEOD001. In response to these concerns, Kinney stated that "[i]t should be noted that somewhere between 15% to 30% of patients are known to be able to show a response on this type of cardiac biomarker following plasma cell directed therapy but when that happens it is generally thought that it tends to be very slow and gradual in progression. Thus the current data where we see a relatively rapid effect of onset as well as a relatively high magnitude of effect, would be somewhat inconsistent with an effect that was due entirely to a prior plasma cell directed therapy." In other words, CSO Kinney dismissed the allegedly positive results from the Phase 1/2 Study as attributable to prior treatment, further reinforcing the perception that NEOD001 was effective at lowering levels of NT-proBNP and achieving a "response."

63. Of the 18 patients on the study, CSO Kinney added that "nine patients were deemed evaluable for cardiac biomarker "response" as assessed by NT-proBNP. . . . Based on our ***best response analysis***, eight of these nine patients had a cardiac biomarker response or were considered stable. So when we looked at these data in total . . . ***we see very encouraging cardiac biomarker responses***. So based on this profile we feel that randomized placebo-controlled Phase 2/3 study are warranted in patients with AL amyloidosis particularly those who have cardiac involvement." This statement was echoed by the presentation released by Prothena that morning which concluded that based on the "response" observed to date that "randomized, placebo-controlled Phase II/III studies are warranted." The statements, which were repeated by Defendants throughout the Class Period, were false and misleading when made.

**G. Defendants' Use of "Best Response" Is Misleading and not Validated by the ALA Community**

64. To understand Defendants' false representations regarding NEOD001 and its prospects for approval, it is essential to distinguish between the three distinct components of the "best response" endpoint as employed by Prothena: first, Prothena measured changes in the biomarker, NT-proBNP; second, they defined "therapeutic response" as a >30% decline from pre-treatment (baseline) levels; third, if a patient had ***at least one*** measurement showing a drop >30% compared to baseline, the patient was counted among the therapeutic responders ***regardless*** of what subsequent measurements indicated about NT-proBNP levels.

65. Indeed, during the Class Period, Prothena focused considerable amounts of attention on the first two components above, i.e. the validity of the NT-proBNP biomarker and the use of >30% reduction in NT-proBNP to define "best response." As Prothena correctly pointed out, and as discussed above, there is a widespread consensus in the AL amyloidosis research community that NT-proBNP levels are a reliable biological indicator of disease status and that ***sustained*** reduction of >30% in NT-proBNP is a clinically meaningful level of improvement. But the use of this measure with "best response" was not widely accepted in the medical community for the reason noted below.

66. Specifically, as a result of the use of "best response," a patient who at any single point of time had a >30% NT-proBNP decline met Prothena's criteria ***without respect to where these levels stand at any other point in a trial*** that featured an average of 12 measurements. This construction is not supported by the AL amyloidosis community and has not been shown to correspond with a meaningful clinical benefit. As such, the claim repeatedly asserted by Defendants that NEOD001 Phase 1/2 trial results "compare favorably" with results of past

studies and similar statements are misleading because ***none of the prior studies employed best response***.

67. While "best response" has sometimes been used in oncology settings, it has not been generally adopted by the AL amyloidosis community as a primary endpoint. Even in oncology settings, when best response is used, it is either in the context of "time to best response" (e.g. "best response [was reached] after an average of 4 months) or as a way of measuring peak status (e.g. "the best response for 60% of patients was a very good partial response"). In short, appropriate uses for best response are to measure the magnitude of a response or the length of time required to achieve it. Defendants did not use best response in this way.

68. Understanding Prothena's misleading use of "best response" also requires an understanding of the natural variability of NT-proBNP and its comparably larger impact on a metric that relies on multiple measurements (best response) as opposed to a single measurement after a predefined amount of time (response, as used in the clinical literature). If NT-proBNP were highly variable, then measurements at a naturally occurring trough in NT-proBNP levels could trigger a "best response" (triggered off of every measurement), even if the average levels of NT-proBNP during treatment were much higher than those during temporary trough.

**(a) Natural Variability of NT-proBNP Levels Renders "Best Response" a Misleading Efficacy Indicator**

69. Biological variability is the natural variability in a lab parameter due to physiological differences among subjects and within the same subject over time. The natural variability of NT-proBNP is a known issue in the medical community. By 2003, for example, BNP/NT-proBNP's natural variability was acknowledged as a confounding feature in clinical

trials (e.g. etanercept, carvedilol, ACE inhibitors).[5] While a widely cited 2003 paper[6] measured NT-proBNP's biological variability at 9.1% over a period of 17 days, a second study published in 2003 and studies published during the Class Period concluded that the natural variability of NT-proBNP is significantly higher. For example, a study by Dr. Bruins investigating NT-proBNP levels in 43 congestive heart failure patients at different points in time over six weeks found natural, intrapatient variation of 8.6% over a 2-hour period, 20% over a 24-hour period, and 35% over a 7-day period.[7] Bruins estimated reference-change values for these periods at 25%, 55%, and 98%, respectively. **In other words, if NT-proBNP were measured 7 days apart, it would have to change by at least 98% for the result to be clinically meaningful.**

70. Figure 1 below shows the results of studies published prior to and during the Class Period exploring NT-proBNP intrapatient variability over time.




[5] *See* Wu 2003 at 630.

[6] Melzi 2003.

[7] *See* 2004 Clinical Chemistry article by Bruins.

71. Defendants both explicitly and implicitly acknowledged that they relied on the *Melzi* study for their assumption that the natural variability of NT-proBNP was 9.1%. For example, on January 10, 2018, at the J.P. Morgan Healthcare Conference, in direct response to a question about the natural variability of NT-proBNP, Nguyen stated that "some of the work that Merlini and Palladini have done out of the Italian group out of Pavia – Pavia out of Italy group was that intra-patient variability, about 9.1% is what they came up with."[8] However, this result is a cherry-picked outlier from other contemporaneous studies addressing the natural variability of NT-proBNP over time, as other studies on the issue found a natural variability that was at least double that of the study relied on by Defendants.

72. Defendants' cherry-picked assumption concerning NT-proBNP's natural variability had a profound impact on Prothena's use of "best response." The chart below shows the likelihood that a change of >30% on a single test is attributable to random variation in NT-proBNP based on hypothetical levels of variability.[9] If the true level of variability is 9.1%, then the probability that a single-test change of >30% would be attributable to random chance is only 0.05%. However, if the true level of variability is 30%, then the probability that a single test change of >30% would be attributable to random chance is 15.9%, or 325 times more likely per test, and the probability would be substantially greater with multiple tests. Specifically with a 15.9% per-test probability of showing a decline of >30% and 12 tests (the average number of per-patient post-treatment NT-proBNP readings in the Phase 1/2 study), **the mathematical probability of a single patient achieving response on at least one test over the duration of the trial would be 87.5%.**

[8] Nguyen was referring to Melzi (2003), which is the only study to find a natural variability of 9.1%.

[9] Assumes the intrapatient change in NT-proBNP is normally distributed.




73. Indeed the implied level of natural variability required to arrive at a randomly generated 53% response rate, which Prothena touted relative to its Phase 1/2 study results, is approximately 19.4% - - ***more than double*** the natural variability touted by Defendants during the Class Period. And, as admitted by Defendant Nguyen at the January 10, 2018, JP Morgan Conference, "if [NT-proBNP] was ultimately, extremely variable, I think that wouldn't be a great link in terms of NT-proBNP predicting survival."[10]

**(b) NT-proBNP "Best Response" Was Never Adopted by the ALA Community**

74. Defendants repeatedly affirmed that NT-proBNP "best response" was adopted and validated by the AL amyloidosis community. These statements were false. A thorough review of published research and guidance published by regulatory authorities and interest

[10] Numerous studies addressing the natural variability of NT-proBNP found substantially higher levels of natural variability in NT-proBNP levels (average 30.2%, range 21% to 35%) than those advanced by Defendant Nguyen. *See* Wu 2003, Bruins 2004, Schou 2007, O'Hanlon 2007, Fahim 2015.

groups finds no discussion of the "best response" endpoint.[11] Further, no AL amyloidosis clinical trial has used NT-proBNP "best response" as a primary endpoint.[12]

75. Despite the fact that best response was not used in AL amyloidosis research prior to publication of the NEOD001 Phase 1/2 trial results, Prothena asserted that it was an accepted endpoint in the field. Even Dr. Gertz of the Mayo Clinic reassured investors at Prothena's R&D Day that the "consensus response" was being applied, stating that "the PRONTO study's primary endpoint was "defined by the consensus criteria that measures a change in NT-proBNP." In October 2015, Kinney stated, "I think we were further encouraged along the way when we see groups like the Amyloidosis Research Consortium also supporting the use of this endpoint in a regulatory environment."[13] Similarly, Kinney stated that Prothena was applying "a widely validated functional cardiac biomarker" on October 15, 2015; "the consensus criteria of NT-proBNP change" on July 5, 2016; the "international consensus criteria for cardiac response" on July 12, 2016; the "international consensus criteria that are in the field" on August 16, 2016; the "consensus criteria for what would constitute a quote unquote cardiac response" on September 7, 2016; "[t]he consensus criteria" on March 21, 2017; "the consensus criteria, which is largely

---

[11] *See* Guidance for Industry: AL Amyloidosis — Developing Drugs for Treatment," a December 2016 document resulting from a collaboration between the US Food and Drug Administration and the Amyloidosis Research Consortium; Merlini, et al., Rationale, application and clinical qualification for NT-proBNP as a surrogate end point in pivotal clinical trials in patients with AL amyloidosis. Leukemia (2016) 30, 1979–1986; Comenzo, et al., Consensus guidelines for the conduct and reporting of clinical trials in systemic light-chain amyloidosis. Leukemia (2012) 26, 2317–2325. None of these sources, or the sources they rely on, use "best response."

[12] Search conducted in November 2018. A list of NCT numbers was developed either through a direct search for interventional Phase 1, 2, or 3 trials in AL amyloidosis at clinicaltrials.gov or through review of medical literature. An unduplicated list of NCT numbers, based on the method by which they were first identified is: Literature: NCT01659658, NCT01807286, NCT01864018, NCT02207556, NCT02245867, **NCT02312206**, NCT02545907, **NCT02632786**, NCT02816476, NCT02841033, NCT03000660, NCT03044353, **NCT03168906**, NCT03201965, NCT03236792, NCT03474458; Direct search: NCT02590588, NCT02909036, NCT01083316, NCT03252600, NCT00091260, NCT00607581, NCT02994784, NCT01789242, **NCT01707264**, NCT01318902, **NCT02613182**, NCT03315026, **NCT03154047**, NCT01222260, NCT01570387. Trials in bold are NEOD001 studies.

[13] Prothena Corporation PLC Conference Call to Discuss NEOD001 Clinical Development Update. October 15, 2015.

biomarker based" on May 3, 2017; "a cardiac consensus response" on November 8, 2017; and the "consensus criteria that measure a change in NT-proBNP" on February 14, 2018.

76. Prothena changed its tune only on April 23, 2018, when it announced the PRONTO results and the discontinuation of NEOD001 development, referring to the "best response" measurement as a "***modified*** consensus criteria" in its public statements for the first time.

### (c) Defendants Made Misleading Comparative Statements with Prior AL Amyloidosis Studies That Did Not Employ "Best Response"

77. No historical AL amyloidosis clinical trial featured a "best response" primary endpoint. Despite this, Defendants drew comparisons between results of the NEOD001 Phase 1/2 study and prior research in Company-sponsored and published materials. These comparisons were of two types, both of which are materially misleading. First, results of prior research were discussed alongside NEOD001 results without disclosing that the historical comparator did not use a "best response." Second, Prothena made demonstrably false statements by explicitly stating that the comparator used "best response."

78. For example, in a press release on July 5, 2016, Prothena stated, "***These cardiac best response rates compare favorably to cardiac response rates of 0% to 15% from available published historical*** data in patients previously-treated with plasma cell directed therapy (Palladini et al, Haematologica, 2013; Dispenzieri et al, Blood, 2012), and are consistent with the best response rate of 57% or 8 of 14 cardiac-evaluable patients reported in the interim analysis of the dose-escalation phase (n=27) of the NEOD001 Phase 1/2 study published in the Journal of Clinical Oncology."

79. Similarly, in a February 9, 2016, press release Prothena announced that interim data from its Phase 1/2 clinical study of NEOD001 in patients with AL Amyloidosis and

persistent organ dysfunction had been published in the Journal of Clinical Oncology. The press release elaborated that "57 percent [of evaluable cardiac patients] met the criteria for cardiac response, which compares favorably to ***the expected cardiac best response rate of 26.5 percent from historical data*** in patients treated solely with off-label standard of care (Comenzo, et al., Leukemia. 2012; 26:2317-2325)" This statement, and statements similar to it made during the Class Period, are demonstrably false. Indeed, the purported support cited by Prothena reported results taken at a single point in time (6 months), not a cherry-picked "best response" over an average of 12 tests.

80. These false comparisons also pervade Prothena's SEC filings. For example, Prothena's Annual Report on Form 10-K filed on February 25, 2016 , states that the "57.1% cardiac best response rate ***compares favorably with the expected cardiac best response rate of a 26.5% from historical data*** in patients treated solely with off-label standard of care (Comenzo, et al., Leukemia. 2012; 26:2317-2325)," and its Annual Report on Form 10-K filed on February 24, 2017 cited even lower "historical" response rates, stating, "These cardiac best response rates ***compared favorably to cardiac response rates of 0% to 15% from available published historical data*** in patients previously treated with plasma cell directed therapy."

81. The false comparisons were also made during Prothena's calls with investors. For example, CEO Schenk stated in December 2014: "we next compared these results to historical published data of NT-proBNP change, ***using the same response criteria in patients with AL amyloidosis who receive standard of care*** . . . You can see that the 50% cardiac response rate in NEOD001-treated patients ***compares favorably to the 26.5% response rate one would expect based on historical data*** . . . ." Similarly, on October 15, 2015, Schenk publicly stated that

"***These best response rates for both renal and cardiac evaluable patients were more than double the published historical rates reported in multiple AL amyloidosis studies***."

82. In sum, Defendants made misleading comparisons of NEOD001's "best response" rate to prior studies, failed to disclose or affirmatively misrepresented that those studies evaluated patient response after a specified period of time (as opposed to a "best response"), and knowingly or recklessly disregarded NT-proBNP's high natural variability and its impact on the validity of "best response" as a clinically meaningful endpoint. Therefore, Defendants' statements concerning the "favorable" Phase 1/2 results and other statements touting the Phase 1/2 trial as a strong predicate for the launch and likely success of the Phase 2b PRONTO study and Phase 3 VITAL study were false and misleading when made.

**(d) Defendants Also Dismissed the Impact of Prior Therapy on NT-proBNP Levels**

83. Defendants' Class Period marketing campaign to promote their "best response" analysis and false comparisons to published response rates also ignored other potential confounding factors, such as the impact of prior treatment on levels of NT-proBNP. Prothena reported that patients in its Phase 1/2 trial tended to achieve cardiac response within a short period after entering the trial. In discussing initial interim results of the Phase 1/2 trials, then-CEO Schenk reported that "of the five responders, four responded after the first dose of NEOD001, which is quite encouraging." Separately, an article covering final results of the Phase 1/2 trial reported that "[t]he median time since last [plasma cell direct] treatment to the start of NEOD001 intervention for all patients was 6.5 (range, 0.6-85.8) months and the median time to first cardiac response after NEOD001 treatment for all cardiac responders was 2 months." In effect, Prothena bolstered the perception that NEOD001 was effective by diminishing the likelihood that declines in NT-proBNP were the result of prior treatment.

84. However, in touting these results as "encouraging," Defendants ignored the large body of evidence demonstrating that patients experience sharp increases in NT-proBNP levels following initiation of PCD therapy and that these levels subside on their own, with NT-proBNP typically falling below baseline levels after 12 months. This phenomenon is supported by extensive research, such that it was already referred to as "well described" by 2012, prior to initiation of Prothena's Phase 1/2 study.[14] As a result, there was a significant risk that the reductions in NT-proBNP described by Prothena in its presentation of the Phase 1/2 results could be attributed to therapeutic response when, in fact, it was simply a known decline from a pre-NEOD001 treatment-induced peak.

85. As summarized by the authors of one study, "***NT-proBNP, as a primary end point, measure[d] too early has potential for giving false negative results as a trial end point***."[15] The therapeutically induced, transient increase in NT-proBNP even led authors of another study to question the biomarker's reliability in determining cardiac response in AL amyloidosis, observing that their "data suggest that the proposed system of NT-proBNP response as a measure of cardiac response ***may not be valid for patients treated with [immune modulatory drug therapy]***".[16] Based on similar principles, the EMA has explicitly banned the use of NT-proBNP and similar biomarkers as a surrogate primary endpoint in Phase 3 clinical trials in CHF.[17]

---

[14] Kastritis, E., et al., A phase 1/2 study of lenalidomide with low-dose oral cyclophosphamide and low-dose dexamethasone (RdC) in AL amyloidosis. Blood 2012 119: 5384-5390.

[15] Wechalekar, A., et al., Challenges of Using NT-ProBNP for Response Assessment in Systemic AL Amyloidosis. Blood Volume 128(22):4511-4511, December 2, 2016.

[16] Dispenzieri, A., et al., Discordance between serum cardiac biomarker and immunoglobulin-free light-chain response in patients with immunoglobulin light-chain amyloidosis treated with immune modulatory drugs. American Journal of Hematology October, 2010.

[17] European Medicines Agency, Guideline on clinical investigation of medicinal products for the treatment of chronic heart failure at 4.1.6 ("In epidemiological studies several biomarkers (neuroendocrine, renal, and cardiac) have been shown to be independent predictors of the clinical outcome in patients with CHF, however ***none has been***

86. Indeed, a transient, post-therapeutic rise in NT-proBNP has been reported in at least seven different articles in prominent medical publications published prior to or during Prothena's Phase 1/2 trial. In each case, the research found an increase in NT-proBNP after initiation of therapy and at least three of the studies also reported an eventual decline in NT-proBNP following treatment.

| Study | Author, Year | Key Findings |
|---|---|---|
| 1 | Dispenzieri, A., et al., Discordance between serum cardiac biomarker and immunoglobulin-free light-chain response in patients with immunoglobulin light-chain amyloidosis treated with immune modulatory drugs. American Journal of Hematology October 2010 | Fifty-eight percent of patients on immune-modulatory therapy experienced an increase of >30% compared to baseline. |
| 2 | Gibbs, S., et al., Transient Post Chemotherapy Rise in NT Pro-BNP in AL Amyloidosis : Implications for Organ Response Assessment. Blood 2009 | "***A rise in NT Pro-BNP from baseline was seen in 36 (71%) patients at 6 months***. The median NT pro-BNP increased from a baseline of 106pmol/L at 0 months to 194pmol/L at 6 months (median increase of 163pmol/L; p = 0.0001). ***A subsequent fall in their NT Pro-BNP levels was seen at 12 months in 33 (92%) of these patients*** to a median NT Pro-BNP value of 92pmol/L (median fall 157pmol/L; p = <0.0001). In 21 (64%) patients, the fall was to below diagnostic levels.<br>In conclusion, this series ***clearly shows that NT Pro-BNP values can rise transiently in the immediate post chemotherapy period*** in nearly three-quarters of patients with a complete FLC response…This rise is not associated with decline in cardiac function on echocardiography nor is it related to worsening renal function. It does not impact the rate of clonal relapse or overall survival." ***This important but transient phenomenon can confound interpretation of treatment response***. |
| 3 | Kastritis, E., et al., A phase 1/2 study | "***A transient increase of NT-proBNP was*** |

***shown to be a reliable surrogate for clinical outcomes in the context of therapeutic interventions***. To this end, biomarkers cannot be included as primary endpoints in phase III clinical trials in CHF") available at https://www.ema.europa.eu/en/documents/scientific-guideline/guideline-clinical-investigation-medicinal-products-treatment-chronic-heart-failure-revision-2_en.pdf.

| Study | Author, Year | Key Findings |
|---|---|---|
| | of lenalidomide with low-dose oral cyclophosphamide and low-dose dexamethasone (RdC) in AL amyloidosis. Blood 2012 119: 5384-5390 | ***observed both in patients with no overt cardiac involvement and in patients with cardiac involvement***. Most patients with very high levels of NT-proBNP went off study before the sixth cycle of RdC, partly explaining the decrease in NT-proBNP after cycle 3; however, ***even among patients with significantly elevated NT-proBNP who received at least 6 cycles, an increase of NT-proBNP followed by a decrease toward baseline levels was also observed***." |
| 4 | Palladini, G., et al., A Phase II Trial of Cyclophosphamide, Lenalidomide and Dexamethasone (CLD) in Previously Treated Patients with AL Amyloidosis. Blood 2009 114:2863 ("Palladini 2009) (This is an earlier report on the same trial (NCT00607581) that appears in Palladini, Haematologica 2013). | Seventy percent of patients, including ***all patients with cardiac involvement, experienced an increase of >30% from baseline***. The median increase after Cycle 1 was 220% |
| 5 | Palladini, G., et al., A phase II trial of cyclophosphamide, lenalidomide and dexamethasone in previously treated patients with AL amyloidosis ("Palladini 2013"). Haematologica Mar 2013. (This covers the same trial (NCT00607581) as Palladini, Blood 2009)). | "Overall, ***a median 138% increase in NT-proBNP was observed after cycle 1, and NT-proBNP remained elevated compared to baseline throughout lenalidomide administration***. This was independent from changes in eGFR. The only baseline variable associated with NT-proBNP increase was heart involvement (median 256% vs. 97%, P=0.001)…***it should be kept in mind that in patients treated with IMiDs the assessment of organ response is hampered by the effect of therapy on markers of cardiac and renal function***." |
| 8 | Tapan, U., et al., Increases in B-type natriuretic peptide (BNP) during treatment with lenalidomide in AL amyloidosis. Blood 2010 116:5071-5072 | ***Eighty-six percent of patients had >30% increase in BNP level from baseline***: in 68% of patients, the increase occurred after Cycle 1 of lenalidomide; an additional 18% of patients experienced the increase after Cycle 3. |
| 7 | Wechalekar, A., et al., Challenges of Using NT-Probnp for Response Assessment in Systemic AL Amyloidosis. Blood Volume 128(22):4511-4511, December 2, 2016 | "The median NT-proBNP at baseline (for the response assessable group n=204) was 2669 ng/L. ***At six months, the median NT-proBNP had increased significantly*** to a median 3258ng/L (p<0.0001). ***At 12 months, there was a significant decrease*** in the NT-proBNP to a median of 2097 pMol/L (p=0.014)." |

87. Of these seven studies, two reported NT-proBNP levels at baseline (i.e. just prior to initiation of PCD therapy), then at 6- and 12-months post therapy. Their results clearly demonstrate the transient increase in NT-proBNP and are highlighted in the figure below.




88. Specifically, these studies reported sharp increases in NT-proBNP six months after the start of therapy (22% and 83%), followed by steep declines after 12 months (-36% and -53% relative to 6-month measurements). In the context of Prothena's "best response" analysis, any patient experiencing NT-proBNP declines of equivalent magnitude would have been counted as a cardiac responder in the Phase 1/2 trial, despite the fact that this "response" was nothing more than a waning effect of prior therapy. Further, the studies reflected in the chart reflect an NT-proBNP measurement at specific points in time in contrast to Prothena's "best response" endpoint, which classified patients as responders if they experienced ***a single NT-proBNP decline of >30% at any point during the trial.***

89. Instead of directly addressing questions by analysts about potential post-treatment non-NEOD001 related declines in NT-proBNP, Prothena instead proposed misleading justifications which it claimed "derisked" the Phase 2B and Phase 3 trials. For example, in an October 15, 2015 investor conference call, Maryana Breitman of UBS inquired about "this concern that some of the [key opinion leaders] are thinking that there may be some effect from the previous treatment" and asked whether PRTA thought the study was "powered sufficiently to differentiate between the prior treatment and the effect of NEOD001?" To which Kinney responded: ". . . if you looked at the different parameters with respect to hematologic response, either degree of hematologic response, time since hematologic response, there's nothing really in the Phase 1/2 data set that suggests that prior hematologic response to treatment had any impact on responding at the organ level following treatment with NT-proBNP. . . . ***quite frankly, we think that's pretty de-risked at this point***, in any event."

90. Separately in a January 10, 2018, investor conference call, Kinney noted that Prothena had reviewed "lots of data" on the issue, stating that, "I think the other thing that we saw in Phase I/II, ***we had done some work to at least give us assurance that the prior chemotherapy that patients had received wasn't contributing to the response profile we saw in NEOD001. We have lots of data that speaks to the fact that, that's unlikely to be the case***." Despite the issue being "derisked," Kinney nevertheless conceded that Prothena introduced a specific washout period in PRONTO that did not exist in the Phase 1/2 trial. In other words, Prothena conditioned eligibility in PRONTO on patients having received ***no*** treatment for at least 6 months prior to entering the study.

91. The market was reassured by Defendants' repeated assurances that the impact of prior treatment on levels of NT-proBNP had been reviewed and, on the basis of the data

reviewed by Prothena, "derisked," with a BTIG Equity research analyst noting in August of 2017 that "[i]nvestor concern has occasionally been raised with regard to [NEOD]001 as to what might be the response due to the residual effects from [treatment], since this was not a placebo-controlled trial, but given what appears to be a rapid, generally sustained, and consistent response, we believe these results are very encouraging."[18]

### H. Defendants Are Confronted With But Conceal Their Best Response Concerns

92. On two separate occasions analysts confronted Defendants with flaws in the design and presentation of the Phase 1/2 study data, specifically alleging that Prothena's "best response" metric was not a reliable indicator of efficacy and did not "derisk" the PRONTO and VITAL studies.

#### (a) The Muddy Waters Report

93. On June 29, 2017, Muddy Waters published a report calling into question the efficacy of NEOD001 and alleging that "[t]he NEOD001 'Best Response Analysis' is misleading . . . as to efficacy, and . . . has led to undue optimism about the drug." The report also stated that "the improvements in biomarker levels could be attributable to PCD therapy, rather than NEOD001," and urged Prothena to release data by individual patient so that investors could better analyze the timing of organ responses, "and have a better basis to judge efficacy."

94. Specifically, the report alleged that the presentation of a biomarker's "best response" was "questionable" because it "measures the largest biomarker improvement (if any) a patient had during the trial . . . [and] does not establish that the patient's biomarkers consistently improved, nor that the patient had a positive overall outcome. The corollary to this issue is that it is showing changes in NT-proBNP levels, and . . . NT-proBNP can change substantially from

---

[18] Hazlett, R., Prothena Corporation PLC: 2Q Shows Progress withPRX002 in Parkinson's and with NEOD001 in VITAL, Setting Up an Eventful 2018. BTIG Equity Research August 10, 2017

day-to-day for these patients due various factors." In a useful analogy, the Muddy Waters report stated, "We think of the Best Response Analysis as akin to extrapolating that former Major League Baseball journeyman Mark Whiten should be inducted into the Hall of Fame based on the one game in which he hit four home runs and 12 RBIs." The report urged Prothena to "release NT-proBNP levels for each patient in the cohort over the life of the study" to appease these investor concerns.

95. The Muddy Waters report also expressed concern over the fact that Phase 1/2 data failed to demonstrate a dose response, stating, "there was no correlation between response and dose size – if anything, the relationship appears to be almost inversely correlated in that the patients at lower dosages seem to have responded better than the patients at higher dosages." The report concluded by raising concerns about Prothena's unwillingness to release individual patient trial data in light of Defendants' "consistent share selling (down to effectively no ownership)" and the $275 million in equity offerings the Company made during the Class Period. *See* Section VI.C, *infra*.

96. Instead of directly addressing these concerns or releasing the data requested by Muddy Watters, Kinney and Nguyen instead participated in a series of investor meetings hosted by Barclays where they continued to tout the potential use of PRONTO, which used "best response" as its primary endpoint, to support filing in the US in addition to the EU. These statements led Barclay's analysts to state on June 30, 2017, that "we got a sense that the changing environment at FDA has ***increased optimism that PRONTO could potentially suffice for accelerated approval***. PRONTO continues to be sufficient for filing in the EU. The company has prioritized commercialization in Europe, as 'D001 approval is likely to occur OUS [outside the United States] first."

97. Indeed, in a September 14, 2017, report published by RBC, analysts continued to "anticipate success in two upcoming binary catalysts for lead asset NEOD001 in AL Amyloidosis. . . . We see NEOD001's 53% cardiac organ response rate as 25% - 30% above what could be expected in a bestcase scenario for standard of care (SoC) plasma cell-directed therapies (PCDTs) and suggestive of a positive outcome based on study powering." Similarly, in line with Defendants misleading statements, in a report published on September 19, 2017, analysts at SunTrust continued to conflate "response" and "best response" in their assessment of the Phase 1/2 data, stating that "the Amyloidosis Research Consortium (ARC) advocated for the use of NT-proBNP as a surrogate primary endpoint in AL amyloidosis studies in a draft guidance that the organization submitted to the FDA in December 2016 . . . [W]e believe PRTA will continue collecting incremental clinical evidence to support NT-proBNP as a surrogate endpoint and that ARC's effort in educating the FDA could benefit NEOD001's regulatory timeline in the U.S."

98. Similarly, in a report on October 22, 2017, by Deutsche Bank following meetings with Prothena management, analysts "[came] away with renewed confidence" because they believed that "management has done well to frame the prior Phase 1/2 data as sufficiently de-risking to the PRONTO study." The report elaborated that "[w]ith the PRONTO trial focusing on a biomarker (vs. outcomes for the VITAL study), ***given the robust responses observed in the earlier study, as well as compelling posthoc analysis***, which further clarify responses as being driven by active therapy (vs. prior treatment), we maintain a favorable view heading into the pivotal read-out."

**(b) The Kerrisdale Report**

99. On November 8, 2017, Kerrisdale Capital published a report ("Kerrisdale Report)"entitled *Prothena Corp. PLC (PRTA) The Next Big Biotech Blow-Up*. The Kerrisdale

Report expanded on criticism of the "best response" endpoint, alleged that 'positive' data from the Phase 1/2 Study presented to investors and analysts was distorted and misleading, and criticized Defendants' narrowed disclosure of Phase 1/2 data. The Kerrisdale Report specifically highlighted, based on interviews with practitioners, clinical investigators, and specifically the "NEOD001 Principal Investigator," the high natural variability of NT-proBNP and the resulting unreliability of "best response" as a primary endpoint. The Kerrisdale Report also discussed how Defendants misleadingly compared NEOD001's "best response" data with that of historical NT-proBNP scholarly article data.

100. Kerrsidale's concerns were noted by market analysts. For example, a November 9, 2017 Oppenheimer analyst report (issued after the Kerrsidale Report) stated, "Investors are concerned about the use of the biomarker NT-proBNP as a surrogate marker of efficacy of NEOD001." However, Defendants continued to issue additional false and/or misleading statements throughout the remainder of the Class Period and sought to reassure the market about the NEOD001 results. For example, on November 16, 2017, Prothena hosted a "R&D Day" for analysts and investors in which it touted the NT-proBNP "best response" benchmark and the "derisking" of the PRONTO study. Later that day, RBC issued a report in which it concluded that there was 75% chance of NEOD001 being commercialized and assigned a price target of $83.00 – only a $4 reduction from its price target prior to the Kerrisdale report.

101. Following the conference, Deutsche Bank stated in a November 17, 2017 analyst report that it "c[a]me away with renewed confidence that the company remains a top pick in mid-cap biotech" and, "Overall, we felt management did a thorough job outlining key aspects of what drives the confidence and rationale for both NEOD001, as well as the PRONTO and VITAL trial design." Deutsche Bank reiterated its $78.00 price target. Jefferies on November 17, 2017 wrote

that while "There's been some increasing debate recently on the stock, . . ." "we don't think anything has changed fundamentally and it represents attractive risk/reward going into the pivotal Phase II PRONTO data in Spring (Q2-18) which can support an accelerated EU filing." Jeffries reiterated its $100 price target.

**I. Defendants Quietly Amend PRONTO's Secondary Endpoint Over Doubts Concerning Use of "Best Response"**

102. Many on the PRONTO steering committee, including Dr. Morie Gertz (Mayo Clinic), Dr. Raymond Comenzo (Tufts), and other top amyloidosis experts, suggested that sloping would have been a better endpoint and questioned the decision to go with best response during the trials.[19] In fact, the Steering Committee as a whole was mildly skeptical of best response as an endpoint and made recommendations to amend the trial design to include a slope analysis.

103. Without public disclosure, on October 22, 2017, Prothena quietly made a "substantial" amendment to PRONTO by adding a new secondary endpoint of "NT-proBNP slope over 12 months of treatment." This secondary endpoint would be used to track the rate of change in NT-proBNP from baseline through 12 months of treatment. This substantial amendment, which was recommended by the experts on the PRONTO steering committee, effectively adopted the suggestion in the Muddy Waters and Kerrisdale reports to "look[] for sustained decline in NT-proBNP" as opposed to the cherry-picked "best response" metric created by Defendants. The fact that the new secondary endpoint was quietly adopted mid-trial by a steering committee skeptical of the primary "best response" endpoint provides further substantiation about the dubiousness of the "best response" measure. This is because substantial

[19] A slope analysis would present the rate of change in NT-proBNP over time. The slope measure ultimately adopted in PRONTO was measured in ng/L per infusion. In other words, the slope measured the absolute change in NT-proBNP per infusion of NEOD001 over a period of 12 months.

amendments to trial endpoints while the trial is underway run the risk of introducing bias into trial results.

104. Indeed, a fundamental principle in the design of randomized trials involves setting out ***in advance*** the endpoints that will be assessed in the trial, as failure to prespecify endpoints can introduce bias into a trial and creates opportunities for manipulation. Sometimes new information may come to light that could merit changes to endpoints during the course of a trial. This new information might include, for example, results from other trials or identification of better biomarkers or surrogate outcome measures.[20] Here, PRONTO's steering committee was composed of treating physicians, such as Dr. Gertz, conducting the PRONTO trial, who had access to trial data, among others on the steering committee. Where the decision to change the endpoint is not independent of the trial data, then "cherry-picking" is a serious concern. New endpoints may be selected because they displayed a trend towards significance, while other candidate endpoints may have been examined but not selected or reported because they failed to display a desirable trend; this increases the chance of false positive (type 1) errors. As the literature explains on this topic, to avoid bias, "[a]ppropriate decision makers should have no knowledge of the endpoint (or related trial data) results." Indeed, any impressions that the investigators may have of the trial to date may influence decisions regarding changes in endpoints. For example, investigators may have a "sense" of the endpoint result or a related variable even though formal analysis of the endpoint has not been conducted. An investigator may notice changes in certain patients at his or her site and may attribute these changes to the investigational medication. For these reasons, study sponsors, investigators, and DMCs may not

[20] Scott Evans, *When and How Can Endpoints Be Changed after Initiation of a Randomized Clinical Trial?*, PLoS Clin Trials. 2007 Apr; 2(4): e18.

be appropriate decision makers for endpoint revisions, and were certainly not appropriate decision makers here for the "substantial" amendment made to PRONTO.

### J. PRONTO and VITAL Data Contradicted Defendants' Positive Statements Concerning NEOD001's Approval Prospects

105. Defendants had real time access to blinded data from PRONTO and VITAL and performed a recurring analysis of blinded PRONTO data of "best response NT-proBNP" versus non-responsive patients, and graphed levels of NT-proBNP over time for these two groups. The results were "undifferentiated," with no change from the baseline NT-proBNP levels. In other words, when Defendants grouped patients that achieved a "best response" (presumably the group showing a therapeutic effect from NEOD001) and patients that did not achieve a "best response," (presumably the group not showing a therapeutic effect from NEOD001) there was no discernible difference in the levels of NT-proBNP for those two patients groups, putting the lie to the Defendants' use of "best response" generally. The blinded PRONTO data and analysis therefore would have strongly suggested that NEOD001 was not successful at reducing levels of NEOD001. Thus, Defendants were at least extremely reckless in continuing to make statements concerning NEOD001's approval prospects and the "derisked" nature of the PRONTO and VITAL studies.

### K. Defendants Knew or Should Have Known that "Best Response" Was Misleading and that NEOD001 Was Not Effective

106. The PRONTO trial results published by Prothena on the final day of the Class show that the placebo arm had a "best response" rate of 47.6% and an average increase of 81.42 ng/L per infusion in NT-proBNP over 12 months compared with the NEOD001 arm's "best response" rate of 39.4% and average increase of 9.80 ng/L per infusion in NT-proBNP over 12 months. In other words, the placebo arm's "best response rate" exceeded that of the treatment arm, and both the placebo and treatment arms of the study showed an average increase in NT-

proBNP per infusion. While the treatment arm showed an average increase in NT-proBNP that was less than that of the placebo arm, the difference was not statistically significant.

107. Given these results, and Defendants' access to blinded study data, it is particularly significant that Defendants amended PRONTO's secondary endpoints on or about October 22, 2017, to include "NT-proBNP Slope" as an additional secondary endpoint approximately 7 months after completion of enrollment. As discussed above, the amendment to the study aligns with the "response" rate approach actually employed in prior published literature to which Defendants falsely compared their Phase 1/2 Study "best response" rate, and would have potentially provided an alternative ground for approval where "best responders" were concentrated in the placebo group, which exhibited an average increase in NT-proBNP levels that was *higher* than the average increase in NT-proBNP levels in the treatment group.

108. Further, Defendants must have known that PRONTO would fail to meet its primary "best response" endpoint based on their review of blended (blinded) PRONTO and "best response" rates. First, Defendants stated that NEOD001 could be expected to induce a "best response" rate of approximately 50% based on the Phase 1/2 data. Second, Defendants stated that the expected best response rate from the published literature was between 0% and 15% percent. Thus, where subjects were assigned evenly between the placebo and treatment arms in PRONTO, the expected blended best response rate should have been the midpoint between the expected best response rate in the treatment arm and the expected best response rate in the placebo arm, or approximately 32.5%. Thus, Defendants would have expected to see a blended (blinded) best response rate approaching 32.5% quickly, as Defendants frequently stated based on the Phase 1/2 data that NEOD001 had a "relatively rapid effect of onset."

109. However, the PRONTO results show that placebo had a "best response" rate of 47.6% compared with NEOD001's "best response" rate of 39.4%, for a blended (blinded) best response rate of approximately 43.5%. The conclusion to be drawn from these results on a blinded basis is that Defendants had access to data from PRONTO that inexorably suggested that the placebo group was massively exceeding expectations by triggering "best responses," and thus that NEOD001 was not effective. This is because the observed blinded best responses rate of approximately 43.5% drastically exceeded the expected blinded best response rate of 32.5% that Defendants' public statements concerning the Phase 1/2 results and the natural variability of NT-proBNP predicted.

110. In addition, because "best responders" were concentrated in the placebo group which was demonstrating an average *increase* in levels of NT-proBNP, Defendants knew or should have known that PRONTO would fail to meet its primary and secondary endpoints early into the study.

### L. The Truth Is Revealed and Defendants Admit to High "Between Patient Variability" in NT-proBNP in PRONTO

111. On April 23, 2018, in a press release, Prothena announced that it was discontinuing the development of NEOD001 for AL Amyloidosis. The decision, Prothena disclosed, was based on results from the Phase 2b PRONTO study and a futility analysis of the Phase 3 VITAL study. The term futility is used to refer to the inability of a clinical trial to achieve its objectives i.e. when the interim results show the study is unlikely to achieve statistical significance. The Company explained that, "based on the results from the Phase 2b PRONTO study, which did not meet its primary or secondary endpoints, the Company asked the independent data monitoring committee (DMC) of the Phase 3 VITAL study to review a futility analysis of the ongoing VITAL study. The DMC recommended discontinuation of the VITAL

study for futility. The Company therefore decided to discontinue all development of NEOD001, including the VITAL study as well as the open label extension studies. The press release provided a high-level summary of the results of PRONTO, which showed that NEOD001 resulted in a less favorable "best response" result than Placebo and failed to meet a single secondary endpoint:

| No statistically significant differences were observed between treatment groups as summarized in the table below. | | |
|---|---|---|
| | **NEOD001** | **Placebo** |
| **Primary Endpoint** | | |
| Cardiac best response (NT-proBNP, modified consensus criteria) | 39.4% | 47.6% |
| **Key Secondary Endpoints** | | |
| Change in Short-form 36 (SF-36v2) Physical Component Summary Score (PCS) after 12 months of treatment (mean) | 0.19 | 0.97 |
| Change in 6-Minute Walk Test distance (meters) after 12 months of | 19.25 | 8.00 |
| NT-proBNP rate of change (slope) through 12 months of treatment | 9.80 | 81.42 |
| **Additional Secondary Endpoints** | | |
| Renal best response (proteinuria and eGFR consensus criteria) through | 53.8% | 33.3% |
| Change in NIS-LL (total score) after 12 months of treatment (mean) | - 1.20 | - 0.60 |
| **Exploratory Endpoint** | | |
| All-cause mortality | 4,5% (n=3) | 9.5% (n=6) |

112. During the April 23, 2018, conference call to explain the Company's decision to discontinue all NEOD001 studies, in response to a question from Christopher Marai of Nomura Securities concerning the high best response rate in the placebo group, Defendant Kinney conceded that NT-proBNP was in fact highly variable, stating that "between patient variability in the placebo group was something that was surprising to us. Said another way, if you looked at the relative difference in slopes between the responders and nonresponders in the placebo group, it was quite widespread . . . ." Similarly, in response to a question from analyst Tazeen Ahmad of Bank of America concerning the continuing validity of the Company's NT-proBNP best response analysis, Defendant Kinney again reiterated the high "between-subject variability that we saw in the placebo arm of the study" as a basis for the disappointing results.

113. On this news, the price of Prothena stock fell from $36.84 per share on April 20, 2018, to close at $11.50 per share on April 23, 2018, a drop of 69%. Investment analysts covering the Company expressed shock. Deutsche Bank called the trials results "disappointing and unexpected," Barclays stated that "[w]e wrongly thought the prior phase 1/2 data would predict success for the Phase 2b PRONTO Trial," and Evercore commented that "clearly [we] did not fully appreciate the significant risks." The market was also surprised that the unfavorable Phase 2b trial results led Prothena to end all NEOD001 development. For example, BTIG stated that "the discontinuation of the entire 001 program" was "unexpected," and RBC Capital Markets similarly underscored that "more surprising is the interim futility of the VITAL trial & full halt of NEOD001."

114. NEOD001's core importance to Prothena is demonstrated by the market's cataclysmic reaction to the cancellation of that program. After the Company cancelled the NEOD001 program, analyst price targets for Prothena's stock plummeted. For example, in an article published on April 23, 2018, RBC slashed its price target for Prothena from $86 per share all the way down to $11 per share. That target price was only $1 per share above RBC's downside, or worst case, scenario of $10 per share. Similarly, Jeffries cut its price target from $100 per share to just $12 per share based just on the cash the company had on hand. Without NEOD001, Prothena possessed "zero-pipeline value" to investors and analysts generally expected the stock to trade at the company's cash value. *See* Section VII, *infra*.

## V. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS[21]

115. The Class Period begins on October 15, 2015, when Prothena issued a press release announcing the start of its late-stage Phase 2b "PRONTO" study for NEOD001 and the

[21] Defendants' statements alleged to be false and misleading are indicated in bold. Defendants' statements alleged to be false and misleading contained in slides are highlighted in yellow.

expansion of its ongoing Phase 1/2 study. During the Class Period, Prothena made the following materially false and misleading statements concerning NEOD001 and Prothena's clinical trials of the drug.

**(a) The October 15, 2015, Press Release, Conference Call and Presentation**

116. On October 15, 2015, the first day of the Class Period, Prothena issued a press release and held an investor conference call announcing the start of its late-stage Phase 2b "PRONTO" study and the expansion of its ongoing Phase 1/2 clinical trial for NEOD001. The October 15, 2015 Press Release disclosed that "the primary endpoint of the trial is a cardiac functional biomarker, defined by NT-proBNP best response over twelve months." The press release also made a number of statements asserting that the NT-proBNP biomarker being used in PRONTO was being used in the same manner as widely accepted and utilized by the medical community and by regulators.

117. The press release quoted Dale Schenk, who was then the President and Chief Executive Officer of Prothena, stating that:

> "**NT-proBNP response is a widely validated functional biomarker that predicts survival in patients with AL amyloidosis.** Demonstrating significant improvements in this key cardiac functional biomarker, along with supporting trends in key secondary endpoints, **will expedite our development timeline and provide an additional opportunity to engage with European regulators on a dialogue around conditional approval for NEOD001.**"

The press release also stated:

> **The PRONTO trial was designed to align with feedback from the European Medicines Agency (EMA) related to The VITAL Amyloidosis Study, a global Phase 3 registrational trial. When combined with data from the ongoing NEOD001 Phase 1/2 trial, the PRONTO trial has the potential to expedite patient access.**

118. The press release also quoted Defendant Kinney, who was at that time Prothena's Chief Operating Officer and Chief Scientific Officer and Head of Research and Development, stating that:

> **"We are encouraged with the continued consensus of leading physicians regarding NT-proBNP as a surrogate endpoint for clinical trials as exemplified by the recently announced Amyloid Research Consortium (ARC) white paper."**

119. The slide presentation for the October 15, 2015 call included the following slides touting the wide acceptance of the Phase 1/2 and PRONTO trial's Prothena's NT-proBNP endpoint:









120. The statements made in the press release and presentation were reiterated during the October 15, 2015, conference call as follows:

(a) CEO Schenk stated:

Additionally, the PRONTO trial was also informed by the results of our ongoing Phase 1/2 trial presented at both the American Society for Clinical Oncology and the European Hematology Association conferences earlier this year. **These data showed that 60% of renal evaluable patients treated with NEOD001 achieved a response, and 57% of cardiac evaluable treated patients achieved a response.**

**These best response rates for both renal and cardiac evaluable patients were more than double the published historical rates reported in multiple AL amyloidosis studies.** In short, we are very excited to expand our clinical development program with **this important study that we believe may enable an expedited path to bring NEOD001 to patients with AL amyloidosis**.

(b) Defendant Kinney added:

In clinical care, a simple blood test for NT-proBNP is used to help detect, diagnose, and evaluate the severity of cardiac dysfunction in patients with AL amyloidosis. **This functional biomarker has been evaluated following interventions in more than seven independent studies in almost 2,000 patients, a significant pool for this rare disease. In these studies it has been consistently shown that NT-proBNP response is predictive of survival of patients with AL amyloidosis.**

Importantly, the predictive nature of NT-proBNP response for survival is independent of which off-label standard-of-care therapy issues for the therapeutic regimen patients may have received**. The International Society of Amyloidosis established and validated NT-proBNP response as a measure of cardiac response and as a surrogate marker of survival in AL amyloidosis**.

In clinical care today, NT-proBNP is widely incorporated into the cardiac staging of patients with AL amyloidosis for diagnostic reasons and also used to determine the optimal treatment regimen and to predict survival based on treatment response. Importantly, key opinion leaders agree that preventing NT-proBNP progression is the treatment objective for patients with AL amyloidosis and cardiac involvement.

In fact, a white paper recently announced by the **Amyloidosis Research Consortium, a group that brings together experts in the field to advance research, provides a compelling rationale for the use of NT-proBNP as a surrogate functional endpoint in registration-directed clinical trials in patients with AL amyloidosis**. This group has called on regulatory authorities to adopt NT-proBNP response as a primary surrogate outcome measure to accelerate the registration of new therapeutics intended for the treatment of AL amyloidosis.

> Slide 11 shows data from a paper published in 2012 on behalf of the International Society of Amyloidosis Consensus Group. In this paper, the Consensus Group defined NT-proBNP response as a greater than 30% and 300 nanogram per liter decrease of NT-proBNP from baseline for those patients with a baseline level greater than or equal to 650 nanograms per liter. As clearly shown in the figure and also in replications of these data, NT-proBNP response following intervention predicts an increase in survival.
>
> NT-proBNP response appears to be particularly well validated for use in patients with AL amyloidosis, as shown in this graph, where responders are noted in purple at the top, those with stable disease are in blue, and progressors are in yellow. **As such, the positive results from our ongoing Phase 1/2 study have directly supported and informed our PRONTO trial design**.

(c) In response to an analyst question about whether "the [PONTO] study is powered sufficiently to differentiate between the prior treatment and the effect of NEOD001", CEO Shenk responded that "it's essentially very similar to the Phase 1/2 study that we've already reported. **There we're seeing obviously robust treatment response, so we don't expect anything different**." Defendant Kinney added:

> … if you looked at the different parameters with respect to hematologic response, either degree of hematologic response, time since hematologic response, **there's nothing really in the Phase 1/2 data set that suggests that prior hematologic response to treatment had any impact on responding at the organ level following treatment with NT-proBNP.**
>
> ***
>
> All of that said, I think in PRONTO clearly the patients will have had some previous treatment; they will also have persistent organ dysfunction as defined in the PRONTO protocol; and of course it is a double-blind placebo-controlled study, so you'll have a control arm in this study that will allow you to assess that in a more systematic way. **But quite frankly, we think that's pretty de-risked at this point, in any event.**

(d) In response to an analyst question about discussions with the EMA, Defendant Kinney also stated:

> Given the serious and progressive nature of AL amyloidosis and the fact that there are no approved therapies for this disease really in any geography anywhere**, we had a discussion with EMA about the potential for conditional approval based on NT-proBNP response as a primary outcome measure.** Now, this was

> in the context of the VITAL amyloidosis study discussion; but really based on that feedback, based on what we've learned from our ongoing Phase 1/2 study -- as exemplified in the data that was presented in the oral presentations at both ASCO and EHA -- **I think we were able to, with a good level of confidence, design a robust study that allows us to really make sure we address the key points around this patient population and this endpoint and do so in a way that we believe that, if the data is positive, it provides a good opportunity to go back and engage the European regulators in dialogue around traditional approval for D001.**
>
> **I think we were further encouraged along the way when we see groups like the Amyloidosis Research Consortium also supporting the use of this endpoint in a regulatory environment.** So I think that's maybe a little bit more color on those interactions.

121. The statements set forth above were materially false and misleading because the "best response" NT-proBNP biomarker used by Prothena (a) was a cherry-picked metric that inflated the perception of NEOD001's efficacy and was not accepted by the medical community; (b) had not been "established and validated" by the International Society of Amyloidosis or "supported" by the Amyloidosis Research Consortium as a measure of cardiac response and as a surrogate marker of survival in AL amyloidosis; (c) did not represent a "consensus criteria" for cardiac response; (d) was not applied in the seven studies with 2,000 patients that Prothena compared to the Phase 1/2 NEOD001 trial results; (e) was not a reliable measure in interventional trials due to its high natural variability; (f) as a result, there was no basis to state that European regulators would consider approving NEOD001 based on a "best response" NT-proBNP result in PRONTO; and (g) as a result, did not provide a basis to state whether the Phase 1/2 trial results "derisked" the PRONTO study. Also, the comparison of the 57% NT-proBNP best response rate achieved in the phase 1/2 NEOD001 study as being "more than double" that achieved in prior studies was false and misleading since those studies did not apply a NT-proBNP "best response" biomarker.

**(b) The November 10, 2015, December 8, 2015, and February 8, 2016, March 9, 2016, and March 11, 2016, Investor Conference Presentations**

122. Between November 2015 and March 2016, Prothena issued presentations in connection with (a) the November 10, 2015, Credit Suisse 24th Annual Healthcare Conference; (b) the December 8, 2015, Oppenheimer 26th Annual Healthcare Conference; (c) the February 8, 2016, Biotechnology Industry Organization CIO & Investor Conference; (d) the March 9, 2016, Cowen and Company Health Care Conference; and (e) the March 11, 2016, Future Leaders in the Biotech Industry Conference. Each of the presentations included the following slides touting the use of the NT-proBNP biomarker.[22] These slides included the following:




[22] The slides below are taken from the November 10, 2015 presentation.

## NT-proBNP: Widely Validated Biomarker

- Seven independent studies in ~2000 patients have consistently shown NT-proBNP response, post-treatment, predicts prolonged survival in AL amyloidosis patients
- International Society of Amyloidosis established and validated NT-proBNP as an indicator of cardiac response and as a surrogate marker of survival
- Established use in clinical care of patients with AL amyloidosis
  - Staging patients (baseline)
  - Determining treatment outcome
  - Predicting survival
- Treatment objective is to prevent NT-proBNP progression

10 prothena

## NT-proBNP Response Predicts Survival of AL Amyloidosis Patients




NT-proBNP progression (at least 300 ng/L and 30% increase), 169 patients
NT-proBNP stable, 108 patients
NT-proBNP response (at least 300 ng/L and 30% decrease), 100 people

11 Comenzo, et al., Leukemia. 2012;26:2317–2325 prothena




123. The slides set forth above were materially false and misleading because the "best response" NT-proBNP biomarker used by Prothena (a) was a cherry-picked metric that inflated the perception of NEOD001's efficacy and was not accepted by the medical community; (b) had not been "established and validated" by the International Society of Amyloidosis established as a measure of cardiac response and as a surrogate marker of survival in AL amyloidosis; (c) was not applied in the seven studies with 2,000 patients that Prothena compared to the Phase 1/2 NEOD001 trial results; (d) was not established for use in clinical care of patients with AL amyloidosis; (e) was not applied in the published literature concerning AL amyloidosis and chemotherapy; and (f) was not a reliable measure in interventional trials due to its high natural variability. Additionally, the comparison of the 57% NT-proBNP best response rate achieved in the phase 1/2 NEOD001 study as being "more than double" that achieved in prior studies was false and misleading since those studies did not apply a NT-proBNP "best response" biomarker.

124. During the February 8, 2016, Biotechnology Industry Organization CEO & Investor Conference, CEO Schenk made the following additional statements about the NT-proBNP biomarker:

> Now let's talk about -- let's get into it a little bit more and talk about a key biomarker for AL amyloidosis that's currently used to monitor the heart disease or the heart problem of the disorder. Interminable pro-BMP [sic] is a fragment of BMP [sic] which is secreted by the heart. It's a hormone. **It's been used for years for heart failure. It's been used for multiple heart conditions. It's -- over the past 10 years it's been recently applied to light-chain amyloidosis. And there's now been seven independent studies showing that BMP [sic] is actually a very good marker for it.** And what does that mean by a good marker -- biomarker?
>
> It turns out that -- let me actually go forward. If -- and this again is a study where multiple patients were analyzed over time. **This is not our data; this is other published data. That if upon treatment with various agents or just by chance, BMP [sic] improves -- in other words, it drops because dropping is good. The Kaplan-Meier data for these patients is substantially better from not improving**. And if it gets worse, the mortality is very bad. And so as you can see, BMP [sic] is a very, very important biomarker for AL amyloidosis.
>
> **Now we go back a little bit. And so what's happened actually is we've done a white paper. Multiple investigators got together and suggested -- they petitioned to the FDA to allow BMP [sic] as the primary endpoint for trials associated with AL amyloidosis. So we will come back to why that's important. Because our PRONTO study is following BMP [sic] is a primary endpoint.**
>
> **Okay, just to recap, though, the data that we've had so far on NEOD001 -- we've actually seen through our phase 1-2 studies a very good overall cardiac response rate thus far of just under 60% -- 57%,** at a renal response rate of 60%. The cardiac response rate is defined by BMP [sic] response. I won't go into the metrics, but it is set by the field, not by us, that a decrease -- how you define a decrease or an improvement in BMP [sic].
>
> ***
>
> **And so this is good. It's encouraging. And, of course, as a result, we've gotten into the -- and set up the phase 2B and the phase 3s.**

125. The statements set forth above were materially false and misleading because the "best response" NT-proBNP biomarker used by Prothena (a) was a cherry-picked metric that inflated the perception of NEOD001's efficacy and was not accepted by the medical community;

(b) had not been used for multiple heart conditions or over the past 10 years and applied to light-chain amyloidosis; (c) was not applied in the seven studies with 2,000 patients that Prothena compared to the Phase 1/2 NEOD001 trial results; (d) was not advocated by "multiple investigators" to the FDA or in a white paper as the "the primary endpoint for trials associated with AL amyloidosis;" and (e) was not a reliable measure in interventional trials due to its high natural variability. Also, the comparison of the 57% NT-proBNP best response rate achieved in the phase 1/2 NEOD001 study as being "way above" that achieved in prior studies was false and misleading since those studies never applied a NT-proBNP "best response" biomarker.

### (c) The February 11, 2016 Leerink Partners Global Healthcare Conference

126. On February 11, 2016, Defendant Kinney presented at the 6th Annual Leerink partners Global Healthcare Conference. During the presentation, Kinney made the following statements about the NT-proBNP biomarker:

> What we do is we looked for patients that had had some level of previous standard of care treatment, but still had ongoing organ dysfunction. In other words, that standard of care treatment was insufficient to allow for benefit at the organ level, which is what you really need to improve function in these patients. And so of those 27 patients, when we looked at data and it was an interim data analysis that was cut in February of 2015, what we found was approximately 14 of those patients were evaluable for cardiac evaluation. **In other words, they had sufficient cardiac involvement that we could look for potential improvement after intervention with NEOD001 and 57% of those patients showed improvement based on predefined criteria.**
>
> ***
>
> **Absolutely. So, yes, we think about the program obviously in the totality and clearly we think about how the Phase 1/2 derisks first our Phase 2b study, which is our PRONTO study and then further how PRONTO, as well as the phase 1/2 derisks the Phase 3 study.** Clearly I think if you think about the patient population that we've looked at in Phase 1/2, it's very similar to what we'll be enrolling in the PRONTO study. These are patients previously treated with standard of care, but for whom again that was insufficient to derive sufficient organ benefit. **In the case of PRONTO, we're talking particularly about cardiac benefit, or lack thereof.**

> So those patients would come into the PRONTO study. They'd be randomized on a one-to-one basis to receive either NEOD001 at 24 milligrams per kilogram intravenously or placebo. **And we'll be looking for cardiac response in that study. And again, it's the same cardiac response criteria used in PRONTO that we've used in the Phase 1/2 study,** so very similar data, very similar patient populations.
>
> ***
>
> **What we know empirically from this is that in over I think it's now seven or maybe even more independent studies in almost 2000 patients with this disease, invariably, when you achieve the cardiac response criteria, which is defined by a change in NT-proBNP, it translates into significantly better survival for these patients. So we know that it's meaningful and we know that it's very sensitive in this disease, per se. In fact, just to talk about some work that's being done outside of the walls of Prothena, there's a group of patients and scientists at work in this disease that have come together called the Amyloidosis Research Consortium and in fact, they've press released last year that they've actually submitted a white paper to FDA and in that white paper, they outlined the case for NT-proBNP change as a biomarker in this disease and in fact suggested it may be suitable for approval on a surrogate basis for this disease in particular.**

127. The statements set forth above were materially false and misleading because the "best response" NT-proBNP biomarker used by Prothena (a) was a cherry-picked metric that inflated the perception of NEOD001's efficacy and was not accepted by the medical community; (b) was not applied in the seven or more studies with almost 2,000 patients that Prothena compared to the Phase 1/2 NEOD001 trial results; (c) had not been propounded by the Amyloidosis Research Consortium in to the FDA as a biomarker for AL amyloidosis or as a surrogate marker for the disease; (d) was not a reliable measure in interventional trials due to its high natural variability; and (e) as a result, did not provide a basis to state whether the Phase 1/2 trial results "derisked" the PRONTO study or the Phase 3 study.

#### (d) The February 9, 2016 Press Release

128. On February 9, 2016 Prothena issued a press release with the caption, "Data From Prothena's Ongoing Phase 1/2 Clinical Trial of NEOD001 in AL Amyloidosis Published in the

Journal of Clinical Oncology." The data consisted of the interim results that Prothena had previously presented. The press release stated in part.

> **Of the 14 cardiac-evaluable patients, 57 percent met the criteria for cardiac response, which compares favorably to the expected cardiac best response rate of 26.5 percent from historical data in patients treated solely with off-label standard of care (Comenzo, et al., Leukemia. 2012; 26:2317-2325).** Forty-three percent of patients had stable disease. **In cardiac responders, the median NT-proBNP, a clinical biomarker used to predict disease progression and mortality, decreased from 1768.5 pg/mL at baseline to 1054 pg/mL at the best response assessment. The mean decrease from baseline was 890 pg/mL, which represented a 48 percent reduction and was statistically significant (P<0.008). NT-proBNP decline for responders significantly correlated with increased number of NEOD001 infusions.**
>
> ***
>
> **"The positive results from our Phase 1/2 study of NEOD001 in patients with AL amyloidosis suggest that NEOD001 may effectively recruit the immune system to clear the circulating soluble and deposited insoluble proteins that cause organ dysfunction in this progressive and life-threatening condition," said Dale Schenk, Ph.D., President and Chief Executive Officer of Prothena. "Based on these data, Prothena has initiated The VITAL Amyloidosis Study, a global registration study for NEOD001, and is planning to initiate the PRONTO study, which will evaluate cardiac response as assessed by changes in NT-proBNP, a cardiac functional biomarker that has been shown to be highly predictive of survival in patients with AL amyloidosis.**

129. The statements set forth above were materially false and misleading because the "best response" NT-proBNP biomarker used by Prothena (a) was a cherry-picked metric that inflated the perception of NEOD001's efficacy and was not accepted by the medical community; (b) was not the biomarker utilized in the historical data for patients treated solely with off-label standard of care; (c) was not a reliable measure in interventional trials due to its high natural variability; and (d) as a result, did not provide a basis to state whether the Phase 1/2 trial results supported the PRONTO study or VITAL study.

**(e) The February 18, 2016, Press Release and Conference Call**

130. On February 18, 2016, Prothena issued a press release on its 2015 financial results and an R&D update. The press release quoted CEO Schenk stating that, in 2015, "[**Prothena] reported encouraging clinical results** from . . . the NEOD001 [trial]" and also stated:

> At oral presentations in June 2015 at the American Society for Clinical Oncology Annual Meeting (ASCO) and the 20th Congress of the European Hematology Association (EHA), reported clinical data from the multiple ascending dose portion of a Phase 1/2 trial **demonstrating NEOD001-treated patients achieved more than double the cardiac and renal biomarker responses when compared to historical data in patients treated solely with off-label standard of care.**

131. During the investor and analyst conference call later that day, Defendant Kinney added:

> **In clinical care today, NT-proBNP is widely incorporated into the cardiac staging of patients with AL Amyloidosis for diagnostic purposes and also used to determine the optimal treatment regimen and to predict survival based on treatment response. Importantly, key opinion leaders agree that preventing NT-proBMP [sic] progression is the treatment objective for patients with AL Amyloidosis and cardiac involvement….**
>
> ***
>
> In a white paper submitted to regulators by the Amyloidosis Research Consortium, a group that brings together experts in the field to advance research, a compelling rationale is outlined for the use of the NT-proBMP [sic] as a surrogate functional biomarker endpoint in clinical trial in patients with AL Amyloidosis. This functional biomarker has been evaluated following intervention in more than seven independent studies in almost 2,000 patients, a significant patient pool for a rare disease. **In these studies, it has been consistently shown that NT-proBMP [sic] response predicts improved survival for patients with AL Amyloidosis.** The Amyloidosis Research Consortium has called on the FDA to adopt NT-proBMP [sic] [ response as a primary surrogate outcome measure to accelerate the registration of new therapeutics intended for the treatment of AL Amyloidosis.
>
> In addition to VITAL and PRONTO, the expansion cohort of the Phase 1/2 multiple ascending dose study of NEOD001 in patients with AL Amyloidosis and persistent organ dysfunction was fully enrolled in 2015. **This expansion cohort seeks to build on our understanding of the impact of NEOD001 on specific functional biomarker endpoints.**

> Of the 42 enrolled patients, there are 15 patients with cardiac dysfunction, 16 patients with renal dysfunction and 11 patients with peripheral neuropathy**. Similar to the functional biomarkers we looked at in the previously reported Phase 1/2 result, in the expansion cohort, we will evaluate the cardiac biomarker NT-proBNP and the renal biomarker proteinuria. . . .**

132. The statements set forth above were materially false and misleading because the "best response" NT-proBNP biomarker used by Prothena (a) was a cherry-picked metric that inflated the perception of NEOD001's efficacy and was not accepted by the medical community; (b) was not "widely incorporated into the cardiac staging of patients with AL Amyloidosis for diagnostic purposes and also used to determine the optimal treatment regimen and to predict survival based on treatment response;" (c) had not been propounded by the Amyloidosis Research Consortium in a white paper as a surrogate functional biomarker endpoint in clinical trial in patients with AL Amyloidosis; (d) had not been applied in studies with almost 2,000 patients that Prothena compared to the Phase 1/2 NEOD001 trial results; and (e) was not a reliable measure in interventional trials due to its high natural variability. Also, for the same reasons, the comparison of the 57% NP-proBNP "best response" achieved in the phase 1/2 NEOD001 study to the historical data in patients treated solely with off-label standard of care was false and misleading.

**(f) The February 25, 2016 Form 10-K**

133. On February 25, 2016 Prothena filed with the SEC its Form 10-K for the year ended December 31, 2015, which was signed by Schenk and Defendant Nguyen. In a section discussing Prothena's Research and Development Pipeline, Prothena stated:

> **In June 2015, we reported results from the ongoing Phase 1/2 study that showed 8 of 14 cardiac-evaluable patients (57.1%) treated with NEOD001 demonstrated a cardiac response**, defined as more than 30% and 300 pg/mL decrease in levels of NT-proBNP from baseline and the remaining 6 patients (42.9%) achieved stable disease. Also, additional monthly infusions of NEOD001 were significantly correlated with NT-proBNP decline ($p < 0.0001$). **Cardiac responders, on average, showed more NT-proBNP decline with added**

> **monthly NEOD001 infusions. The 57.1% cardiac best response rate compares favorably with the expected cardiac best response rate of a 26.5% from historical data in patients treated solely with off-label standard of care (Comenzo, et al., Leukemia. 2012;26:2317-2325). NT-proBNP is a validated cardiac biomarker associated with mortality in patients with AL amyloidosis. As noted in numerous peer-reviewed publications, increasing levels of NT-proBNP predicts higher mortality rates in patients with AL amyloidosis. Conversely, decreasing levels of NT-proBNP following interventional treatment predicts lower mortality rates**.

134. The statements set forth above were materially false and misleading because the "best response" NT-proBNP biomarker used by Prothena (a) was a cherry-picked metric that inflated the perception of NEOD001's efficacy and was not accepted by the medical community as a "validated cardiac biomarker"; (b) was not utilized in the Comenzo study, which was based on results taken at a single point in time (6 months) rather than "best response"; (c) was not a reliable measure in interventional trials due to its high natural variability; and (d) therefore did not "compare favorably to the [supposedly] expected cardiac best response rate of 26.5 percent from historical data in patients treated solely with off-label standard of care."

#### (g) The May 3, 2016, Press Release And "About NEOD001" Disclosures in Subsequent Press Releases

135. On May 3, 2016, Prothena issued its press release announcing its financial results for the first quarter of 2016 and an R&D update. The press release stated, during the quarter, Prothena:

> Initiated PRONTO, a randomized, registration-directed, global Phase 2b trial of NEOD001 in previously-treated patients with AL amyloidosis and persistent cardiac dysfunction. The primary endpoint of the trial is **best response over 12 months of a cardiac functional biomarker, defined by the consensus criteria of NT-proBNP change.**

136. This "defined by the consensus criteria of NT-proBNP change" language was included verbatim in numerous subsequent Prothena press releases, including on May 23, 2016,

June 21, 2016, July 5, 2016, November 3, 2016, May 9, 2017, August 15, 2017, September 18, 2017, February 14, 2018 and March 12, 2018.

(a) May Prothena's May 23, 2016, press release, for example, stated:

> The PRONTO trial, a double-blind, placebo-controlled, global Phase 2b registration-directed trial, is evaluating NEOD001 in previously-treated patients with AL amyloidosis and persistent cardiac dysfunction, and **will assess best response over 12 months of the cardiac functional biomarker NT-proBNP, defined by the consensus criteria of NT-proBNP change**, . . .

(b) Prothena's July 5, 2016, press release stated:

> The PRONTO study, a global, Phase 2b, double-blind, placebo-controlled, registration-directed study, will evaluate NEOD001 vs. placebo in previously-treated patients with AL amyloidosis and persistent cardiac dysfunction, and **will best response over 12 months of the cardiac functional biomarker NT-proBNP, defined by the consensus criteria of NT-proBNP change,** in addition to other biomarker, quality of life and functional endpoints.

(c) Prothena's March 12, 2018, press release stated:

> The PRONTO study, a global, Phase 2b, double-blind, placebo-controlled, registration-directed study, will evaluate NEOD001 vs. placebo in previously-treated patients with AL amyloidosis and persistent cardiac dysfunction, and **will assess best response over 12 months of the cardiac biomarker NT-proBNP, defined by the consensus criteria of NT-proBNP change,** in addition to other biomarker, quality of life and functional endpoints.

137. The statements set forth above were materially false and misleading because the "best response" NT-proBNP biomarker used by Prothena (a) was a cherry-picked metric that inflated the perception of NEOD001's efficacy and was not accepted by the medical community; (b) was not applied in the available published historical data in patients previously treated with plasma cell directed therapy; (c) had not been "consistently demonstrated in numerous peer-reviewed publications" to predict survival in patients with AL amyloidosis; (d) was not a reliable measure in interventional trials due to its high natural variability; and (e) did not represent a "consensus criteria" for cardiac response.

**(h) The July 5, 2016, Press Release, Presentation and Conference Call**

138. On July 5, 2016, Prothena issued a press release on new interim clinical data from Phase 1/2 Study. The July 5, 2016, press release stated, in part that:

> New interim data from the Phase 1/2 study as of May 9, 2016, demonstrated best response rates from total cardiac- (n=36) and renal- (n=35) evaluable patients of 53% and 63%, respectively, that are consistent with the interim analysis from the dose-escalation phase published February 2016 in the Journal of Clinical Oncology (Gertz, et al, 2016)….
>
> ***
>
> **In a best response analysis of patients in the Phase 1/2 study who received NEOD001, 53% or 19 of 36 total cardiac-evaluable patients and 47% or seven of 15 prospectively defined cardiac expansion cohort patients, demonstrated a cardiac response, defined as more than 30% and 300 pg/mL decrease in levels of NT-proBNP. These cardiac best response rates compare favorably to cardiac response rates of 0% to 15% from available published historical data in patients previously-treated with plasma cell directed therapy (Palladini et al, Haematologica, 2013; Dispenzieri et al, Blood, 2012), and are consistent with the best response rate of 57% or 8 of 14 cardiac-evaluable patients reported in the interim analysis of the dose-escalation phase (n=27) of the NEOD001 Phase 1/2 study published in the Journal of Clinical Oncology.** As consistently demonstrated in numerous peer-reviewed publications, the functional biomarker NT-proBNP predicts survival in patients with AL amyloidosis. Increasing levels of NT-proBNP predict higher mortality in patients with AL amyloidosis. Conversely, decreasing levels of NT-proBNP following intervention predict increased survival.
>
> ***
>
> **"Best response rates of 53% and 63% demonstrated in total cardiac- and renal-evaluable patients, respectively, are consistent with those previously reported, and suggests that directly targeting amyloid has the potential to improve organ function in patients with AL amyloidosis," said Dale Schenk PhD, President and Chief Executive Officer of Prothena.** "We now have a robust data set of nearly 70 patients that informs our ongoing NEOD001 clinical development program. The organ response rates from the expansion cohorts were consistent with the overall study population, and increase our confidence in the design and powering assumptions for both the PRONTO and VITAL studies.". . .

(a) The July 5, 2016, Press release also stated that:

> **The [Phase 2b] PRONTO study was designed to align with feedback from the European Medicines Agency (EMA) related to The VITAL Amyloidosis**

> **Study. When combined with data from the NEOD001 Phase 1/2 study, the PRONTO study has the potential to expedite patient access**.
>
> ***
>
> The PRONTO study, a global, Phase 2b, double-blind, placebo-controlled, registration-directed study, will evaluate NEOD001 in previously-treated patients with AL amyloidosis and persistent cardiac dysfunction, **and will best response over 12 months of the cardiac functional biomarker NT-proBNP, defined by the consensus criteria of NT-proBNP change**, in addition to other biomarker, quality of life and functional endpoints.

139. The statements set forth above were materially false and misleading because the "best response" NT-proBNP biomarker used by Prothena (a) was a cherry-picked metric that inflated the perception of NEOD001's efficacy and was not accepted by the medical community; (b) did not represent a "consensus criteria" for cardiac response; (c) was not applied in the available published historical data in patients previously treated with plasma cell directed therapy; (d) had not been "consistently demonstrated in numerous peer-reviewed publications" to predict survival in patients with AL amyloidosis; (e) was not a reliable measure in interventional trials due to its high natural variability; and, therefore (f) did not provide a potential for expediting patient access to NEOD001. Also, the comparison of the 53% NT-proBNP best response rate achieved in the phase 1/2 NEOD001 study to "cardiac response rates of 0% to 15% from "available published historical data" was false and misleading since those studies did not apply a NT-proBNP "best response" biomarker.

140. On July 5, 2016, Prothena also issued an investor presentation on the new interim results. The presentation included the following slides and other slides comparing the Phase 1/2 "best response" results to NT-proBNP results in earlier studies:







141. During the conference call that day, July 5, 2016, the following statements were made about the Phase 1/2 results:

(a) CEO Schenk stated:

> Beyond these reassuring safety and tolerability findings, **the new data demonstrated improvements in all three organ systems measured in this study: cardiac, renal, and peripheral nerves. Of the total patients in the Phase 1/2 study, the 36 cardiac and 35 renal evaluable patients demonstrated best response rates of 53% and 63%, respectively. These are consistent with the response rates we saw in the dose escalation phase that we published earlier this year in the Journal of Clinical Oncology.**

***

> **[T]hese cardiac and renal (…) response rates continue to compare favorably to what we would expect to see in this patient population that has been previously treated with one or more plasma cell directed therapies.**

***

> Mortality is typically driven by cardiac dysfunction and deficits in quality of life are driven by symptoms of dysfunction across all three of these organ systems. **Finally, as Gene will discuss in additional detail, this large new data set further increases our confidence in our initial design and powering assumptions for our ongoing Phase 2b PRONTO and Phase 3 VITAL studies.**

(b) Defendant Kinney also stated:

> Turning to Slide 42 [on the PRONTO and VITAL studies], I would like to comment on the relevance of the new Phase 1/2 results to our ongoing late-stage studies. Our Phase 2b PRONTO study is enrolling patients with AL amyloidosis and persistent cardiac dysfunction who have been previously treated with at least one course of plasma cell directed therapy. **The primary endpoint is best response over 12 months of the cardiac functional biomarker NT-proBNP, defined by the consensus criteria of NT-proBNP change.**
>
> In terms of having received previous treatment with plasma cell directed therapy and experiencing ongoing organ dysfunction, the patients enrolling in the PRONTO study are similar to the patients in our Phase 1/2 study. Our initial design for PRONTO was based on the result of the dose escalation phase of the study that were published in the Journal of Clinical Oncology. **Therefore, the consistency of the results from the larger patient pool we are reporting today increases our confidence in the initial design and powering of PRONTO.**
>
> **I will also just reiterate our conviction around NT-proBNP as a functional biomarker. NT-proBNP is a cardiac biomarker known to predict survival following therapeutic intervention in patients with AL amyloidosis. As shown in numerous peer-reviewed publications, increasing levels of NT-proBNP predict higher mortality in patients with AL amyloidosis and decreasing levels of NT-proBNP following intervention predicts increased survival.**

142. The statements set forth above were materially false and misleading because the "best response" NT-proBNP biomarker used by Prothena (a) was a cherry-picked metric that inflated the perception of NEOD001's efficacy and was not "validated" by the medical community; (b) did not represent a "consensus criteria" for cardiac response; (c) was not applied

in the prior studies; (d) was not a reliable measure in interventional trials due to its high natural variability; and (e) therefore did not provide a basis to provide confidence to Prothena in its design and powering of its Phase 2b PRONTO and Phase 3 VITAL studies. Also, the comparisons of the 53% NT-proBNP best response rate to the rate achieved in other studies were false and misleading since those studies did not apply a NT-proBNP "best response" biomarker.

**(i) The July 12, 2016, Cantor Fitzgerald Healthcare Conference**

143. On July 12, 2016, Prothena gave a presentation at the Cantor Fitzgerald Healthcare Conference. The presentation included substantially the same "Key Findings" slide and individual patient progression slides. These slides were false and misleading for the reasons set forth in ¶142, above.

144. During the Conference, Defendant Kinney again reiterated that

> **In the most recent data cut, with 36 of the 69 patients actually being evaluable for cardiac response, we found that 53% met the international consensus criteria for cardiac response.**
>
> ***
>
> **So now, with cardiac, renal and peripheral neuropathy improvement, we see three organ systems that are all moving in the same direction following intervention with NEOD001. So again, this gives us, I think, increased confidence in our ongoing pivotally designed studies, those being our Phase 2b PRONTO and our Phase 3 VITAL studies.**

145. The statements set forth above were materially false and misleading because the "best response" NT-proBNP biomarker used by Prothena (a) was a cherry-picked metric that inflated the perception of NEOD001's efficacy and was not validated by the medical community; (b) did not represent the "international consensus criteria" for cardiac response; (c) was not a reliable measure in interventional trials due to its high natural variability; and (d) therefore did not provide a basis to provide confidence to Prothena in its design and powering of its Phase 2b PRONTO and Phase 3 VITAL studies.

**(j) The August 16, 2016, Wedbush PacGrow Healthcare Conference**

146. On August 16, 2016, Defendant Kinney gave a presentation on behalf of Prothena at the August 16, 2017, Wedbush PacGrow Healthcare Conference. During his presentation, Defendant Kinney stated:

> **So, across the entirety of that data set, we were able to evaluate both cardiac and renal responses using international consensus criteria that are in the field. So, we adopted these from the experts. The cardiac response criteria looks at an endpoint of a peptide, NT-proBNP. We know that achieving this consensus response for cardiac response predicts better survival in these patients.**
>
> **And what we found was that 36 of our 69 patients could be evaluated based on the criteria of that international consensus response criteria for cardiac benefit. And of those, 53% showed cardiac benefit. And, of course, we're very encouraged by that number.** It's consistent with previous data we've reported from interim data cuts and certainly **gives us, I think, good confidence in how we've powered our ongoing pivotal studies, which we can talk about.**
>
> ***
>
> I'll point to the Amyloidosis Research Consortium. The amyloidosis research consortium is a very important group that has been founded by -- out of the Amyloidosis Foundation, but is really now -- consists of some of the key treating physicians across the world that see these patients every day and actually treat these patients every day. And they certainly very publicly talked about the submission of a white paper and conversations **that they've had, not the least of which was last November, a patient day where they met with members of the FDA to talk about this disease. And, not insignificantly, to talk about the adequacy of the international cardiac consensus criteria which uses a change in NT-proBNP to predict benefit and survival.**

147. The statements set forth above were materially false and misleading because the "best response" NT-proBNP biomarker used by Prothena (a) was a cherry-picked metric that inflated the perception of NEOD001's efficacy and was not "validated" by the medical community; (b) was different than the "international consensus response criteria" biomarker for cardiac benefit; (c) was different than the "international consensus criteria" that was advocated by the Amyloidosis Research Consortium; (d) was not a reliable measure in interventional trials

due to its high natural variability; and (e) as a result, did not provide a basis to provide confidence to Prothena in its design and powering of its Phase 2b PRONTO and Phase 3 VITAL studies.

**(k) The September 7, 2016, Credit Suisse Antibody Day Conference**

148. On September 7, 2016, Defendant Kinney gave a presentation on behalf of Prothena at the Credit Suisse Antibody Day Conference. Defendant Kinney again highlighted how the Phase 1/2 Study used "international consensus" response criteria, stating:

> In AL amyloidosis, changes in NT-proBNP are an extremely sensitive marker following intervention that seem to be predictive of survival of these patients. **And in fact, this has been shown now with several thousand patients across multiple studies and really without exception**.
>
> **I think from a clinical perspective, the field feels very strongly that is very well clinically validated. It is predictive of survival when you meet the criteria of cardiac response which uses this NT-proBNP measure.**
>
> ***
>
> But to come back to your question -- so many years ago now, **a consensus group from the International Symposium on Amyloidosis developed a consensus criteria for what would constitute a quote unquote cardiac response, meaning cardiac benefit in the context of this disease.**
>
> **And generally, it revolves around NT-proBNP changes.** So provided that you are sufficiently cardiac involved, you have a NT-proBNP of at least 650 nanograms per liter at baseline. **If you see a change after intervention, which is a decrease of NT-proBNP of at least 30% and an absolute change of at least 300 nanograms per liter, you are considered a cardiac responder. And that vary significantly predicts improved survival in this disease.**
>
> **And so we've incorporated that. That's actually the marker and the criteria that we used in our Phase 1/2 study and is the primary outcome measure of our PRONTO trial as well. Now this point, we believe that PRONTO, if successful, could serve potentially for discussions around conditional approval with the European regulator.** That's not something that we set as a base space in the US, although I will say that we are encouraged by some of the work that groups outside of Prothena's walls are doing in this space.
>
> **There's a group called the Amyloidosis Research Consortium that I'd point to, which really consists of some of the key physicians that treat this disease,**

> **has good support from the patient advocacy groups as well. And of course, inasmuch as the patients -- or the physicians in this space utilize this indicator of cardiac benefit on a pretty regular basis, they have actually entered into dialogue with FDA. Talked about the potential qualification of this outcome measure at the surrogate for efficacy-directed studies.**
>
> And as far as I know, those conversations are ongoing. There was a very nice publication in Leukemia several weeks ago that actually outlined some of the evidence of this. But we support those efforts; we think that they are moving down the right path, and certainly engaging with regulators is very responsible. And I think an important thing to do.

149. The statements set forth above were materially false and misleading because the "best response" NT-proBNP biomarker used in the Phase 1/2 study and PRONTO study (a) was a cherry-picked metric that inflated the perception of NEOD001's efficacy and was not "validated" by the medical community; (b) was different than the "clinically validated" biomarker to ascertain cardiac benefit; (c) was different than the "international consensus criteria" or "indicator of cardiac benefit" that was advocated by the Amyloidosis Research Consortium; (d) was not a reliable measure in interventional trials due to its high natural variability; and (e) as a result, there was no basis to state that European regulators would consider approving NEOD001 based on a "best response" NT-proBNP result in PRONTO.

### (l) The September 12, 2016, Morgan Stanley Global Healthcare Conference

150. On September 12, 2016, Defendant Nguyen gave a presentation on behalf of Prothena at the Morgan Stanley Global Healthcare Conference. Defendant Nguyen highlighted the "exciting" results of its ongoing Phase 1/2 trial and expressed confidence in the success of late-stage NEOD001 clinical trials. Defendant Nguyen stated, "we continue to see very consistent results from our dose escalation versus our expansion, and so that was very exciting for us. **We saw greater than 50% response rates for cardiac** . . ."

151. During the Morgan Stanley Global Healthcare Conference, Defendant Nguyen also represented to investors that the results of the Phase 1/2 trial had positive implications for NEOD001's late-stage VITAL and PRONTO studies due to positive data seen across three different organs. Defendant Nguyen stated:

> **And what's important about the Phase I/II, just to draw the back -- build a bridge back to the PRONTO trial and also VITAL is that when we see improvements now in all three organs in these patients,** we feel that with the Short-form 36, which is quality of life, and 6-minute walk, it is – those are integrated endpoints that account for the heart, the kidney, and also now peripheral neuropathy.

152. The statements set forth above were materially false and misleading because the "best response" NT-proBNP biomarker used in the Phase 1/2 study and PRONTO study (a) was a cherry-picked metric that inflated the perception of NEOD001's efficacy and was not "validated" by the medical community; (b) was not applied in prior studies repeatedly cited by Prothena as substantiating its use of the "best response" biomarker; (c) was different than the "international consensus criteria" or "indicator of cardiac benefit" that was advocated by the Amyloidosis Research Consortium; (d) was not a reliable measure in interventional trials due to its high natural variability; and (e) as a result, did not provide a basis to provide confidence to Prothena in its design and powering of its Phase 2b PRONTO and Phase 3 VITAL studies.

**(m) The December 5, 2016, Final Phase 1/2 Results Presentation**

153. On December 5, 2016, Prothena presented its final Phase 1/2 trial results and subsequently hosted the presentation on its webpage. The presentation concluded that the "**best response rates are better than those reported for patients treated with plasma cell-directed therapies**" and that "**[e]ncouraging results have now been observed across 3 organ systems**." Prothena reported final best response figures of 53% for cardiac patients. The presentation concluded in part that: "Encouraging results have now been observed across 3 organ systems"

and "Cardiac . . . best response rates **are better than those reported for patients treated with plasma cell–directed therapies**"




154. The statements set forth above were materially false and misleading because the "best response" NT-proBNP biomarker used in the Phase 1/2 study and PRONTO study (a) was a cherry-picked metric that inflated the perception of NEOD001's efficacy and was not "validated" by the medical community; (b) was not the biomarker used to determine response rates in the studies of patients treated with plasma cell-directed therapies; (c) was not a reliable measure in interventional trials due to its high natural variability; and (d) as a result, did not provide a basis to determine whether the Phase 1/2 trial results supported the efficacy of NEOD001. Also, the comparison of the 53% NT-proBNP best response rate to the rates "reported for patients treated with plasma cell-directed therapies" was false and misleading since those studies did not apply a NT-proBNP "best response" biomarker.

155. The December 5, 2016, presentation also included charts showing the monthly progression for the same two patients as in the July 5, 2016, presentation: of a 47-year old man for NT-proBNP "best response," and a 61 year-old man for Renal "best response."




156. The cherry-picking of data of a single patient for each of these timelines obscured the progression for the overall patient trial population and was therefore a misleading presentation of the trial data that therefore did not provide a basis to determine whether the Phase 1/2 Study results supported the efficacy of NEOD001.

**(n) The January 12, 2017, J.P. Morgan Healthcare Conference**

157. On January 12, 2017, Prothena gave a presentation at the JP Morgan Healthcare Conference. The presentation included the same individual patient progression slides as in the December 5, 2016, presentation and included the following "Key Findings" slide:




158. During the January 12, 2017, conference, Defendant Kinney made the following statements concerning NEOD001:

> What we then did, of course, was looked in a subset analysis at those patients that had cardiac dysfunction or renal dysfunction or peripheral neuropathy and evaluated the response criteria. **These response criteria were set by the International Amyloidosis Society, so these are internationally used and very consistent criteria that we adopted into our trial. In the case of cardiac for example, meeting a cardiac response simply means that you're at much better odds of surviving this disease. Meeting a renal response means a delayed time for need to haemodialysis, and for the peripheral neuropathy assessments, we use the neuropathy impairment scale lower limb, which directly assesses neuropathy in the lower limbs of these patients.**
>
> **So 36 of our 69 patients could be evaluated for cardiac benefit. And of those that were evaluated, 53% showed a cardiac response, again indicative of the potential for improved survival.**
>
> In the kidney, when we looked at those patients, again, 36 patients were evaluable for renal response, and in this case, 64% showed a renal response in a positive direction.

***

> **… And so we were very encouraged by these data. And what they indicate to us is that NEOD001,** as you would expect, recognizes the toxic amyloid species **without regard to which organ those amyloid species may deposit, and has the potential to improve organ function in that context**.

159. The statements set forth above were materially false and misleading because the "best response" NT-proBNP biomarker used in the Phase 1/2 study (a) was a cherry-picked metric that inflated the perception of NEOD001's efficacy and was not "validated" by the medical community; (b) was different than the measurement "set by the International Amyloidosis Society;" (c) was not an "internationally used and very consistent criteria" (in fact, it was highly variable); and (d) as a result, did not provide a basis to determine whether the Phase 1/2 trial results supported the efficacy of NEOD001. Also, the comparison of the 53% NT-proBNP best response rate achieved in the phase 1/2 NEOD001 study as "comparing favorably" to published historical response rates in patients previously treated with plasma cell directed therapy was false and misleading since those studies did not apply a NT-proBNP "best response" biomarker.

**(o) The February 14, 2017, Prothena Conference Call**

160. On February 14, 2017, Prothena held a conference call with analysts and investors to discuss the Company's earnings for the fourth quarter and full year 2016. During that conference call, Defendant Kinney stated:

> **Data from the study also demonstrated improvement in three organ systems: cardiac, renal, and peripheral nerve. Specifically, the results of the best-response analysis showed that 53%, or 19 of 36 of the cardiac-evaluable patients, demonstrated a cardiac response . . . .**
>
> **These response rates, achieved across three organ systems in our study, compared favorably to published historical response rates in patients previously treated with plasma cell-directed therapy.**

**Based on these positive data from the Phase 1/2 study, we remain confident in the design and powering of our two ongoing clinical studies, the PRONTO and VITAL amyloidosis studies.**

The primary endpoint of the PRONTO study is cardiac best response, as defined by a change in NT-proBNP. **NT-proBNP is a widely clinically validated functional biomarker that predicts survival in patients with AL amyloidosis following intervention and has been demonstrated by numerous retrospective and prospective studies. Demonstrating a significant effect on cardiac response as measured by NT-proBNP, along with supporting secondary outcomes, has the potential to expedite our development timeline and provide an additional opportunity to engage with European regulators.**

We also continue to closely follow the important work of the Amyloidosis Research Consortium, or ARC, as they continue their dialogue with regulators on this topic. **Most recently, in December of 2016, ARC reported the submission of draft guidance to the FDA on developing new therapies in AL amyloidosis. Amongst other topics, this guidance reiterated the AL amyloidosis research community's assessment of the evidence for NT-proBNP as a surrogate endpoint for clinical outcome and survival.**

They've [the Amyloidosis Research Consortium] also been pursuing, for some time now, the qualification procedures within the FDA. **And here I think they've been pretty clear that they're looking to qualify cardiac response as defined by change in NT-proBNP, as a surrogate efficacy outcome measure for interventional studies in AL amyloidosis with cardiac involvement.** And then thirdly, and I mentioned this in the call today, **they submitted draft guidance document to the FDA at the end of last year, which as at least part of that document again reiterated their view that use of NT-proBNP and the cardiac response biomarker should be utilized in interventional studies, in as much as it is very predictive of survival in this patient population.**

I'd point, too, to some work at ASH. A lot of the previous work that the Amyloidosis Research Consortium was relying on were retrospective data, was very robust data, don't get me wrong, but it was retrospective nonetheless. **At ASH in 2016, there were actually two groups, the UK group and the Italian group, which published independent studies, which independently showed that in a prospective manner NT-proBNP was predictive of survival again in this disease.**

**And so, I think it's a very robust biomarker. It clearly, both from retrospective and prospective data without any exception is predictive of survival, uniquely in this patient population.** I think, with strong data, I think it will be a good dialogue with the agency, where the agency is, at least with respect to FDA, at that point in their thinking about this biomarker, I can't really comment on today. **But we are encouraged that they continue to be educated by an independent third party like the Amyloidosis Research Consortium.**

161. The statements set forth above were materially false and misleading because the "best response" NT-proBNP biomarker used in the Phase 1/2 study (a) was a cherry-picked metric that inflated the perception of NEOD001's efficacy and was not "validated" by the medical community; (b) had not been propounded by the International Society of Amyloidosis as a measure of cardiac response and as a surrogate marker of survival in AL amyloidosis; (c) was not the biomarker proposed in the Society's draft guidance submitted to the FDA; (d) was not the biomarker shown to be predictive of disease in prior studies, including in the UK and Italian group studies presented at ASH 2016; (e) was not a reliable measure in interventional trials due to its high natural variability; and (f) as a result, did not provide a basis to determine whether the Phase 1/2 trial results supported the efficacy of NEOD001. Also, the comparison of the 53% NT-proBNP best response rate achieved in the phase 1/2 NEOD001 study as "comparing favorably" to "published historical response rates in patients previously treated with plasma cell-directed therapy" was false and misleading since those studies did not apply a NT-proBNP "best response" biomarker.

**(p) The February 27, 2017, Form 10-K**

162. On February 27, 2017, Prothena filed with the SEC its annual report on Form 10-K for the year ended December 31, 2016. In addition to reporting the final results of Prothena's Phase 1/2 study, reiterating the best response results of 53% for cardiac patients, Prothena continued to favorably compare its findings to historical studies, stating:

> In a best response analysis of patients in the Phase 1/2 study who received NEOD001, 53% or 19 of 36 total cardiac-evaluable patients demonstrated a cardiac response, defined as more than 30% and 300 pg/mL decrease in levels of NT-proBNP. **These cardiac best response rates compared favorably to cardiac response rates of 0% to 15% from available published historical data in patients previously treated with plasma cell directed therapy,** and were consistent with the best response rate of 57%, or 8 of 14 cardiac-evaluable patients, reported in the interim analysis of the dose escalation phase (n=27) of the

NEOD001 Phase 1/2 study published in the Journal of Clinical Oncology in February 2016.

163. The statements set forth above were materially false and misleading because the "best response" NT-proBNP biomarker used in the Phase 1/2 study (a) was a cherry-picked metric that inflated the perception of NEOD001's efficacy and was not "validated" by the medical community; (b) was not applied in the "available published historical data in patients previously treated with plasma cell-directed therapy" and (c) was not a reliable measure in interventional trials due to its high natural variability. Also, the comparison of the 53% NT-proBNP best response rate achieved in the phase 1/2 NEOD001 study to "cardiac response rates of 0% to 15% from available published historical data" was false and misleading since those studies did not apply a NT-proBNP "best response" biomarker.

**(q) The March 21, 2017, Oppenheimer Healthcare Conference**

164. On March 21, 2017, at the Oppenheimer Healthcare Conference, Defendant Kinney gave a presentation where he emphasized the results of Prothena's Phase 1/2 trial, specifically best response results of 53% for cardiac patients. Additionally, Defendant Kinney discussed during this conference the relevance of the Phase 1/2 results to the Phase 2b PRONTO, stating that PRONTO is "very similar to the Phase 1/2 study, in as much as we're looking at patients that have previously had standard of care, but still have ongoing organ dysfunction," which he acknowledged was "the most dire circumstance for these patients."

165. Defendant Kinney also stated during the presentation:

> **The consensus criteria basically says for anyone that has an NT-proBNP level above 650 nanograms per liter, which is well dysfunctional, that a decrease by 30% and -- so it's an and statement -- 300 nanograms per liter represents a response. So what does a response mean? Well, what's been shown actually in multiple independent studies, both through retrospective studies as well as now two randomized prospective studies, NT-proBNP lowering and achieving that response predicts survival in these patients very, very well and without exception.**

> **So from a clinical perspective, I think we would argue that this is a very well-validated biomarker that is predictive of survival.** The Amyloidosis Research Consortium you brought up I think is doing some great work in this space. Obviously, they are outside of the walls of Prothena and they are an independent organization, a group that consists of both patients as well as some of the leading physicians in the world. **And as we know from publicly released information, it looks like they have engaged with the FDA, at least on three fronts.**
>
> And the first is a patient voice initiative where they've had meetings with FDA and brought patients to talk about disease and levels of risk tolerance in this disease. **The second kind of area that they have been focused on, I think it was in December of last year, they talked about submission of draft guidance documents to the FDA. We haven't seen anything come back from the FDA on that point, but are encouraged that the Amyloidosis Research Consortium has taken that step.**
>
> **Part of that draft guidance document was a discussion on the use of this cardiac endpoint, and so -- and actually a recommendation that it be used even over survival studies in the context of developing interventional therapies for AL amyloidosis with cardiac involvement.**
>
> The third approach that they have taken that they have talked about is that they have engaged directly with the FDA on the biomarker qualification process, which is a formal process that the FDA has. **And here what the Amyloidosis Research Consortium has said is that they are very interested in seeing the NT-proBNP biomarker fully qualified as a surrogate efficacy outcome measure in the context of interventional studies in AL amyloidosis.**
>
> **So we are encouraged by that work.** We haven't seen the FDA come back favorably in those discussions yet, but we know that those conversations are ongoing, which we think is great from an educational perspective. I think -- and you had asked EMA and FDA. **What we have said I think very consistently as a company is that based on the written regulatory feedback we've received to date, our guidance has been that the PRONTO study, which is based on the biomarker, with the appropriate data set would allow us for the productive and correct conversations with the European regulators around the potential for conditional approval.**

166. The statements set forth above were materially false and misleading because the "best response" NT-proBNP biomarker used by Prothena (a) was a cherry-picked metric that inflated the perception of NEOD001's efficacy and was not "very well-validated" by the medical community; (b) was not a "consensus criteria;" (c) was not applied in "multiple independent studies, both through retrospective studies as well as . . . two randomized prospective studies,"

and shown in those studies to "predict[] survival in these patients very, very, well and without exception;" (d) was not propounded, including in draft guidance documents, by the Amyloidosis Research Consortium to the FDA; (e) was not a reliable measure in interventional trials due to its high natural variability; and (f) as a result, did not provide a basis to determine whether the Phase 1/2 trial results or the PRONTO results (if the endpoint was reached) supported the efficacy of NEOD001 or to support European conditional approval.

**(r) The May 9, 2017, Press Release and Form 10-Q**

167. On May 9, 2017, Prothena issued a press release on its first quarter 2017 financial results and an R&D update, and it filed its Form 10Q for the quarter. The press release stated that Prothena had:

> Completed enrollment in the Phase 2b PRONTO study evaluating NEOD001 in previously treated patients with AL amyloidosis and persistent cardiac dysfunction. Based on the high level of patient interest, there are 129 patients randomized in the study, representing over-enrollment by 29 patients. The PRONTO study is a global, double-blind, placebo-controlled, registration-directed study with **a primary endpoint of best response over 12 months of the cardiac functional biomarker NT-proBNP, defined by the consensus criteria of NT-proBNP change.** Secondary endpoints include quality of life, functional and biomarker measures.

168. The Form 10-Q include substantially the same statements, stating:

> In March 2017, we completed enrollment in the Phase 2b PRONTO study evaluating NEOD001 in previously treated patients with AL amyloidosis and persistent cardiac dysfunction. Based on the high level of patient interest, the study is over-enrolled with 129 patients randomized. The PRONTO study, **a global, double-blind, placebo-controlled, registration-directed study with a primary endpoint of best response over 12 months of the cardiac functional biomarker NT-proBNP, defined by the consensus criteria of NT-proBNP change.** Secondary endpoints include biomarker, quality of life and functional measures.

169. The statements set forth above were materially false and misleading because the "best response" NT-proBNP biomarker used by Prothena (a) was a cherry-picked metric that inflated the perception of NEOD001's efficacy and was not accepted by the medical community;

(b) was not applied in the available published historical data in patients previously treated with plasma cell directed therapy; (c) had not been "consistently demonstrated in numerous peer-reviewed publications" to predict survival in patients with AL amyloidosis; (d) was not a reliable measure in interventional trials due to its high natural variability; and (e) did not represent a "consensus criteria" for cardiac response.

**(s) The May 3, 2017, Health Care Conferences**

170. On May 3, 2017, Defendant Kinney presented on behalf of Prothena at the Deutsche Bank Health Care Conference, Defendant Kinney once again cited the results of the Phase 1/2 study. Among other things, Kinney reiterated that

- Prothena "measured cardiac and renal improvement in the Phase I/II study was **by using consensus criteria**, which is largely biomarker based."
- The International Society of Amyloidosis has "shown very nicely, both using retrospective and prospective data, is **that if you lower NT-proBNP in patients** where the NT-proBNP level is at least at 650 nanograms per liter or higher, if you lower that **by 30% in 300 nanograms per liter, both criteria, those patients survive at a much greater rate than patients where you don't see that effect**."
- The Pronto Phase IIb study "is using **that NT-proBNP response criteria** as a primary outcome measure."
- "So in discussions with regulators. And based on written feedback that we've received from them, [a positive PRONTO study] **may be sufficient for, I think, productive interaction dialogue with the European regulators around conditional approval**."
- The Amyloidosis Research Consortium (ARC) has "talked to the FDA and indicated that they've been speaking with the FDA on an ongoing way **about the qualification of the NT-proBNP response as a surrogate efficacy outcome measure**."
- The ARC also "submitted draft guidance to the FDA on the development of therapeutics in this space, wherein **they talk pretty extensively about the use of the NT-proBNP response criteria,** its predictive value in this disease space, how it's different in chronic heart failure generally **and why, at least in their opinion, they believe that it should be utilized as a primary outcome measure for studies that are interventional in patients with AL amyloidosis and cardiac involvement**."

171. On May 18, 2017, Defendant Kinney presented on behalf of Prothena at a Bank of America Merrill Lynch Healthcare Conference. Defendant Kinney made the same points as in the Deutsche Bank conferences, stating that:

- In the Phase IIb Pronto trial, "**what we'll be evaluating is a biomarker that's been at least clinically validated in this community to predict improved survival when you meet the certain criteria on this cardiac biomarker. It is the same biomarker that we used in our Phase I/II study and a very similar population to the Phase I/II study.**"
- "**So that study, as you indicated, if positive, based on regulatory feedback we've received to date, we feel, could provide for, I think, positive discussions with the European regulators around conditional approval**."
- "Well, so I would say that, again if you think about where that -- where we're using that marker, we're using that marker as a primary outcome measure in our PRONTO study. **And as I mentioned, I think there, with a positive study, we feel that it's probably more appropriate and probably more -- there's probably more of an opening to go have a productive dialogue with the European regulators."**
- "And what we know then, what that translates to in the clinical setting is really in a number of studies, both retrospective and prospective, where there's NT-proBNP response, i.e. a lowering of NT-proBNP by a certain amount from baseline has been observed after intervention in patients with AL amyloidosis. This is called the cardiac response in the field of AL amyloidosis. **When you see that, it predicts with highly significant and almost with no contrary data improved survival in these patients. And so clinically I think it's fair to say that this is commonly used as a way to monitor patients' response to intervention and used to inform decisions about further treatment, further intervention."**
- "[T]he Amyloidosis Research Consortium is actively interacting with FDA. . . . **They've worked with them through a formal qualification process and working with them to qualify NT-proBNP as a surrogate efficacy outcome measure for interventional studies in AL amyloidosis. And they've also submitted a, I believe, draft guidance document to FDA, wherein a significant portion of that talks about the preference for use of NT-proBNP biomarker changes over survival studies in this patient population. And so I think there's a robust literature around that. And of course, in that you can see, I think, just a lot of clinical support that bolsters those points."**

172. On May 23, 2017, Defendant Kinney gave a presentation on behalf of Prothena at the UBS Global Healthcare Conference. During the presentation, Ellen Rose, Head of

Communications repeated that the NT-proBNP biomarker used by Prothena was widely accepted, stating:

> **So as you know, the primary end point for PRONTO is NT-proBNP. It's the cardiac biomarker that's understood to be very indicative of survival, particularly in amyloidosis more than other diseases where NT-proBNP is used as a measure of heart failure.**

173. The above statements by Kinney and Rose, on behalf of Prothena, were materially false and misleading because the "best response" NT-proBNP biomarker used by Prothena (a) was a cherry-picked metric that inflated the perception of NEOD001's efficacy and was not "clinically validated" or "commonly used" biomarker that was accepted by the medical community; (b) was not a "consensus criteria" (c) was not "understood to be very indicative of survival, particularly in amyloidosis;" (d) was not propounded by the International Society of Amyloidosis; (e) was not propounded, including in draft guidance documents, by the Amyloidosis Research Consortium to the FDA; (f) was not a reliable measure in interventional trials due to its high natural variability; and (g) as a result, did not provide a basis to determine whether the Phase 1/2 trial results or the PRONTO results (if the endpoint was reached) supported the efficacy of NEOD001 or to support European conditional approval.

**(t) The September 18, 2017, Press Release and November 8, 2017 Form 10-Q.**

174. On September 18, 2017, Prothena issued a press release announcing that it had presented "New Research Supporting Clinical Relevance of Cardiac Biomarker NT-proBNP in AL Amyloidosis." The study demonstrated the "relationship between misfolded light chain toxicity to heart cells and production of NT-proBNP." Specifically, the research purported to show that increased misfolded light chain production induced oxidative stress in heart cells and also increased NT-proBNP secretion.

175. The press release added that "**NT-proBNP is a cardiac biomarker that has been shown in multiple independent studies to predict survival in patients with AL amyloidosis (Merlini, et. al, Leukemia, 2016)**" and quoted Defendant Noonberg stating that "**These results provide new insights into the important role of NT-proBNP in AL amyloidosis, unique from other forms of heart failure, and offer further support for the clinical utility of NT-proBNP as a surrogate biomarker in AL amyloidosis studies**." The press release also added:

> The PRONTO study, a global, Phase 2b, double-blind, placebo-controlled, registration-directed study, will evaluate NEOD001 vs. placebo in previously-treated patients with AL amyloidosis and persistent cardiac dysfunction, and **will assess best response over 12 months of the cardiac biomarker NT-proBNP, defined by the consensus criteria of NT-proBNP change**, in addition to other biomarker, quality of life and functional endpoints.

176. Prothena repeated these statements in its November 7, 2017, Form 10-Q filed for the third quarter of 2017 with the SEC. The Form 10-Q stated:

> In September 2017, we presented new research at the Heart Failure Society of America Annual Scientific Meeting that further supports the important role of the cardiac biomarker NT-proBNP in both the biology and clinical aspects of AL amyloidosis. Preclinical data presented in a moderated poster talk and poster session at the conference demonstrated the relationship between misfolded light chain toxicity to heart cells and production of NT-proBNP. **NT-proBNP is a cardiac biomarker that has been shown in multiple independent studies to predict survival in patients with AL amyloidosis (Merlini, et. al, Leukemia, 2016).**

177. The above statements were materially false and misleading because Prothena failed to disclose that, in its own clinical studies, it did not measure NT-proBNP by using a biomarker that was shown in "multiple independent studies to predict survival in patients with AL amyloidosis" but rather utilized a "best response" measure that (a) was a cherry-picked metric that inflated the perception of NEOD001's efficacy and was not "validated" by the medical community; (b) was not a "consensus criteria;" (c) was not applied in "multiple independent studies" or the Merlini study; (d) was not a reliable measure in interventional trials

due to its high natural variability; and (e) as a result, did not provide a basis to determine whether the Phase 1/2 trial results or the PRONTO results (if the endpoint was reached) supported the efficacy of NEOD001.

**(u) The November 8, 2017, Credit Suisse Healthcare Conference**

178. On November 8, 2017, Defendant Kinney presented on behalf of Prothena at the Credit Suisse Healthcare Conference. Consistent with the conferences at which he presented in May, Defendant Kinney stated:

> **And here what we're looking at as a primary outcome measure is, what we call, a cardiac consensus response, which is based on a biomarker known as NT-proBNP. The consensus response criteria in the field requires a baseline NT-proBNP level of somewhere between 650 to 8,500 nanograms per liter at baseline, which is certainly abnormal. And we're looking to see a 30% decrease in that following initiation of treatment, plus it's an and statement, at least 300 nanogram per liter decrease. And what that essentially means is any baseline below 1,000 requires something in excess of 30% reduction. So that's the way the consensus criteria is set.**
>
> **Using those consensus criteria, I think the field has shown, through multiple studies, both interventional -- well, certainly with multiple interventional approaches, that if you reach those criteria, it predicts better outcome with respect to survival.**…
>
> ***
>
> Yes. So from an overall study perspective, I think one of the most comprehensive papers written was by Dr. (inaudible) and others that came out in leukemia end of 2015, I believe. **In that study, which was done in association with the Amyloidosis Research Consortium, they looked back at a number of retrospective studies that had evaluated the survival benefit that could be derived from meeting the definition of cardiac response by using the consensus criteria.** And I think overall, what I'd say is while the numbers differ between studies to some extent, it was invariant. **I mean, basically in every single study where you looked at this from a interventional perspective. In other words, I'm intervening with some form of treatment and it didn't matter what the treatment was, did you have an NT-proBNP response or cardiac response by this criteria or did you not and what did that project in terms of outcome with respect to survival. And in every cases, it was very, very predicable survival.**

> There have now been two prospective studies run that I'm aware of as well: One out of the London group and one out of Italian group. And in both cases, they used NT-proBNP response again. **And again, it was predictive survival, which was actually quite remarkable because with the initial data set, the primary treatment arms didn't differ. But if you ask the question, did the cardiac consensus criteria predict survival, it did. So for those that actually had this response, you saw improved survival.**
>
> **So what I'd say is without exception in every study that's ever been evaluated, if you meet this consensus criteria of NT-proBNP response regardless of interventional approach, you see a benefit with respect to survival. And to some extent on some of those retrospective analysis, you can actually start to quantitate that to a different degree.**

179. The above statements by Defendant Kinney were materially false and misleading because the "best response" NT-proBNP biomarker used by Prothena (a) was a cherry-picked metric that inflated the perception of NEOD001's efficacy and was not "validated" by the medical community; (b) was not a "cardiac consensus criteria" that was accepted by the medical community; (c) was not utilized in "multiple" prior studies," including the 2015 study in *Leukemia* or the prospective studies by the London and Italian groups; (d) did not predict "very credible" survival rates; (e) was not propounded by the International Society of Amyloidosis; (f) was not propounded, including in draft guidance documents, by the Amyloidosis Research Consortium to the FDA; (g) was not a reliable measure in interventional trials due to its high natural variability; and (h) as a result, did not provide a basis to determine whether the Phase 1/2 trial results or the PRONTO results (if the endpoint was reached) supported the efficacy of NEOD001.

**(v) The November 16, 2017, Prothena R&D Day**

180. On November 16, 2017, at Prothena's R&D Day, Defendant Noonberg touted the results of Prothena's NEOD001 Phase 1/2 study, stating that

> **[i]n this first in-human study, we also observed organ responses in the 3 main organ systems I talked about earlier: cardiac, renal and the peripheral nervous system. So the Phase I/II study gave us confidence then for**

**PRONTO, and the goal of PRONTO being to confirm the cardiac responses that we observed in the open-label setting in the Phase I/II study now in a double-blind placebo-controlled study. And given what's been published extensively in the literature about the predictive ability of cardiac responses to predict improved overall survival on interventions, success on PRONTO will give us even more confidence about VITAL,** our ongoing Phase III study where the primary endpoint is survival in cardiac hospitalizations in newly diagnosed, treatment-naive patients.

***

So starting with PRONTO. **And a major derisking aspect of PRONTO was the extent to which the PRONTO patient population is similar to the Phase I/II patient population where we previously observed organ responses.** And this slide, as well as the next slide, **provides us with a lot of reassurance** that, in fact, these 2 patient populations are very similar with key demographic and baseline characteristics that might affect the outcome.

181. A slide in Prothena's R&D presentation also represented the validity of the NT-proBNP measure, stating:




182. The above statements made at the Prothena R&D Day conference or published by Prothena as part of the presentation accompanying the statements were materially false and

misleading because the "best response" NT-proBNP biomarker used by Prothena (a) was not "published [about] extensively in the literature about the predictive ability of cardiac responses to predict improved overall survival on interventions" (b) was not "a widely established cardiac biomarker that has been validated globally for its utility in AL amyloidosis;" (c) was not "widely established as a cardiac biomarker in clinical care for amyloidosis patients;" (d) was not a reliable measure in interventional trials due to its high natural variability; (e) as a result, did not provide "reassurance" or a basis to determine whether the Phase 1/2 trial results or the PRONTO results (if the endpoint was reached) supported the efficacy of NEOD001 or that the Phase 1/2 trial results "derisked" the PRONTO study.

**(w) The January 10, 2018, J.P. Morgan Healthcare Conference**

183. On January 10, 2018, Prothena gave a presentation at the JP Morgan Healthcare Conference. The presentation included substantially the same individual patient progression slides as in the prior year's J.P. Morgan Healthcare and included the following "Key Findings" slide that repeated the statements made in the prior year's slide:




184. The January 10, 2018, presentation also included the same individual patient progression slides as in the previous year's presentation and added the following slide:



185. During the conference, Defendant Kinney made the following statements concerning the "best response" biomarker used in the Phase 1/2 and PRONTO studies:

> Minimally, you have to have a 650 nanogram per liter NT-proBNP to be eligible for the PRONTO study, which is consistent with Phase I/II. **I think the other thing that we saw in Phase I/II, we had done some work to at least give us assurance that the prior chemotherapy that patients had received wasn't contributing to the response profile we saw in NEOD001. We have lots of data that speaks to the fact that, that's unlikely to be the case.** That said, we introduced a specific washout period in PRONTO that we didn't have in Phase I/II. So if you had prior chemotherapy, you need to be off that chemotherapy for a minimum of 6 months before you enter into the PRONTO study. I'm struggling to remember if there are any other significant differences.
>
> * * *
>
> As you would imagine, in the context of the regulatory discussions, we also discussed the potential for early approval, conditional approval in Europe, accelerated approval in the U.S. **And at least with respect to the feedback we've received from the European regulators, I think what we've been saying pretty consistently is that we believe that if PRONTO is positive, meaning primary end point is positive, the secondary endpoints are supportive of clinical benefit, that, that would allow for a productive dialogue with the European regulators around the potential for conditional approval….**

186. In responding to an analyst question during the conference about presenting Phase 1/2 trial results over time, as opposed to best response results, Defendant Nguyen represented that such a figure "***wouldn't be a good predictor. It just wouldn't.***" Additionally, Defendant Nguyen stated that using the "best response" criteria was appropriate because otherwise "you might miss a response."

187. The statements set forth above were materially false and misleading because the "best response" NT-proBNP biomarker used by Prothena (a) was a cherry-picked metric that inflated the perception of NEOD001's efficacy; (b) was not applied in the available published historical data in patients previously treated with plasma cell directed therapy; (c) was not a reliable measure in interventional trials due to its high natural variability; (d) as a result, did not provide a basis to determine whether the Phase 1/2 trial results or the PRONTO results (if the

endpoint was reached) supported the efficacy of NEOD001; and (e) as a result, there was no basis to state that European regulators would consider approving NEOD001 based on a "best response" NT-proBNP result in PRONTO.

**(x) The February 14, 2018, Prothena Press Release And Conference Call**

188. On February 14, 2018, Prothena issued a press release on its 2017 financial results and an R&D Update.

(a) The press release quoted Defendant Kinney stating that:

> "In 2017, our team **progressed our clinical stage development programs towards key milestones,** unveiled novel discovery programs, and continued to build our organization to support our maturing pipeline," said Gene Kinney, Ph.D., President and Chief Executive Officer of Prothena. "We successfully completed enrollment in both the Phase 2b PRONTO and Phase 3 VITAL studies in AL Amyloidosis. We also presented data elucidating the toxic effect — that is unique from other forms of heart failure — of misfolded soluble light chain on cardiomyocytes that results in increased production of NT-proBNP, **a cardiac biomarker that has been shown in multiple independent studies to predict survival in patients with AL amyloidosis."**

(b) The press release also stated that Prothena had

> Completed enrollment in the Phase 2b PRONTO study evaluating NEOD001 in previously treated patients with AL amyloidosis and persistent cardiac dysfunction. The PRONTO study is a global, double-blind, placebo-controlled, registration-directed study **with a primary endpoint of best response over 12 months of the cardiac biomarker NT-proBNP, defined by the consensus criteria of NT-proBNP change.** Secondary endpoints include evaluations of SF-36 and Six-Minute Walk Test.

189. During the conference call that day with analysts and investors regarding Prothena's fourth quarter and full year 2017 earnings. Defendant Kinney again assured the market that the Company's best response analysis was appropriate, stating:

> **The primary endpoint of the PRONTO study is cardiac best response over 12 months as defined by the consensus criteria that measure a change in NT-proBNP. The criteria were developed and are currently used in clinical practice by physicians who treat patients with AL amyloidosis.**

**With respect to secondary endpoints in PRONTO, I think we've always been pretty consistent that the primary thing that obviously we're most interested in is the primary outcome, which is NT-proBNP. We believe in the predictive value of that for survival as it has been used and elucidated in the field.**

Our assumption is that with a positive PRONTO trial with the primary coming in strong and the secondary is supportive, **that we think we could have the productive dialogue with the European regulators around conditional approval.**

190. Defendant Kinney later answered the following question concerning best response:

**Kennen B. MacKay** - RBC Capital Markets, LLC, Research Division - Co-Head of Biotechnology Research

Got you. And then just one more quick follow-up as it relates to doing some sort of historical comparisons throughout the trial landscape here**. Can you talk a little bit about the sort of best response analysis for NT-proBNP that's been used sort of in a landscape fashion at a specific time point versus a best response over a period of time?** And how that relates to the trials that you had run as well as some of the trials across the, again, historical landscape here and really, how we should think about sort of reconciling between these 2 different endpoints?

**Gene G. Kinney** - *Prothena Corporation plc - President, CEO & Director*

Yes, sure. So there -- so when people have looked at NT-proBNP response, they've done it multiple different ways. They've done it at various time points, 3 months, 6 months, 12 months. People have used best response. **And I think what we can say is across all of those analyses, without any exception that I'm aware of, NT-proBNP response predicts survival following intervention. I think -- and when** I say NT-proBNP response, I mean, by the consensus criteria, reducing NT-proBNP by at least 30% and a minimum of 300 nanograms per liter….

191. In response to another question, Defendant Nguyen also stated:

And then in terms of your other question regarding PRONTO. I mean, I think, first and foremost, Gene, I think, mentioned this previously, is that **we need to show that we can move NT-proBNP. And I think that's what our primary focus is on because the reliance is that NT-proBNP is predictive of survival in terms of its relevance to clearly VITAL, our Phase III trial that's ongoing. And I think that's the first thing that we are very focused on.**

192. The statements set forth above were materially false and misleading because the "best response" NT-proBNP biomarker used in the Phase 1/2 study and PRONTO study (a) was a cherry-picked metric that inflated the perception of NEOD001's efficacy and was not "validated" by the medical community; (b) was not a "consensus criteria" to "measure the change in NT-proBNP;" (c) was not applied in the available published historical data in patients previously treated with plasma cell directed therapy; (d) was not "currently used in clinical practice by physicians who treat patients with AL amyloidosis;" (e) was not a validated predictor of survival of patients with Al amyloidosis; (f) was not a reliable measure in interventional trials due to its high natural variability; and (g) as a result, did not provide a basis to determine whether the Phase 1/2 trial results or the PRONTO results (if the endpoint was reached) supported the efficacy of NEOD001 or to support European conditional approval.

**(y) The February 15, 2018, Leerink Global Healthcare Conference**

193. On February 15, 2018, Prothena issued a presentation in connection with the Leerink Partners 7th Annual Global Healthcare Conference. The presentation included the following slides touting the use of the NT-proBNP biomarker:







194. The statements set forth above were materially false and misleading because the "best response" NT-proBNP biomarker used in the Phase 1/2 study and PRONTO study (a) was

a cherry-picked metric that inflated the perception of NEOD001's efficacy and was not "validated" by the medical community; (b) was not applied in the available published historical data in patients previously treated with plasma cell directed therapy; (c) was not applied in the "Multiple independent retrospective and prospective studies in 2,000+ patients" or the Merlini study and therefore was not a "validated predictor of better survival in AL amyloidosis;" (d) was not a reliable measure in interventional trials due to its high natural variability; and (e) as a result, did not provide a basis to determine whether the Phase 1/2 trial results or the PRONTO results (if the endpoint was reached) supported the efficacy of NEOD001.

**(z) The February 26, 2018, Form 10-K**

195. On February 26, 2018, Prothena filed with the SEC its Form 10-K for the year ended December 31, 2017, which was signed by Defendants Kinney and Nguyen. In a section discussing Prothena's Research and Development Pipeline, Prothena stated:

> **NT-proBNP is a cardiac biomarker that is widely used by clinicians who treat patients with AL amyloidosis to stage patients at baseline, determine treatment outcomes and predict survival. In multiple independent studies, NT-proBNP has been shown to predict survival in patients with AL amyloidosis (Merlini, et. al, Leukemia, 2016). …**
>
> ***
>
> **The VITAL Amyloidosis Study and the PRONTO study were initiated based on data from the Phase 1/2 multiple ascending dose clinical study.** In 2015, data from an interim assessment from the dose escalation phase of the Phase 1/2 clinical study were reported in oral presentations at both the American Society for Clinical Oncology Annual Meeting (ASCO) and the 20th Congress of the European Hematology Association (EHA) and subsequently published in February 2016 in the Journal of Clinical Oncology. We presented the final analysis from the Phase 1/2 clinical study from patients in both the dose escalation and expansion phases in December 2016 at the American Society of Hematology (ASH) Annual Meeting.
>
> ***
>
> Results of the Phase 1/2 study demonstrated that NEOD001 was safe and well-tolerated in patients with AL amyloidosis and persistent organ dysfunction. **In**

> **this study, clinical assessments demonstrated improvements in three organ systems in previously treated patients with AL amyloidosis.**
>
> **In a best response analysis of patients in the Phase 1/2 study who received NEOD001, 53% or 19 of 36 total cardiac-evaluable patients demonstrated a cardiac response, defined as at least 30% and 300 pg/mL decrease in levels of NT-proBNP. Of the 36 cardiac-evaluable patients, 50% or 18 patients demonstrated a cardiac response, defined as more than 30% and 300 pg/mL decrease in levels of NT-proBNP….**

196. The statements set forth above were materially false and misleading because the "best response" NT-proBNP biomarker used in the Phase 1/2 study and PRONTO study (a) was a cherry-picked metric that inflated the perception of NEOD001's efficacy and was not "validated" by the medical community; (b) was not applied in the available published historical data in patients previously treated with plasma cell directed therapy; (c) was not applied in the Merlini study and therefore was not a "validated predictor of better survival in AL amyloidosis;" (d) was not a reliable measure in interventional trials due to its high natural variability; and (e) as a result, did not provide a basis to determine whether the Phase 1/2 trial results or the PRONTO results (if the endpoint was reached) supported the efficacy of NEOD001.

**(aa) The March 14, 2018, Barclays Global Healthcare Conference**

197. On March 14, 2018, Defendant Kinney gave a presentation on behalf of Prothena at the March 14, 2018, Barclays Global Healthcare Conference. During his presentation, Defendant Kinney stated:

> **The primary endpoint is looking at what happens to a biomarker which in this disease is known to predict survival. So we're looking for a reduction of a peptide known as NT-proBNP. Very uniquely in this disease relative to even general heart failure, we know that reduction by a certain magnitude of this peptide following intervention is highly predictive of survival.** So obviously we'll be looking at a response approach across the 12 months, comparing our treated patients versus placebo patients. . . .

***

> **I think our base assumption and what we've guided to has been very consistent and we haven't changed our view. And that view is based on the interactions we've had with the regulatory authorities, both in the US as well as in Europe. And that is with a positive PRONTO trial, assuming that the data is consistent, i.e., the endpoints are supportive of the primary outcome measure and we have good clinical benefit, we think that we can have a productive dialogue with the European regulators around the potential for conditional approval. . . .**
>
> ***
>
> **And I think here, in the physician communities, NT-proBNP is widely used in this field. In fact, it is the expert physicians that have clinically validated that endpoint. So I think there, there's a lot of comfort in the use of NT-proBNP and what it predicts in this disease and the fact that it would portend to a better outcome for patients**. . . .

198. The statements set forth above were materially false and misleading because the "best response" NT-proBNP biomarker used in the Phase 1/2 study and PRONTO study (a) was a cherry-picked metric that inflated the perception of NEOD001's efficacy and was not "widely used" or "clinically validated" by the medical community; (b) was not applied in the available published historical data in patients previously treated with plasma cell directed therapy; (c) was not a reliable measure in interventional trials due to its high natural variability; and (d) as a result, did not provide a basis to determine whether the Phase 1/2 trial results or the PRONTO results (if the end-point was reached) supported the efficacy of NEOD001; and (e) as a result, did not provide a basis to determine whether the Phase 1/2 trial results or the PRONTO results (if the endpoint was reached) supported the efficacy of NEOD001 or to support European conditional approval.

## VI. ADDITIONAL ALLEGATIONS SUPPORTING THE INDIVIDUAL DEFENDANTS' SCIENTER

199. At all relevant times, the Individual Defendants acted with scienter in making the materially false and misleading statements and omissions alleged herein. The Individual Defendants had actual knowledge that the statements and omissions made by them were false

and misleading, or acted with reckless disregard for the truth or falsity of those statements and omissions. The Individual Defendants' intent to deceive, or reckless disregard for the truth, is demonstrated by substantial direct and circumstantial evidence supporting a strong inference of scienter. *See* Section VI.A. Defendants' scienter is also supported by their motive and opportunity to commit securities fraud. *See* Section VI.B.

### A. Defendants Acted Knowingly and/or Recklessly

#### (a) Defendants Were Subject Matter Experts in the Study of AL Amyloidosis and Had Considerable Relevant Technical Experience

200. The Individual Defendants were highly trained scientists and/or experts in the field of AL amyloidosis and/or held themselves out as knowledgeable about the content of their class period statements alleged to be false and misleading. *See* ¶¶20-22.

201. Prior to being appointed President and CEO, Defendant Kinney was Chief Operating Officer and Chief Scientific Officer of Prothena. Dr. Kinney was a member of Prothena's founding leadership team, and between 2012 and 2016 held the position of Chief Scientific Officer and Head of Research and Development. Before joining Prothena, Dr. Kinney held positions with Elan Pharmaceuticals Inc., including Senior Vice President of Pharmacological Sciences (a position he held from 2011 to 2012), and Vice President, Pharmacology (a position he held from 2009 to 2011); while in those positions, Dr. Kinney also served as Head of Nonclinical Research for Janssen Alzheimer Immunotherapy. Before joining Elan, Dr. Kinney held several senior positions at Merck Research Laboratories and Bristol-Myers Squibb, and was an Assistant Professor at the Emory University School of Medicine. Dr. Kinney earned his B.A. from Bloomsburg University and his M.A. and Ph.D. from Florida Atlantic University.

202. Defendant Noonberg is a board-certified physician and scientist with over 14 years of leadership experience in clinical development, from initial drug discovery to global regulatory approvals and commercialization. Prior to joining Prothena, Dr. Noonberg served as Global Head of Clinical Development at BioMarin, and Senior Vice President at Medivation where she led programs across all phases of development. Dr. Noonberg earned her M.D. from the University of California San Francisco, a Ph.D. in Bioengineering from the University of California, Berkeley, and a B.S. in Engineering Science from Dartmouth College. Noonberg was appointed as the CMO by Prothena's board of directors on May 16, 2017. As the CMO, Noonberg's role was "to define and advance Prothena's product pipeline and lead its clinical and medical organizations."

203. Defendant Nguyen has served as Prothena's Chief Operating Officer since 2018 and its CFO since 2013. He has over 20 years of finance experience in the healthcare, banking and private equity industries. Prior to joining Prothena, Mr. Nguyen was Vice President, Chief Financial Officer (from 2010 to 2011) and then Senior Vice President, Chief Financial Officer of Somaxon Pharmaceuticals, Inc., from 2011 until its sale in 2013. He was Vice President, Chief Financial Officer at Metabasis Therapeutics, Inc., from 2009 until its sale in 2010. From 2007 to 2009, Mr. Nguyen was a Vice President in the Healthcare Investment Banking group at Citi Global Markets, Inc., and from 2004 to 2007 he served in various capacities as a healthcare investment banker at Lehman Brothers, Inc. Mr. Nguyen currently serves on the boards of directors of Sierra Oncology, Inc., a public clinical-stage oncology company, and Rain Therapeutics Inc., a private clinical-stage oncology company. Mr. Nguyen earned his B.A. in Economics and Psychology from Claremont McKenna College and his M.B.A. from the Anderson School of Management at the University of California, Los Angeles.

204. While Defendant Nguyen does not have the technical and scientific background of Defendants Kinney and Noonberg, he nonetheless directly addressed issues at the core of the dispute concerning the "best response" endpoint. For example, on January 10, 2018 at the JP Morgan Healthcare Conference, in response to the question, "Can you just remind me of what you guys think about just the natural fluctuation of proBNP?" Defendant Nguyen replied that "if [NT-proBNP] was ultimately, extremely variable, I think that wouldn't be a great link in terms of NT-proBNP predicting survival. But I think some of the work that Merlini and Palladini have done out of the Italian Group out of Pavia -- Pavia out of Italy group, was [an] intrapatient variability about 9.1% is what they came up with."

205. Defendant Nguyen's statement, which correctly recalled the natural variability of NT-proBNP in a specific study to the correct decimal, highlights his deep knowledge of the subject.

**(b) Defendants Knowingly Cherry-Picked the "Best Response" Endpoint Amid Lackluster Phase 1/2 Results**

206. The Individual Defendants deliberately and consciously selected the "best response" endpoint because it inflated the perceived efficacy of NEOD001 as a potential treatment for AL amyloidosis amid otherwise lackluster results from the Phase 1/2 Study. *See* Section IV.F.

207. Defendants then consciously presented or caused to be presented results from the Phase 1/2 trial without detail sufficient for the investors to understand the ability of NEOD001 to effect a sustained decrease in NT-proBNP. *See generally* Section IV.H (Muddy Waters and Kerrisdale). For example, between November 2015 and March 2016, Prothena issued presentations in connection with (a) the November 10, 2015 Credit Suisse 24th Annual Healthcare Conference; (b) the December 8, 2015 Oppenheimer 26th Annual Healthcare

Conference; (c) the February 8, 2016 Biotechnology Industry Organization CEO & Investor Conference; (d) the March 9, 2016 Cowen and Company 36th Annual Health Care Conference; and (e) the March 11, 2016 Future Leaders in the Biotech Industry Conference. The presentations included a scatterplot chart that excluded non-responders and aggregated the remaining data rather than showing trends for individual patients on NEOD001. In the November 10, 2015 and December 8, 2015 presentations, Prothena included a chart showing the NT-proBNP progression of only a single patient. These were replaced in the March 9, 2016 and March 11, 2016 presentations with charts showing the NT-proBNP progression for two patients: a 46 year-old male (the same patient in the prior presentations) and a 55 year-old male. The charts in the November 10, 2015 presentation were the following:






208. By contrast, on April 29, 2014, before the Class Period and at a much earlier point in the Phase 1/2 trial, Prothena broke out NT-proBNP progression data for ***each*** individual patient, data that failed to show a trend concerning NEOD001's efficacy and ability to reduce NT-proBNP levels and gave the market pause. *See* ¶60. Prothena's cherry-picked presentation of data and the deliberate choice to present more limited data in this manner supports an inference of scienter.

**(c) Defendants Consciously Mischaracterized the Scientific Literature to Mislead the Market Concerning the "Best Response" Endpoint and Cherry-Pick an Outlier Measure of Natural Variability of NT-proBNP**

209. Defendants, as experts in the field, intentionally mischaracterized the scholarly literature on "response" rates to validate their cherry-picked measure of "best response." *See* Section IV.G. Defendants knowingly relied on a cherry-picked measure of the natural variability of NT-proBNP that rendered their statements concerning the validity of the "best response"

endpoint misleading. *See* Section IV.L. Defendants knowingly and repeatedly affirmed that the "best response" endpoint was adopted and validated by the AL amyloidosis community, when this was demonstrably false. *See* Section IV.G. Further, while touting NEOD001's perceived efficacy, Defendants also knowingly made comparative statements between the NEOD001 "best response" trials and prior AL amyloidosis studies that did not employ a best response analysis. *See* Section IV.J.

210. For example, shortly after the start of the Class Period, Defendants held a conference call on October 15, 2015, to provide a NEOD001 clinical development update. During this call, Defendant Kinney discussed the promising use of the "best response" rate as the primary endpoint for the PRONTO study because it was supported by "groups like the Amyloidosis Research Consortium also supporting the use of this endpoint in a regulatory environment." There, however, were no historical AL amyloidosis clinical trials that have ever utilized a "best response" primary endpoint.

211. There are several important documents that address best practices in clinical trial design for AL amyloidosis. These include:

(a) "Guidance for Industry: AL Amyloidosis — Developing Drugs for Treatment," a December 2016 document resulting from a collaboration between the US Food and Drug Administration and the Amyloidosis Research Consortium;

(b) G. Merlini et al., *Rationale, Application and Clinical Qualification for NT-proBNP as a Surrogate End Point in Pivotal Clinical Trials in Patients with AL Amyloidosis*, 30 LEUKEMIA 1979 (2016) ("Merlini 2016");

(c) RL. Comenzo et al., *Consensus Guidelines for the Conduct and Reporting of Clinical Trials in Systemic Light-Chain Amyloidosis*, 26 LEUKEMIA 2317 (2012) ("Comenzo 2012")

212. Each of these documents was cited by Prothena in its SEC filings or by one of the Individual Defendants during the Class Period and therefore the content of each was known by Defendants.

213. A review of these documents finds no discussion of the "best response" endpoint. Further, Merlini 2016, which specifically addressed the use of NT-proBNP as a surrogate endpoint in clinical trials, also references 12 prior clinical studies on the subject of NT-proBNP. Out of the 12 cited studies in Merlini 2016, none used a "best response" endpoint:

| Article | Mentions best response? |
|---|---|
| Palladini G, Dispenzieri A, Gertz MA, Kumar S, Wechalekar A, Hawkins PN et al. New criteria for response to treatment in immunoglobulin light chain amyloidosis based on free light chain measurement and cardiac biomarkers: impact on survival outcomes. *J Clin Oncol* 2012; 30: 4541–4549. | No |
| Palladini G, Campana C, Klersy C, Balduini A, Vadacca G, Perfetti V et al. Serum N-terminal pro-brain natriuretic peptide is a sensitive marker of myocardial dysfunction in AL amyloidosis. *Circulation* 2003; 107: 2440–2445. | No |
| Kumar SK, Gertz MA, Lacy MQ, Dingli D, Hayman SR, Buadi FK et al. Recent improvements in survival in primary systemic amyloidosis and the importance of an early mortality risk score. *Mayo Clin Proc* 2011; 86: 12–18. | No |
| Kristen AV, Biener M, Hegenbart U, Hardt S, Schnabel PA, Rocken C et al. Evaluation of the clinical use of midregional pro-atrial natriuretic peptide (MR-proANP) in comparison to N-terminal pro-B-type natriuretic peptide (NT-proBNP) for risk stratification in patients with light-chain amyloidosis. *Int J Cardiol* 2014; 176: 1113–1115. | No |
| Banypersad SM, Fontana M, Maestrini V, Sado DM, Captur G, Petrie A et al. T1 mapping and survival in systemic light-chain amyloidosis. *Eur Heart J* 2015; 36: 244–251. | No |
| Kristen AV, Rinn J, Hegenbart U, Lindenmaier D, Merkle C, Rocken C et al. Improvement of risk | No |

| Article | Mentions best response? |
|---|---|
| assessment in systemic light-chain amyloidosis using human placental growth factor. *Clin Res Cardiol* 2015; 104: 250–257. | |
| Palladini G, Barassi A, Klersy C, Pacciolla R, Milani P, Sarais G et al. The combination of high-sensitivity cardiac troponin T (hs-cTnT) at presentation and changes in N-terminal natriuretic peptide type B (NT-proBNP) after chemotherapy best predicts survival in AL amyloidosis. *Blood* 2010; 116: 3426–3430. | No |
| Kristen AV, Giannitsis E, Lehrke S, Hegenbart U, Konstandin M, Lindenmaier D et al. Assessment of disease severity and outcome in patients with systemic lightchain amyloidosis by the high-sensitivity troponin T assay. *Blood* 2010; 116: 2455–2461. | No |
| Wechalekar AD, Schonland SO, Kastritis E, Gillmore JD, Dimopoulos MA, Lane T et al. A European collaborative study of treatment outcomes in 346 patients with cardiac stage III AL amyloidosis. *Blood* 2013; 121: 3420–3427. | No |
| Dispenzieri A, Gertz MA, Kyle RA, Lacy MQ, Burritt MF, Therneau TM et al. Serum cardiac troponins and N-terminal pro-brain natriuretic peptide: a staging system for primary systemic amyloidosis. *J Clin Oncol* 2004; 22: 3751–3757. | No |
| Palladini G, Lavatelli F, Russo P, Perlini S, Perfetti V, Bosoni T et al. Circulating amyloidogenic free light chains and serum N-terminal natriuretic peptide type B decrease simultaneously in association with improvement of survival in AL. *Blood* 2006; 107: 3854–3858. | No |
| Kastritis E, Wechalekar AD, Dimopoulos MA, Merlini G, Hawkins PN, Perfetti V et al. Bortezomib with or without dexamethasone in primary systemic (light chain) amyloidosis. *J Clin Oncol* 2010; 28: 1031–1037. | No |
| Kastritis E, Roussou M, Gavriatopoulou M, Migkou M, Kalapanida D, Pamboucas C et al. Long-term outcomes of primary systemic light chain (AL) amyloidosis in patients treated upfront with bortezomib or lenalidomide and the importance of risk adapted strategies. *Am J Hematol* 2015; 90: E60–E65. | No |

214. Notably, Prothena specifically relied upon Merlini 2016 and Comezo 2012 to support statements in the Company's SEC filings:

(a) Prothena cited to Merlini 2016 in its Form 10-Q for the quarter ended September 30, 2017 filed with the SEC on November 7, 2017 when it stated "NT-proBNP is a cardiac biomarker that has been shown in multiple independent studies to predict survival in patients with AL amyloidosis (Merlini, et. al, Leukemia, 2016).";

(b) Prothena also cited to Merlini 2016 article in its Form 10-K for the year ended December 31, 2017 filed with the SEC on February 26, 2018 when it stated "NT-proBNP has been shown to predict survival in patients with AL amyloidosis (Merlini, et. al, Leukemia, 2016).";

(c) Prothena cited to Comenzo 2012 in its Form 10-K for the year ended December 31, 2015 filed with the SEC on February 25, 2016 stating "The 57.1% cardiac best response rate compares favorably with the expected cardiac best response rate of a 26.5% from historical data in patients treated solely with off-label standard of care (Comenzo, et al., Leukemia. 2012; 26:2317-2325)."

215. Moreover, excepting the six trials of NEOD001, there were a total of 25 drug therapy trials for AL amyloidosis listed on clinicaltrials.gov as of November 28, 2018. None of these trials uses "best response" as a primary endpoint and only two (8%) use best response (or the synonymous "maximum response") as a secondary endpoint. Both trials that included "best response" as a secondary endpoint did not adopt that metric until the second half of 2015, indicating that the use likely arose as a reaction to NEOD001's Phase 1/2 trial, rather than from a recognition of the endpoint's validity.

216. Indeed, none of the historical AL amyloidosis clinical trials featured a "best response" endpoint. This, however, did not prevent Defendants from affirmatively drawing comparisons between the results of the NEOD001 Phase 1/2 study and prior research in

company-sponsored published materials. *See, e.g.*, ¶¶133, 138, 140, 141, 144, 146, 148, 153, 157, 160, 165, 171. By citing these research studies and specific data contained therein, Defendants held themselves out to know the content of these materials. Thus, given the falsity and misleading nature of these statements, Defendants either knew that their statements were false when made or consciously disregarded that these materials did not state the proposition for which they were citing them.

**(d) Defendants Knew or Recklessly Disregarded that Measuring "Best Response" Contradicted Their Claims about NEOD001's Mechanism of Action**

217. Defendants described NEOD001's mechanism of action as "draining the bathtub" of amyloid. As stated by Defendant Kinney during the November 8, 2017 Credit Suisse Healthcare Conference, NEOD001 was to remove the amyloid that filled up in a patient's organ or "if you think of this almost like a bathtub analogy, you're trying to turn off the faucet. But what we see is that the bathtub's already full. Otherwise, you wouldn't have a diagnosis, the misfolded material is already there, it's already in the tissue causing dysfunction. And so what's needed is an approach that can actually clean out the bathtub, and that's what NEOD001 is designed to do."

218. There however, is a fundamental disconnect between what Kinney claimed about NEOD001's mechanism of action and what Prothena measured with "best response." As noted by Kinney, NEOD001 was supposed to drain the tub by removing the misfolded amyloid from a patient's organs. Assuming their portrayal of the mechanism was correct, if NEOD001 was effective, the tub would have continued to drain. Thus, the appropriate measurement would not have been a "best response", but rather it should have been measured by evaluating how NT-proBNP levels changed over time. Thus, measuring "best response" contradicts Prothena's claims about NEOD001's mechanism of action. The contradiction between Defendants'

statements concerning NED001's method of action and their measurement of "best response" highlights that Defendants knew their statements concerning NEOD001 were false when made.

219. Moreover, Defendants' own statements support that they knew or recklessly disregarded the importance of changes to the sustained levels of NT-proBNP. For example, during the November 11, 2014 Credit Suisse Healthcare Conference, Kinney admitted that "NT-proBNP changes are highly correlative of clinical outcome." In other words, declines in NT-proBNP are not clinically meaningful unless they are sustained.

**(e) Defendants Ignored Repeated Criticism of "Best Response"**

220. Defendants consciously or recklessly ignored and/or failed to directly address criticism of the "best response" endpoint. On two separate occasions analysts confronted Defendants with flaws in the design and presentation of the Phase 1/2 study data, specifically alleging that Prothena's "best response" metric was not a reliable indicator of efficacy and did not "derisk" the PRONTO and VITAL studies. Instead of directly addressing these concerns or releasing the data requested by market participants, Defendants instead participated in a series of investor meetings where they continued to tout NEOD001's approval prospects. *See* Section IV.H.

**(f) Defendants Quietly Make a "Substantial" Amendment to PRONTO to Include Alternate Efficacy Measures**

221. Despite their continued statements concerning the clinical validity and acceptance of the "best response" endpoint, Defendants "substantially" amended the PRONTO trial to include "NT-proBNP slope" as a secondary endpoint. Without public disclosure, on or about October 22, 2017, Prothena quietly made a "substantial" amendment to PRONTO by adding a new secondary endpoint of "NT-proBNP slope over 12 months of treatment." This secondary endpoint would be used to track the rate of change in NT-proBNP from baseline through 12

months of treatment. This substantial amendment, which was recommended by the experts on the PRONTO steering committee, effectively adopted the suggestion in the Muddy Waters and Kerrisdale reports to "look[] for sustained decline in NT-proBNP" as opposed to the cherry-picked "best response" metric created by Defendants. Defendants quietly added this secondary endpoint despite the fact that a fundamental principle in the design of randomized trials involves setting out ***in advance*** the endpoints that will be assessed in the trial, as failure to prespecify endpoints can introduce bias into a trial and creates opportunities for manipulation. *See* Section IV.I.

**(g) Defendants Had "Real Time" Access to Blinded PRONTO Results and Analyses that Contradicted their Positive Statements Concerning NEOD001**

222. Defendants had access to the Phase 1/2 and blinded PRONTO data which would have contradicted their public statements. The data was circulated quarterly but frequently monthly or even weekly. Analyses of this data would have suggested NEOD001 was not effective and that Defendants' assumptions weren't right. These figures were presented to Defendant Noonberg, who would in turn present the figures to others in the C-Suite. *See* Sections IV.J.

223. The PRONTO trial results, to which Defendants had "real time" access on a blinded basis, indicate that NEOD001 was not effective when compared to placebo for the treatment of AL amyloidosis. These results, when received on a blinded basis, would have also indicated that the placebo group was massively exceeding expectations by triggering "best responses," and thus that NEOD001 was not effective compared to placebo under a best response analysis. *See* Section IV.K.

**(h) Defendants Admit to High Variability of NT-proBNP and Characterize Their Best Response Analysis for the First Time as a "Modified Consensus Criteria"**

224. During the April 23, 2018 conference call to explain the Company's decision to discontinue all NEOD001 studies, Defendant Kinney conceded that NT-proBNP was in fact highly variable, stating that "between patient variability in the placebo group was something that was surprising to us. Said another way, if you looked at the relative difference in slopes between the responders and nonresponders in the placebo group, it was quite widespread . . . ." Similarly, in response to a question from analyst Tazeen Ahmad of Bank of America concerning the continuing validity of the Company's NT-proBNP best response analysis, Defendant Kinney again reiterated the high "between-subject variability that we saw in the placebo arm of the study" as a basis for the disappointing results. *See* Section IV.L.

225. Further, in discussing the PRONTO study results and the reasons for stopping the NEOD001 trials, Defendants implicitly admitted the falsity of their use of the "best response" endpoint by describing it, for the first time, as a "modified consensus criteria." *See id. supra*.

226. Defendants, therefore, knowingly or with conscious recklessness made false and/or misleading statements and/or failed to disclose material information so as to render their statements misleading by representing that the "best response" was an acceptable primary endpoint, stating that certain of these historical studies used a "best response" endpoint, making comparisons between data collected from the NEOD001 trials to the historical data contained in these previous trials on an apples-to-oranges basis, and extolling the "favorable" Phase 1/2 results and Phase 1/2 trial as a strong predicate for the launch and likely success of the Phase 2b PRONTO study and Phase 3 VITAL studies.

### B. Defendants' Motive and Opportunity to Commit Securities Fraud

#### (a) Defendant Noonberg Departs Abruptly Before the PRONTO Study's Data was Unblinded, Foregoing Substantial Compensation

227. On April 2, 2017, Defendant Noonberg accepted Prothena's offer to join the company as the CMO. Pursuant to the offer letter agreement, Noonberg was to be appointed as the CMO by Prothena's board of directors on May 16, 2017. As the CMO, Noonberg role was "to define and advance Prothena's product pipeline and lead its clinical and medical organizations."

228. In exchange for her services, Noonberg's starting salary was $465,000. Furthermore, Noonberg was to receive a retention bonus of $100,000 in her first paycheck "which will be fully earned in the event that [she] remain[s] employed with Prothena for one year." The unearned portion of Noonberg's retention bonus would be repayable by her to Prothena on a pro-rata basis if she ceased employment at Prothena prior to the one-year anniversary of her start date of employment.

229. Noonberg was also eligible to participate in Prothena's cash incentive plan, the Prothena Corporation plc Amended and Restated Incentive Compensation Plan. Prothena determined that Noonberg's targeted cash bonus was to be 40% of her actual plan year salaried earnings. The payment of this bonus was contingent on Noonberg remaining employed with Prothena through the pay date of the otherwise earned award, which would be paid no later than March 15 in the year following the conclusion of the plan year.

230. In 2017, Prothena determined that its overall performance relative to the pre-determined corporate objectives under its Incentive Compensation Plan was 100%, resulting in annual cash bonuses for its named executive officers at 100% of their targeted annual cash bonuses.

231. Noonberg's incentive cash bonus in 2017 was equal to $124,000.

232. Moreover, in connection with Noonberg's commencement of employment, on May 16, 2017, she received an option to acquire 100,000 shares of Prothena common stock with a strike price of $56.37. Prothena ascribed a value of this option granted at $3,640,070. This option was subject to Noonberg's continued employment and would vest 25% on the first anniversary of the grant date, and monthly at a rate of 1/48th of the award thereafter with the option becoming fully vested after a four-year period of continuous employment.

233. Noonberg stayed with Prothena just long enough to obtain her incentive cash bonus for 2017. While Noonberg tendered her resignation from her position on February 2, 2018, she stayed with Prothena until March 15, 2018 to provide "transitional support."

234. Noonberg was not entitled to and did not receive any severance payment or benefit in connection with her resignation, and her stock option was cancelled as of that date. Additionally, pursuant to the terms of her employment agreement, she would have to return to Prothena approximately $16,667 of her signing bonus as she did not remain employed with the company until her one-year employment anniversary.

235. CMO Noonberg's choice to resign is even more peculiar as PRONTO's data was still blinded at the time she informed Prothena that she was resigning. Noonberg's willingness to leave Prothena while the results were still blinded and only less than 9 months after taking the position supports the inference that Noonberg knew that the NEOD001 trials would fail. This inference is further supported by Noonberg's willingness to leave in advance of her one-year anniversary and forego significant amounts of money and value in the to-be-vested options.

236. After the market closed on Friday, February 2, 2018, Prothena announced the unexpected and abrupt resignation of Noonberg from her position as Prothena's CMO. The

sudden departure of Noonberg was a surprise to investors given that the PRONTO study data was still blinded and the anticipated readout was just around the corner. The departure of Prothena's CMO at this time therefore raised significant concerns as to the viability of NEOD001 and the PRONTO study. In fact, investors found this so troubling that Prothena's stock price fell by 18.84% or $7.46 per share on February 5, 2018, declining an additional 9.37%, or $3.01 per share on February 6, 2018.

237. These above-alleged facts concerning Noonberg's departure further contribute to and support an inference that Noonberg and the Defendants acted with scienter.

**C. Defendants Benefitted Financially from the Fraud**

**(a) Defendants Raised More than $275,000,000 While Falsely Touting NEOD001's Approval Prospects**

238. Defendants had the motive and opportunity to commit the alleged fraud. During the Class Period, Prothena raised more than $275,000,000 through public offerings to fund its future operations.

239. On January 7, 2016, Prothena offered 2.25 million shares, plus overallotments, at its then highest ever offering price of $53.00. As a result of selling 2,587,500 shares during the offering in the January 2016, Prothena raised $128.6 million in net proceeds.

240. On March 6, 2017, Prothena further raised the bar for its highest offering price by offering 2.7 million shares at $57.50. As a result of selling 2,700,000 shares during the offering in the March 2017, Prothena raised an additional $150.3 million in net proceeds.

241. In large part because of these offerings, Prothena was able to increase its cash position from approximately $370.586 million in 2015 to $386.923 million in 2016, and ultimately to $417.620 million in 2017, outpacing its spending on NEOD001 and building a cash stockpile to fund clinical trials for other products in the Company's pipeline.

242. Knowing the likely failure of the NEOD001 and the PRONTO and VITAL trials, Defendants sought to stockpile cash by offering these shares at artificially inflated prices to fund their other potentially viable products in its pipeline, including: (i) their continuing obligation from their partnership with Roche to contribute 30% of the development and commercialization costs for PRX002 in the U.S. in exchange for 30% of the drug's potential profits; (ii) PRX004 and its then-upcoming Phase I multiple ascending dose study of PRX004 for the potential treatment of ATTR amyloidosis; and (iii) their other R&D programs, including three programs that Prothena partnered with Celgene, a global biopharmaceutical company.

243. Notably, at the end of an investor conference call held on April 23, 2018 to discuss Prothena's decision to discontinue the development of NEOD001, Defendant Nguyen informed the market that Prothena had "the resources to support our pipeline -- thoroughly support our pipeline." More specifically, Defendant Nguyen responded to a question from Kennen MacKay from RBC Capital Markets, LLC's concerning the effect of the discontinuation of NEOD001 on Prothena's expense guidance for 2018 and stated:

> We clearly will be working behind the scenes on coming to you all with the right guidance at the right time. We'll be working as fast as we can. We clearly want to make sure again we realign our resources appropriately against our pipeline to advance them to meaningful clinical milestones. ***But I can say solidly as of today, we don't need financing to do that. We believe we have the resources to support our pipeline -- thoroughly support our pipeline.*** So we will come back to you very shortly with the reguidance on 2018.

Emphasis added.

244. Given that the market's expectations of Prothena's prospects were strongly tied to the expected success of NEOD001 and the PRONTO study, Defendants were incentivized to make false and/or misleading statements during the Class Period to increase the likelihood the Company would receive the financing needed to fund its operations in a post-NEOD001 environment.

### (b) Corporate Scienter and Core Operations: Prothena's Employees had Extensive Expertise in Pharmaceuticals and Knowledge Concerning AL Amyloidosis and NEOD001 in Particular

245. Prothena's public statements about NEOD001 and its Phase 1/2, PRONTO, and VITAL studies were critical to Prothena's reputation and overall operations. Given the specific allegations of falsity contained herein, a strong inference exists that Prothena's corporate officials knew of the falsity of the statements at the time of publication. Specifically, Prothena's CEO Kinney, CMO Noonberg, and CFO Nguyen knew facts concerning the design of the Phase 1/2, PRONTO, and VITAL studies, the acceptance of the best response rate primary endpoint, the studies on AL amyloidosis and its natural variability, and were privy to discussions with the FDA and the EMA concerning the design of these studies.

246. The development of NEOD001 and achieving FDA and EMA approval as a result of the PRONTO and VITAL studies throughout the Class Period (as well as all times prior thereto) were Prothena's "core matters of central importance," or its "core operations."

247. Indeed, at all times until April 23, 2018, Prothena's main focus was the development of its lead product candidate. This is facially apparent by Kinney's reference to NEOD001 as Prothena's "lead program." This reference is not at all surprising as NEOD001 was Prothena's most developed product candidate during the Class Period and had an expected market value to Prothena in excess of $1 billion. When Prothena on April 23, 2018 announced the PRONTO results and that it was discontinuing research and development of NEOD001, Prothena's stock closed at $11.50 a share, a decline of more than two-thirds from its closing price on April 20, 2018, the prior day of trading, which underscored the importance of NEOD001 to the Company. As detailed herein, Defendants consistently discussed in their SEC filings, their press releases, and in their conference calls the status of Prothena's lead product

candidate NEOD001 and its progress through the various clinical trials, especially the Phase 1/2 and the PRONTO studies.

248. NEOD001 had incredible potential value to Prothena, investors, and to the stock option rights held by Defendants. As noted in a July 10, 2017, Jefferies' analyst report initiating coverage entitled *Pipeline humming, big catalyst around the corner in 2018 - Initiate at Buy*, Jeffries noted that "we think lead drug NEOD-001 for AL amyloidosis (Orphan disease) will show positive data in ongoing Phase IIB PRONTO study in Q2-18 and could be filed to the EMA for accelerated approval supporting our market model and potential $1B [worldwide] peak sales in time with USA."

249. Accordingly, Defendants knew or acted with conscious recklessness in making the misstatements and omissions during the Class Period. Defendants had access to and referred to various documents and data related to NEOD001's clinical trials, the clinical studies designs, access to leading AL amyloidosis experts (such as Dr. Gertz who participated in Prothena's investor conferences to present data on NEOD001 with certain of the Individual Defendants), conversations with both the FDA and EMA concerning NEOD001 clinical trials, and sophisticated scientific knowledge as evidenced by the doctorate and/or medical degrees.

250. Further, at all relevant times, Prothena was a relatively small company. As of December 31, 2015, Prothena had only 66 employees with 40 of them engaged in research and development, up from 46 employees with 29 engaged in research and development as of December 31, 2014. As of December 31, 2016, Prothena had 96 employees with 65 of them engaged in research and development. As of December 31, 2017, Prothena had 125 employees with 83 of them engaged in research and development.

251. That the majority of Prothena's employees worked in research and development and that Prothena had only a few major products in development during the Class Period (with NEOD001 being the most developed), further supports an inference of scienter, making it less likely that details concerning NEOD001's clinical studies and data would be known only by front-line technical personnel, and making it more likely that the details were fully known by Prothena's senior executives and officers.

252. These facts support that the development of NEOD001 was a "core operation" of Prothena. Consequently, Defendants' scienter concerning such core operations – and, specifically, NEOD001's studies, the comparisons of NEOD001 studies and data to other academic articles, and the natural variability of NT-proBNP and issues concerning the use of the "best response" endpoint – may be inferred. Collectively, these facts further support a strong and cogent inference of Defendants' scienter. *See* Section IV.B.-C., *supra*.

## VII. LOSS CAUSATION AND ECONOMIC LOSS

253. During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated and/or maintained Prothena's stock price, and operated as a fraud or deceit on acquirers of Prothena's common stock. As detailed above, when the truth about NEOD001 and the PRONTO study was revealed, the value of Prothena's securities declined precipitously as the prior artificial inflation no longer propped up its stock price. The decline in Prothena's share price was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market. The timing and magnitude of the common stock price decline negates any inference that the loss suffered by the Lead Plaintiffs and other members of the Class was caused by changed market conditions, macroeconomic or industry factors or Prothena-specific facts unrelated to the Defendants' fraudulent conduct. The economic loss, i.e., damages, suffered by Lead Plaintiffs and other Class

members was a direct result of Defendants' fraudulent scheme to artificially inflate Prothena's stock price and the subsequent significant decline in the value of Prothena's share price when Defendants' prior misrepresentations and other fraudulent conduct was revealed.

254. At all relevant times, Defendants' materially false and misleading statements or omissions alleged herein directly or proximately caused the damages suffered by the Lead Plaintiffs and other Class members. Those statements were materially false and misleading through their failure to disclose a true and accurate picture of NEOD001 and the PRONTO study, as alleged herein. Throughout the Class Period, Defendants publicly issued materially false and misleading statements and omitted material facts necessary to make Defendants' statements not false or misleading, causing Prothena's common stock to be artificially inflated. Lead Plaintiffs and other Class members purchased Prothena's common stock at those artificially inflated prices, causing them to suffer the damages complained of herein.

255. Prothena's stock price fell in response to the news issued after the market opened on November 8, 2017, as alleged *supra*. On November 8, 2017, Kerrisdale Capital issued a report disclosing information that was directly related to and partially revealed the truth about Defendants' prior misrepresentations and material omissions concerning NEOD001 and the PRONTO trial.

256. More specifically, as discussed *supra*, after the market opened on Friday, November 8, 2017, Kerrisdale Capital published the Kerrisdale Report that discussed significant issues concerning NEOD001, including the PRONTO and VITAL studies. The information disclosed in the Kerrisdale Report partially revealed the truth about Defendants' misrepresentations and material omissions during the Class Period.

257. In response, Prothena's stock price decreased as investors and the market considered the report. Accordingly, on November 8, 2017, the price of Prothena's common stock declined by $4.72 from its closing price on November 7, 2017, of $60.96 per share, to close at $56.24 on November 8, 2017. Thus, in a single day, Prothena's common stock fell by 7.74% on unusually high trading volume of 1.696 million shares.

258. Shortly after trading opened on November 8, 2017, *FierceBiotech.com* reported that "[t]he company's stock was down 8% at the open on the report." The article noted that "Kerrisdale has form when it comes to betting against companies and taking its case public," and the market reacted accordingly. Additionally, later that same day, *SeekingAlpha.com* issued a bulletin linking the 8% drop in Prothena's stock price to the Kerrisdale report. The bulletin also included a quote from Kerrisdale's Sahm Adrangi bluntly stating; "It's clear that [NEOD001] has no chance of success" and "[b]oth studies are going to flop."

259. Prothena's stock price also fell in response to the news issued post-market open on February 2, 2018, as alleged *supra*. On February 2, 2018, Defendants disclosed information that was directly related to and revealed the truth about their prior misrepresentations and material omissions concerning NEOD001 and the PRONTO trial.

260. More specifically, after the market closed on Friday, February 2, 2018, Prothena announced the Defendant Noonberg was resigning from her position as the Chief Medical Officer. This news prompted an immediate, material decline in the price of Prothena's stock on the next two trading days, Monday, February 5 and 6, 2018, as it was directly related to and partially revealed the truth about Defendants' prior misrepresentations and material omissions concerning NEOD001 and the PRONTO study.

261. On February 5, 2018, the price of Prothena's common stock declined by $7.46 from its closing price on February 2, 2018, of $39.60 per share to close at $32.14 on February 5, 2018. Thus, in a single day, Prothena's common stock fell by 18.84% on unusually high trading volume of 3.92 million shares. Reporting on the 18% decrease in Prothena's stock price earlier that day, *Barrons.com* noted that "the sudden departure [of Noonberg] seems to have stoked fears about the Dublin-based company's clinical trial of a treatment for light chain amyloidosis[.]"

262. In addition, Sean Williams of *The Motley Fool* noted that "[n]o one is a big fan of questions marks, and the sudden resignation of Prothena's CMO is exactly that" in attributing the drop in Prothena's shares to Noonberg's departure. Williams also noted that Prothena was different from most other companies in that "the departure of the CMO could signal trouble in paradise with regard to Prothena's pipeline." Further, *SeekingAlpha.com* released a bulletin the afternoon of February 5, 2018, attributing the more than 18% drop to Noonberg's departure. The bulletin noted that while "[n]ormally, the departure of the Chief Medical Officer does not cause too much of a ripple," in Prothena's case investors sent the share price down.

263. On the following day, February 6, 2018, the market continued to incorporate the import of Noonberg's departure concerning NEOD001 and the PRONTO study by driving down Prothena's stock price an additional $3.01 per shares, an additional 9.37%, on unusually high trading volume of 2.08 million shares.

264. Finally, on April 23, 2018, Prothena's stock price fell in response to the news issued pre-market open, as alleged *supra*. On April 23, 2018, Defendants disclosed information that was directly related to and revealed the truth about their prior misrepresentations and material omissions concerning NEOD001 and the PRONTO study.

265. More specifically, on April 23, 2018, Prothena disclosed via a press release that it was discontinuing development of NEOD001 as the PRONTO study did not meet its primary or secondary endpoints, and the independent data monitoring committee for the VITAL study had determined that the VITAL study should be discontinued due to its futility. Notably, the press release provided data concerning the primary endpoint, the cardiac best response, that showed that the placebo had a "best response" rate of 47.6% as compared to the 39.4% rate for NEOD001. Thus, Prothena announced that, as a result of this and additional data collected, it was discontinuing all development of NEOD001.

266. The disclosure on April 23, 2018, prompted an immediate material decline in the price of Prothena's stock as investors discovered the truth about NEOD001 and the PRONTO study's primary endpoint, the cardiac best response rate. As a result of this disclosure, analysts soured on Prothena. For instance, in anticipation of the potential approval of NEOD001, Jeffries set its price target as high as $100 per share. However, upon learning that the NEOD001 "program has gone away based on failure today," Jeffries slashed its price target all the way down to $12 per share because "the stock will likely reflect zero-pipeline value for a while." Additionally, Cantor Fitzgerald dropped its price target from $69 all the way to $14 "based on the disclosure that clinical development of . . . NEOD001 is being discontinued."

267. On April 23, 2018, in an article for the *Financial Times*, Dan McCrum noted that as a result of the failure of NEOD001, "shares were indicated down 60 per cent in pre-market trading" and "[t]he price drop was almost 70 per cent after an hour of trading." Additionally, Emma Court reported for *MarketWatch* that Prothena "shares plummeted 60% in premarket trade . . . after the company said it [wa]s discontinuing development" of NEOD001.

268. The news disclosed on April 23, 2018, revealed the truth about Defendants' materially false and/or misleading statements made during the Class Period and caused the price of Prothena's common stock to decline dramatically from a closing market price of $36.84 per share on April 20, 2018 to $11.50 per share on April 23, 2018 on unusually high volume of 15.1 million shares. Based on this news, in the span of just a single day, Prothena's stock price fell by 69%, erasing over $1 billion in market capitalization.

## VIII. APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET

269. Lead Plaintiffs will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a) Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b) the omissions and misrepresentations were material;

(c) the Company's stock traded in an efficient market;

(d) the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's stock; and

(e) Lead Plaintiffs and other members of the Class purchased Prothena common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

270. At all relevant times, the markets for Prothena common stock were efficient for the following reasons, among others:

(a) as a regulated issuer, Prothena filed periodic public reports with the SEC;

(b) Prothena regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services;

(c) Prothena was followed by several securities analysts employed by major brokerage firm(s) who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firm(s) and that were publicly available and entered the public marketplace; and

(d) Prothena common stock was actively traded in an efficient market, namely the NASDAQ, under the ticker symbol "PRTA."

271. As a result of the foregoing, the market for Prothena common stock promptly digested current information regarding Prothena from publicly available sources and reflected such information in Prothena's stock price. Under these circumstances, all purchasers of Prothena common stock during the Class Period suffered similar injury through their purchase of Prothena common stock at artificially inflated prices and the presumption of reliance applies.

272. Further, to the extent that the Defendants concealed or improperly failed to disclose material facts with regard to the Company, Lead Plaintiffs are entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972).

## IX. NO SAFE HARBOR

273. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be

characterized as forward-looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Prothena who knew that the statement was false when made.

## X. CLASS ACTION ALLEGATIONS

274. Lead Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons or entities who purchased or otherwise acquired Prothena common stock between October 15, 2015, and April 20, 2018, inclusive (the "Class"). Excluded from the Class are Defendants, members of the immediate family of each of the Individual Defendants, any subsidiary or affiliate of Prothena, and the directors and officers of Prothena and their families and affiliates at all relevant times.

275. The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.

276. There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a) Whether the Exchange Act was violated by Defendants;

(b) Whether Defendants omitted and/or misrepresented material facts;

(c) Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d) Whether Defendants knew or recklessly disregarded that their statements were false and misleading;

(e) Whether the price of Prothena common stock was artificially inflated; and

(f) The extent of damage sustained by Class members and the appropriate measure of damages.

277. Lead Plaintiffs' claims are typical of those of the Class because Lead Plaintiffs and the Class sustained damages from Defendants' wrongful conduct.

278. Lead Plaintiffs will adequately protect the interests of the Class and has retained counsel experienced in securities class action litigation. Lead Plaintiffs have no interests that conflict with those of the Class.

279. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## XI. CLAIMS FOR RELIEF

### COUNT I
### For Violation of Section 10(b) of the Exchange Act
### and Rule 10b-5 Against All Defendants

280. Lead Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

281. During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

282. Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they:

(a) Employed devices, schemes, and artifices to defraud;

(b) Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c) Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Lead Plaintiffs and others similarly situated in connection with their purchases of Prothena common stock during the Class Period.

283. Lead Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Prothena common stock. Lead Plaintiffs and the Class would not have purchased Prothena common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

284. As a direct and proximate result of these Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their purchases of Prothena common stock during the Class Period.

**COUNT II**
**For Violation of Section 20(a) of the Exchange Act**
**Against the Individual Defendants**

285. Lead Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

286. The Individual Defendants acted as controlling persons of Prothena within the meaning of Section 20(a) of the Exchange Act. By virtue of their positions and their power to control public statements about Prothena, the Individual Defendants had the power and ability to

control the actions of Prothena and its employees. By reason of such conduct, Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiffs pray for judgment as follows:

A. Declaring this action to be a proper class action pursuant to Federal Rule of Civil Procedure 23;

B. Awarding Lead Plaintiffs and the members of the Class damages and interest;

C. Awarding Lead Plaintiffs' reasonable costs, including attorneys' fees; and

D. Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## JURY DEMAND

Lead Plaintiffs demand a trial by jury.

DATED: June 20, 2019

**LABATON SUCHAROW LLP**

*/s/ Carol C. Villegas*
Carol C. Villegas
David J. Schwartz
Alec T. Coquin
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
Emails: cvillegas@labaton.com
dschwartz@labaton.com
acoquin@labaton.com

*Attorneys for Lead Plaintiff Granite Point Capital and the Class*

**LEVI & KORSINSKY, LLP**
Nicholas I. Porritt
Adam M. Apton
55 Broadway, 10th Floor
New York, New York 10006

Telephone: (212) 363-7500
Facsimile: (212) 363-7171
Email: nporritt@zlk.com
aapton@zlk.com

**LEVI & KORSINSKY, LLP**
Alexander Krot
(*pro hac vice* to be filed)
1101 30th Street, NW
Suite 115
Washington, D.C. 20007
Telephone: (202) 524-4290
Facsimile: (202) 333-2121
Email: akrot@zlk.com

*Attorneys for Lead Plaintiff Simon James and the Class*

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**
Lauren McMillen Ormsbee
Kurt Hunciker
1251 Avenue of the Americas
New York, New York 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
Email: laurenm@blbglaw.com
kurt@blbglaw.com

*Additional Counsel for Lead Plaintiffs and the Class*