**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE PROTHENA CORPORATION PLC SECURITIES LITIGATION | Case No. 1:18-cv-06425-ALC <br><br> <u>CLASS ACTION</u> |

**MEMORANDUM OF LAW IN SUPPORT OF LEAD PLAINTIFFS'**
**MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND**
**<u>APPROVAL OF PLAN OF ALLOCATION</u>**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................. ii

PRELIMINARY STATEMENT ......................................................................................... 1

ARGUMENT ....................................................................................................................... 4

I.     THE PROPOSED SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE, AND WARRANTS FINAL APPROVAL .................................................. 4

     A.     The Law Favors and Encourages Settlement of Class Action Litigation ............... 4

     B.     The Standards for Final Approval ........................................................................... 4

     C.     The Settlement Was Reached after Robust Arm's-Length Negotiations, Is Procedurally Fair, and Is Entitled to a Presumption of Reasonableness ................ 6

     D.     Application of the Second Circuit's *Grinnell* Factors Supports Approval of the Settlement as Substantively Fair, Reasonable, and Adequate ......................... 7

           1.     The Complexity, Expense, and Likely Duration of the Litigation Support Approval of the Settlement ......................................................... 8

           2.     The Reaction of the Settlement Class to the Settlement ............................ 9

           3.     The Stage of the Proceedings and the Amount of Information Available to Counsel Support Approval of the Settlement ....................... 10

           4.     The Risks of Establishing Liability and Damages Support Approval of the Settlement ...................................................................... 11

                  (a)     Risks to Proving Liability ............................................................ 12

                  (b)     Risks Related to Loss Causation and Damages ........................... 14

           5.     The Risks of Maintaining Class Certification ........................................... 16

           6.     The Ability of Defendants to Withstand a Greater Judgment ................... 17

           7.     The Range of Reasonableness of the Settlement Amount in Light of the Best Possible Recovery and all the Attendant Risks of Litigation Support Approval of the Settlement ......................................... 18

     E.     Application of the Factors Identified in the Amendments to Rule 23(e)(2) Support Approval of the Settlement as Fair, Reasonable, and Adequate ............. 19

       1.      Lead Plaintiffs and Co-Lead Counsel Have Adequately Represented the Settlement Class ...............................................................19

       2.      The Settlement Is the Result of Arm's-Length Negotiations.....................20

       3.      The Relief Provided to the Settlement Class Is Adequate ........................20

II.     THE PLAN OF ALLOCATION FOR THE PROCEEDS OF THE SETTLEMENT IS FAIR AND REASONABLE AND SHOULD BE APPROVED ...............................................................................................................22

III.    NOTICE TO THE CLASS SATISFIED THE  REQUIREMENTS OF RULE 23 AND DUE PROCESS ............................................................................................24

CONCLUSION......................................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Advanced Battery Techs. Inc. Sec. Litig.*,
  298 F.R.D. 171 (S.D.N.Y. 2014) ............................................................5

*In re Alloy, Inc. Sec. Litig.*,
  No. 03-1597, 2004 WL 2750089 (S.D.N.Y. Dec. 2, 2004) ...................................12

*Anixter v. Home-Stake Prod. Co.*,
  77 F.3d 1215 (10th Cir. 1996) ...............................................................9

*In re AOL Time Warner Inc.*,
  No. 02 cv 5575, 2006 WL 903236 (S.D.N.Y. Apr. 6, 2006)................................12

*In re Apollo Grp., Inc. Sec. Litig.*,
  No. CV-04-2147-PHX-JAT, 2008 WL 3072731 (D. Ariz. Aug. 4, 2008),
  *rev'd*, No. 08-16971, 2010 WL 5927988 (9th Cir. June 23, 2010) .........................9

*In re Bear Stearns, Inc. Sec. Derivative & ERISA Litig.*,
  909 F. Supp. 2d 259 (S.D.N.Y. 2012)..............................................*passim*

*In re Citigroup Inc. Sec. Litig.*,
  No. 09 MD 2070 (SHS), 2014 WL 2112136 (S.D.N.Y. May 20, 2014) ..................5

*City of Detroit v. Grinnell Corp.*
  495 F.2d 448 (2d Cir. 1974)........................................................*passim*

*City of Providence v. Aeropostale Inc. et al.*,
  No. 11 civ. 7132, 2014 WL 1883494, at *5 (S.D.N.Y. May 9, 2014), *aff'd*,
  *Arbuthnot v. Pierson*, 607 F. App'x. 73 (2d Cir. 2015).......................................6, 7

*Dalberth v. Xerox Corp.*,
  766 F.3d 172 (2d Cir. 2014)..................................................................14

*Ebbert v. Nassau Cty.*,
  No. CV 05-5445 AKT, 2011 WL 6826121 (E.D.N.Y. Dec. 22, 2011) ............16, 17

*In re Facebook, Inc. IPO Sec. & Deriv. Litig.*,
  No. MDL 12-2389, 2015 WL 6971424 (S.D.N.Y. Nov. 9, 2015),
  *aff'd*, 674 F. App'x. 37 (2d Cir. 2016)..................................................6, 8

*In re FLAG Telecom Holdings, Ltd. Sec. Litig.*,
  No. 02-CV-3400 (CM)(PED), 2010 WL 4537550 (S.D.N.Y. Nov. 8, 2010)...........8, 9, 22, 23

*In re Giant Interactive Grp., Inc. Sec. Litig.*,
    279 F.R.D. 151 (S.D.N.Y. 2011) ......................................................24

*In re Gilat Satellite Networks*, *Ltd.*,
    No. CV-02-1510, 2007 WL 1191048 (E.D.N.Y. Apr. 19, 2007) .............................8

*In re Global Crossing Sec. & ERISA Litig.*,
    225 F.R.D. 436 (S.D.N.Y. 2004) ......................................7, 14, 16, 17

*Goldberger v. Integrated Res., Inc.*,
    209 F.3d 43 (2d Cir. 2000).......................................................... *passim*

*IBEW Local Union No. 58 Pension Trust Fund & Annuity Fund v.*
    *Royal Bank of Scotland Grp. PLC*,
    783 F.3d 383 (2d Cir. 2015).........................................................11

*In re IMAX Sec. Litig.*,
    283 F.R.D. 178 (S.D.N.Y. 2012) ...................................5, 16, 22, 23

*Ingles v. Toro*,
    438 F. Supp. 2d 203 (S.D.N.Y. 2006) ....................................................17

*In re Initial Pub. Offering Sec. Litig.*,
    671 F. Supp. 2d 467 (S.D.N.Y. 2009)...........................................8, 23

*Int'l Bhd of Elec. Workers Local 697 Pension Fund v. Int'l Game Tech., Inc.*,
    No. 3:09-cv-00419, 2012 WL 5199742 (D. Nev. Oct. 19, 2012).........................19

*Janbay v. Canadian Solar, Inc.*,
    No. 10–cv–4430, 2012 WL 1080306 (S.D.N.Y. Mar. 30, 2012) ..........................15

*Maley v. Del Global Techs. Corp.*,
    186 F. Supp. 2d 358 (S.D.N.Y. 2002).........................................10, 17

*In re Marsh & McLennan Cos. Sec. Litig.*,
    No. 04 Civ. 8144 (CM), 2009 WL 5178546 (S.D.N.Y. Dec. 23, 2009)...............25

*In re Marsh ERISA Litig.*,
    265 F.R.D. 128 (S.D.N.Y. 2010) ....................................................24

*In re Merrill Lynch & Co. Research Reports Sec. Litig.*,
    246 F.R.D. 156 (S.D.N.Y. 2007) ....................................................18, 19

*In re Merrill Lynch & Co. Research Reports Sec. Litig.*,
    No. 02 MDL 1484 (JFK), 2007 WL 313474 (S.D.N.Y. Feb. 1, 2007)..................18

*In re NASDAQ Market-Makers Antitrust Litig.*,
    187 F.R.D. 465 (S.D.N.Y. 1998) ......................................................7

*Newman v. Stein*,
    464 F.2d 689 (2d Cir. 1972)............................................................................18

*In re Omnivision Techs., Inc.*,
    559 F. Supp. 2d 1036 (N.D. Cal. 2008) ...........................................................19

*In re PaineWebber Ltd. P'ships Litig.*,
    171 F.R.D. 104 (S.D.N.Y. 1997), *aff'd*, 117 F.3d 721 (2d Cir. 1997).............18, 23

*In re Polaroid ERISA Litig.*,
    240 F.R.D. 65 (S.D.N.Y. 2006) .......................................................................20

*Prasker v. Asia Five Eight LLC*,
    No. 08 Civ. 5811(MGC), 2010 WL 476009 (S.D.N.Y. Jan. 6, 2010) ...................17

*Robbins v. Koger Props., Inc.*,
    116 F.3d 1441 (11th Cir. 1997) .........................................................................9

*Shapiro v. JPMorgan Chase & Co.*,
    No. 11 Civ. 8331, 2014 WL 1224666 (S.D.N.Y. Mar. 24, 2014) ...........................7

*Strougo ex rel. Brazilian Equity Fund, Inc. v. Bassini*,
    258 F. Supp. 2d 254 (S.D.N.Y. 2003) ................................................................9

*Teachers Ret. Sys. of La. v. A.C.L.N., Ltd.*,
    No. 01-Civ-11814 (MP), 2004 WL 1087261 (S.D.N.Y. May 14, 2004).........11, 17

*In re Telik, Inc. Sec. Litig.*,
    576 F. Supp. 2d 570 (S.D.N.Y. 2008).................................................8, 9, 13, 16

*In re Veeco Instruments Inc. Sec. Litig.*,
    No. 05-1695 (CM), 2007 WL 4115809 (S.D.N.Y. Nov. 7, 2007).......................7, 9

*Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*,
    396 F.3d 96 (2d Cir. 2005).....................................................................4, 5, 6, 24

*In re Warner Chilcott Ltd. Sec. Litig.*,
    No. 06 Civ. 11515, 2009 WL 2025160 (S.D.N.Y. July 10, 2009) .........................10

*White v. First Am. Registry, Inc.*,
    No. 04 Civ. 1611 (LAK), 2007 WL 703926 (S.D.N.Y. Mar. 7, 2007).....................7

## Statutes

15 U.S.C. § 78u-4(a)(7) .......................................................................................25

15 U.S.C. § 78u-4(e) ...........................................................................................23

**Rules**

Fed. R. Civ. P. 23(a) ...........................................................................................................17

Fed. R. Civ. P. 23(b)(3) .......................................................................................................17

Fed. R. Civ. P. 23(c)(1)(C) ..................................................................................................16

Fed. R. Civ. P. 23(c)(2)(B) ..................................................................................................25

Fed. R. Civ. P. 23(e) ....................................................................................................1, 4, 24

Fed. R. Civ. P. 23(e)(2) ...............................................................................................4, 5, 19

Fed. R. Civ. P. 23(e)(2)(C) ..................................................................................................20

Fed. R. Civ. P. 23 (e)(2)(C)(ii) ............................................................................................20

Fed. R. Civ. P. 23 (e)(2)(C)(iii) ...........................................................................................22

Fed. R. Civ. P. 23 (e)(2)(C)(iv) ...........................................................................................22

Fed. R. Civ. P. 23(e)(3) ...................................................................................................6, 22

Pursuant to Rule 23(e) of the Federal Rules of Civil Procedure, Court-appointed Lead Plaintiffs Granite Point Capital Master Fund, LP, Granite Point Capital Panacea Global Healthcare, Granite Point Capital Scorpion Focused Ideas Fund (collectively, "Granite Point") and Simon James (collectively, "Lead Plaintiffs"), on behalf of themselves and all other members of the proposed Settlement Class,[1] respectfully submit this memorandum of law in support of their motion for final approval of the proposed Settlement of the above-captioned class action (the "Action"), approval of the proposed plan of allocation for the proceeds of the Settlement (the "Plan of Allocation"), and final certification of the Settlement Class.

## PRELIMINARY STATEMENT

As detailed in the Stipulation, Lead Plaintiffs and Prothena Corporation plc ("Prothena" or the "Company"), Dr. Gene Kinney, Tran B. Nguyen, and Dr. Sarah Noonberg, M.D., Ph.D. (collectively, "Defendants") have agreed to a settlement of the claims in the Action, and the release of all Released Claims, in exchange for a payment of $15,750,000 in cash. The terms of the Settlement are set forth in the Stipulation, which was previously filed with the Court. ECF No. 43-1. This recovery is a favorable result for the Settlement Class and avoids the substantial risks and expenses of continued litigation, including the risk of recovering less than the Settlement Amount, or nothing at all.

The Settlement was reached only after Lead Plaintiffs and Co-Lead Counsel had a well-developed understanding of the strengths and weaknesses of the claims. As more fully described in the Joint Declaration of Carol C. Villegas and Adam M. Apton in Support of (I) Lead Plaintiffs' Motion for Final Approval of Class Action Settlement and Plan of Allocation and (II)

---

[1] All capitalized terms used herein that are not defined have the same meanings given to them in the Stipulation and Agreement of Settlement, dated August 26, 2019 (the "Stipulation"), previously filed with the Court (ECF No. 43-1).

Co-Lead Counsel's Motion for an Award of Attorneys' Fees and Payment of Litigation Expenses (the "Joint Declaration" or "Joint Decl."), filed herewith,[2] by the time the Settlement was agreed to, Plaintiffs' Counsel had engaged in a thorough factual investigation that included, among other things, the review and analysis of: (i) press releases, news articles, transcripts, and other public statements issued by or concerning Prothena and the Individual Defendants; (ii) research reports issued by financial analysts concerning Prothena's business; (iii) Prothena's filings with the U.S. Securities and Exchange Commission ("SEC"); (iv) news articles, media reports and other publications concerning the pharmaceutical industry and markets; (v) Prothena's filings with the U.S. Food and Drug Administration and the European Medicines Agency, as well as any documents issued by these agencies concerning the same; and (vi) other publicly available information and data concerning Prothena, its securities, and the markets therefor.  As part of their investigation and in furtherance of their allegations against Defendants, Plaintiffs' Counsel consulted with an expert in pharmaceutical study design and regulation; contacted 39 potential witnesses with knowledge of the alleged events; conducted interviews with five former employees of Prothena, analysts, and NEOD001 trial administrators; and reviewed a significant amount of medical and clinical literature about amyloid light chain amyloidosis ("AL amyloidosis"), the condition NEOD001 was designed to address.  Counsel also conferred with an expert on the issues of damages and loss causation. *See generally* Joint Decl. ¶¶16-21.

---

[2] The Joint Declaration is an integral part of this submission and, for the sake of brevity in this memorandum, the Court is respectfully referred to it for a detailed description of, *inter alia*: the history of the Action; the nature of the claims asserted; the negotiations leading to the Settlement; and the risks and uncertainties of continued litigation; among other things.  Citations to "¶" in this memorandum refer to paragraphs in the Joint Declaration.

All exhibits herein are annexed to the Joint Declaration.  For clarity, citations to exhibits that themselves have attached exhibits will be referenced as "Ex. ___ - ___." The first numerical reference is to the designation of the entire exhibit attached to the Joint Declaration and the second reference is to the exhibit designation within the exhibit itself.

The Settlement is also the product of extensive arm's-length negotiations between the Parties, which included an in-person mediation session under the auspices of a respected and experienced mediator, Robert Meyer Esq. of JAMS.  After a full day of negotiation, the Parties agreed, in principle, to a settlement based on the Mediator's recommendation, subject to the negotiation of a mutually acceptable long form stipulation of settlement and the completion of additional due diligence.  Joint Decl. ¶¶39-43.  In connection with this due diligence, Defendants produced Board of Directors meeting material, Prothena's formal communications with and submissions to the FDA regarding NEOD001, and Co-Lead Counsel interviewed Defendant Kinney, the Company's Chief Executive Officer.  *Id*. ¶¶46-48.

The Settlement is a favorable result in light of the risks of continued litigation.  While Lead Plaintiffs and Co-Lead Counsel believe that the claims asserted against Defendants are strong, they recognize that this Action presented a number of substantial risks, especially in light of Defendants' anticipated challenges to several of the elements of a claim under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.  *See generally* Joint Decl. §III.  While Lead Plaintiffs would advance credible counter arguments to Defendants' liability defenses, they nonetheless recognize a substantial risk that Defendants' anticipated motion to dismiss might be granted in part or in full.  Even if Defendants' motion to dismiss were unsuccessful, Defendants likely would have continued to press their arguments at summary judgment, at trial, and through appeals.  These risks are in addition to the genuine risk of a much smaller recovery, or no recovery at all, given the Company's limited assets and dwindling insurance coverage.

In light of the recovery for the Settlement Class and the risks to continued litigation, as discussed further below and in the Joint Declaration, Lead Plaintiffs respectfully submit that the

Settlement is fair, reasonable, and adequate, and warrants final approval by the Court.  *See* Declaration of C. David Bushley on Behalf of Granite Point (Ex. 1 at ¶4) and Declaration of Simon R. James (Ex. 2 at ¶3).

Additionally, Lead Plaintiffs request that the Court approve the proposed Plan of Allocation, which was set forth in the Notice sent to Settlement Class Members.  The Plan of Allocation, which was developed by Co-Lead Counsel in consultation with Lead Plaintiffs' consulting damages expert, provides a reasonable and equitable method for allocating the Net Settlement Fund among Settlement Class Members who submit valid claims.  The Plan of Allocation is fair and reasonable, and should likewise be approved.

## ARGUMENT

**I.    THE PROPOSED SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE, AND WARRANTS FINAL APPROVAL**

### A.    The Law Favors and Encourages Settlement of Class Action Litigation

Public policy favors the settlement of disputed claims among private litigants, particularly in class actions.  *See Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96, 116 (2d Cir. 2005) ("*Visa*") ("We are mindful of the strong judicial policy in favor of settlements, particularly in the class action context.").[3]  This policy would be well-served by approval of the Settlement of this complex securities class action, that absent resolution, would consume years of additional time of this Court.

### B.    The Standards for Final Approval

Rule 23(e) of the Federal Rules of Civil Procedure provides that a class action settlement must be presented to the Court for approval.  The Settlement should be approved if the Court finds it "fair, reasonable, and adequate."  Fed. R. Civ. P. 23(e)(2).  In ruling on final approval of

---

[3] All internal quotations and citations are omitted unless otherwise stated.

a class settlement, courts in the Second Circuit have held that a court should examine both the

negotiating process leading to the settlement, and the settlement's substantive terms. *See Visa*,

396 F.3d at 116; *In re Citigroup Inc. Sec. Litig.*, No. 09 MD 2070 (SHS), 2014 WL 2112136, at

*2-3 (S.D.N.Y. May 20, 2014); *In re IMAX Sec. Litig.*, 283 F.R.D. 178, 188 (S.D.N.Y. 2012).

The standards governing approval of class action settlements are well established in the

Second Circuit.  In *City of Detroit v. Grinnell Corp.*, the Second Circuit held that the following

factors should be considered in evaluating a class action settlement:

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction
> of the class to the settlement; (3) the stage of the proceedings and the amount of
> discovery completed; (4) the risks of establishing liability; (5) the risks of
> establishing damages; (6) the risks of maintaining the class action through the
> trial; (7) the ability of the defendants to withstand a greater judgment; (8) the
> range of reasonableness of the settlement fund in light of the best possible
> recovery; [and] (9) the range of reasonableness of the settlement fund to a
> possible recovery in light of all the attendant risks of litigation.

495 F.2d 448, 463 (2d Cir. 1974), *abrogated on other grounds by, Goldberger v. Integrated Res.,*

*Inc.*, 209 F.3d 43 (2d Cir. 2000), *see also Visa*, 396 F.3d at 117; *In re Advanced Battery Techs.*

*Inc. Sec. Litig.*, 298 F.R.D. 171, 175 (S.D.N.Y. 2014); *In re Bear Stearns, Inc. Sec. Derivative &*

*ERISA Litig.*, 909 F. Supp. 2d 259, 265-66 (S.D.N.Y. 2012).

Additionally, pursuant to the recent amendments to Rule 23(e)(2), a court may approve a

settlement as "fair, reasonable, and adequate" after considering the following four factors, most

of which overlap with the *Grinnell* factors:

> (A)  whether the class representatives and class counsel have adequately
> represented the class;
>
> (B)  whether the proposal was negotiated at arm's length;
>
> (C)  whether the relief provided for the class is adequate, taking into account:
>
>> i.  the costs, risks, and delay of trial and appeal;

        ii.        the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;

        iii.        the terms of any proposed ward of attorneys' fees, including timing of payment; and

        iv.        any agreement required to be identified under Rule 23(e)(3); and

    (D)    whether the proposal treats class members equitably relative to each other.

For the reasons discussed herein, the proposed Settlement meets the criteria set forth by the Second Circuit and the federal rules.

### C. The Settlement Was Reached after Robust Arm's-Length Negotiations, Is Procedurally Fair, and Is Entitled to a Presumption of Reasonableness

A settlement is entitled to a "presumption of fairness, adequacy, and reasonableness" when "reached in arm's length negotiations between experienced, capable counsel after meaningful discovery." *Visa*, 396 F.3d at 116; *In re Facebook, Inc. IPO Sec. & Derivative Litig.*, No. MDL 12-2389, 2015 WL 6971424, at *3 (S.D.N.Y. Nov. 9, 2015), *aff'd*, 674 F. App'x. 37 (2d Cir. 2016).

The Settlement here merits such a presumption of fairness because it was achieved after thorough arm's-length negotiations between well-informed and experienced counsel, under the supervision of an experienced Mediator, and after an extensive investigation into the claims. As a result, Lead Plaintiffs and Co-Lead Counsel had a well-informed basis for assessing the strength of the Settlement Class's claims and Defendants' defenses when they agreed to settle the Action.

The judgment of Co-Lead Counsel—law firms that are highly experienced in securities class action litigation—that the Settlement is in the best interests of the Settlement Class is entitled to "great weight." *City of Providence v. Aeropostale Inc. et al.*, No. 11 civ. 7132, 2014

WL 1883494, at *5 (S.D.N.Y. May 9, 2014), *aff'd*, *Arbuthnot v. Pierson*, 607 F. App'x. 73 (2d Cir. 2015); *Shapiro v. JPMorgan Chase & Co.*, No. 11 Civ. 8331, 2014 WL 1224666, at *2 (S.D.N.Y. Mar. 24, 2014); *accord, In re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. 465, 474 (S.D.N.Y. 1998) (courts consistently give "'great weight' . . . to the recommendations of counsel, who are most closely acquainted with the facts of the underlying litigation"). Moreover, Lead Plaintiffs took an active role in supervising this litigation, as envisioned by the PSLRA, and endorse the Settlement.  *See* Exs. 1 and 2.  A settlement reached "with the endorsement of a sophisticated institutional investor . . . is 'entitled to an even greater presumption of reasonableness.'"  *In re Veeco Instruments Inc. Sec. Litig.*, No. 05 MDL 01695 (CM), 2007 WL 4115809, at *5 (S.D.N.Y. Nov. 7, 2007).

Accordingly, the Settlement is entitled to a presumption of reasonableness.

### D.    Application of the Second Circuit's *Grinnell* Factors Supports Approval of the Settlement as Substantively Fair, Reasonable, and Adequate

The Settlement is also substantively fair, reasonable, and adequate.  "In finding that a settlement is fair, not every factor must weigh in favor of settlement, 'rather the court should consider the totality of these factors in light of the particular circumstances.'"  *In re Global Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 456 (S.D.N.Y. 2004) (quoting *Thompson v. Metro. Life Ins. Co.*, 216 F.R.D. 55, 61 (S.D.N.Y. 2003)).  Additionally, in deciding whether to approve a settlement, a court "should not attempt to approximate a litigated determination of the merits of the case lest the process of determining whether to approve a settlement simply substitute one complex, time consuming and expensive litigation for another."  *White v. First Am. Registry, Inc.*, No. 04 Civ. 1611 (LAK), 2007 WL 703926, at *2 (S.D.N.Y. Mar. 7, 2007). Here, the Settlement fully satisfies the criteria for approval articulated in *Grinnell*.

1.      **The Complexity, Expense, and Likely Duration
of the Litigation Support Approval of the Settlement**

Securities class actions like this one are by their nature complicated, and district courts in this Circuit have long recognized that "[a]s a general rule, securities class actions are 'notably difficult and notoriously uncertain' to litigate." *In re Facebook,* 2015 WL 6971424, at *3; *Bear Stearns,* 909 F. Supp. 2d at 266; *In re FLAG Telecom Holdings, Ltd. Sec. Litig.*, No. 02-CV-3400 (CM)(PED), 2010 WL 4537550, at *15 (S.D.N.Y. Nov. 8, 2010); *In re Gilat Satellite Networks*, *Ltd*., No. CV-02-1510, 2007 WL 1191048, at *10 (E.D.N.Y. Apr. 19, 2007) ("Securities class actions are generally complex and expensive to prosecute.").

This case was no exception.  As discussed in the Joint Declaration, the case involved complicated and intricate issues related to, among other things, AL amyloidosis, clinical trial design, FDA regulatory practices, securities fraud, and loss causation. Surviving a motion to dismiss, prevailing on summary judgment and then achieving a litigated verdict at trial (and sustaining any such verdict in the appeals that would inevitably ensue) would have been a very complex and risky undertaking that would have required substantial additional time and expense. *See In re Initial Pub. Offering Sec. Litig.*, 671 F. Supp. 2d 467, 481 (S.D.N.Y. 2009) (finding that the complexity, expense and duration of continued litigation supports final approval where, among other things "motions would be filed raising every possible kind of pre-trial, trial and post-trial issue conceivable").

Indeed, the trial of the Action here would have required extensive expert testimony on numerous contested issues, including falsity, scienter, causation and damages, all within the nuanced and esoteric context of drug development.  Courts routinely observe that these sorts of disputes—requiring dueling testimony from experts—are particularly difficult for plaintiffs to litigate. *See, e.g., In re Telik, Inc. Sec. Litig.,* 576 F. Supp. 2d 570, 579-80 (S.D.N.Y. 2008) (in a

"battle of experts, it is virtually impossible to predict with any certainty which testimony would be credited").

Of course, even if Lead Plaintiffs had prevailed at trial, it is virtually certain that appeals would be taken, which would have, at best, substantially delayed any recovery for the Settlement Class.  *See Strougo ex rel. Brazilian Equity Fund, Inc. v. Bassini*, 258 F. Supp. 2d 254, 261 (S.D.N.Y. 2003) ("[E]ven if a shareholder or class member was willing to assume all the risks of pursuing the actions through further litigation . . . the passage of time would introduce yet more risks . . . and would in light of the time value of money, make future recoveries less valuable than this current recovery.").  At worst, there is always a risk that the verdict could be reversed by the trial court or on appeal.  *See, e.g., Robbins v. Koger Props., Inc.*, 116 F.3d 1441, 1449 (11th Cir. 1997) (reversing $81 million jury verdict and dismissing case with prejudice in securities action); *Anixter v. Home-Stake Prod. Co.*, 77 F.3d 1215 (10th Cir. 1996) (overturning plaintiffs' verdict obtained after two decades of litigation); *cf. In re Apollo Grp., Inc. Sec. Litig.*, No. CV-04-2147-PHX-JAT, 2008 WL 3072731 (D. Ariz. Aug. 4, 2008), *rev'd*, No. 08-16971, 2010 WL 5927988 (9th Cir. June 23, 2010) (trial court overturned unanimous verdict for plaintiffs, later reinstated by the Ninth Circuit Court of Appeals, and judgment re-entered after denial of *certiorari* by the U.S. Supreme Court).

### 2.      The Reaction of the Settlement Class to the Settlement

The reaction of the class to a proposed settlement is a significant factor to be weighed in considering its fairness and adequacy.  *See, e.g.*, *Bear Stearns*, 909 F. Supp. 2d at 266-67; *FLAG Telecom*, 2010 WL 4537550, at *16; *Veeco*, 2007 WL 4115809, at *7.

Pursuant to the Preliminary Approval Order, the Court-appointed Claims Administrator, Strategic Claims Services ("SCS"), mailed copies of the Notice Packet (consisting of the Notice and Claim Form) to record holders identified in the Company's transfer records and potential

Settlement Class Members and their nominees. *See* Declaration of Josephine Bravata, Ex. 4 at ¶¶3-8. As of October 25, 2019, SCS has mailed 28,379 copies of the Notice Packet to potential Settlement Class Members. *Id*. ¶8. In addition, the Summary Notice was published in *Investor's Business Daily* and transmitted over the internet using *PR Newswire* on October 7, 2019. *Id*. ¶9.

The Notice set out the essential terms of the Settlement, Co-Lead Counsel's Fee and Expense Application, and the proposed Plan of Allocation and informed potential Settlement Class Members of, among other things, their right to object to any aspect of the Settlement, as well as the procedure for submitting Claim Forms, and for requesting exclusion from the Settlement Class. While the deadline set by the Court for Settlement Class Members to object or request exclusion (November 11, 2019) has not yet passed, to date, no objections or requests for exclusion have been received. *See In re Warner Chilcott Ltd. Sec. Litig.*, No. 06 Civ. 11515, 2009 WL 2025160, at *2 (S.D.N.Y. July 10, 2009) (no class member objections since preliminary approval supported final approval). As provided in the Preliminary Approval Order, Lead Plaintiffs will file reply papers no later than November 25, 2019 addressing any objections.

### 3.      The Stage of the Proceedings and the Amount of Information Available to Counsel Support Approval of the Settlement

In considering this factor, "the question is whether the parties had adequate information about their claims such that their counsel can intelligently evaluate the merits of plaintiff's claims, the strengths of the defenses asserted by defendants, and the value of plaintiffs' causes of action for purposes of settlement." *Bear Stearns*, 909 F. Supp. 2d at 267. To satisfy this factor, parties need not have even engaged in formal or extensive discovery. *See Maley v. Del Global Techs. Corp.*, 186 F. Supp. 2d 358, 363 (S.D.N.Y. 2002).

Here, as detailed in the Joint Declaration, before filing the Amended Complaint, Plaintiffs' Counsel conducted a robust investigation that included, among other things,

contacting 39 potential witnesses with knowledge of the alleged events and interviews with five former employees of Prothena, analysts, and NEOD001 trial administrators; reviewing Prothena's filings with the U.S. Food and Drug Administration and the European Medicines Agency concerning NEOD001, as well as any documents issued by these agencies concerning the same; and consulting with an economics expert regarding loss causation and damages, and with an expert in clinical trial design regarding, among other things, the validity of Company's use of NT-proBNP "best response" as a clinical trial endpoint. Joint Decl. ¶¶16-21.

Armed with this substantial base of knowledge, Lead Plaintiffs were in a position to balance the proposed settlement amount with a well-educated assessment of the likelihood of overcoming the risks of litigation, as well as the Company's financial condition. Accordingly, Lead Plaintiffs and Co-Lead Counsel respectfully submit that they had "a clear view of the strengths and weaknesses of their case[]" and of the range of possible outcomes at trial. *Teachers Ret. Sys. of La. v. A.C.L.N., Ltd*., No. 01-Civ-11814 (MP), 2004 WL 1087261, at *3 (S.D.N.Y. May 14, 2004). The Court thus should find that this factor also supports approval.

### 4. The Risks of Establishing Liability and Damages Support Approval of the Settlement

In assessing the fairness, reasonableness, and adequacy of a settlement, courts should consider the "risks of establishing liability [and] the risks of establishing damages." *Grinnell*, 495 F.2d at 463.

The principal claims in the Action are based on Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated thereunder. To establish a claim under the Exchange Act, "a plaintiff must prove: (1) the defendant made a material misrepresentation or omission; (2) with scienter; (3) in connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation." *IBEW Local Union No. 58*

11

*Pension Trust Fund & Annuity Fund v. Royal Bank of Scotland Grp. PLC*, 783 F.3d 383, 389 (2d Cir. 2015).   Securities class actions present hurdles to proving liability that are difficult for plaintiffs to meet.   *See In re AOL Time Warner Inc.*, No. 02 cv 5575, 2006 WL 903236, at *11 (S.D.N.Y. Apr. 6, 2006) (noting that "[t]he difficulty of establishing liability is a common risk of securities litigation"); *In re Alloy, Inc. Sec. Litig.*, No. 03-1597, 2004 WL 2750089, at *1 (S.D.N.Y. Dec. 2, 2004) (finding that issues present in securities action presented significant hurdles to proving liability).

Here, in particular, Defendants would have vigorously challenged Lead Plaintiffs on falsity, scienter and loss causation.

### (a)    Risks to Proving Liability

The central allegations of the Action arise from Prothena's clinical trials for a drug candidate known as "NEOD001," which was designed to treat AL amyloidosis, a rare, progressive, and typically fatal disease caused by misfolded amyloid proteins that aggregate and deposit in tissue, resulting in progressive organ damage and failure.   In general, the Amended Complaint alleges that Defendants made a number of materially false and misleading statements and omissions regarding Prothena's development of NEOD001 in violation of the Exchange Act. The Amended Complaint further alleges that when the truth regarding NEOD001 was allegedly disclosed to the market, the price of Prothena shares declined causing damages to the proposed class.   *See generally*, Joint Decl. ¶¶10-11.

Regarding the falsity of the alleged misstatements, Defendants would likely have contended that their statements concerning the use of the NT-proBNP "best response" endpoint were novel yet accurate and well supported in the scientific literature.   Defendants would have argued that Lead Plaintiffs' position as to the validity of using NT-proBNP "best response" as a surrogate efficacy endpoint in the NEOD001 clinical trials was nothing more than a well-

12

publicized scientific disagreement.  Defendants would have also argued that they disclosed all available information concerning the validity of NT-proBNP "best response" as a surrogate efficacy endpoint and that, therefore, many of the challenged statements about NT-proBNP "best response" were technically accurate when taken in the context of Defendants' more fulsome disclosures.  Joint Decl. ¶¶25, 27.

The Settlement Class also faced a significant challenge in proving that Defendants acted with scienter as "[p]roving a defendant's state of mind is hard in any circumstances." *Telik,* 576 F. Supp. 2d at 579.  Defendants would have argued, among other things, that: (i) Defendants reasonably believed that NEOD001's clinical data and studies would produce data supporting its efficacy; (ii) the clinical trial data for NEOD001 was blinded and Lead Plaintiffs have not adequately alleged that Defendants knew their statements were false; (iii) Defendants had no incentive to continue or to accelerate NEOD001's clinical trials, or invest limited cash reserves in building a commercial organization for possible regulatory approval to market NEOD001, if they knew the drug was going to fail; (iv) raising capital for general business operations does not contribute to a strong inference of scienter; and (v) Defendants Dr. Kinney and Mr. Nguyen could have, but did not, exercise the vast majority of their vested stock options with significant in-the-money value during the Class Period.  *See* Joint Decl. ¶26.

Further, there were very significant concerns relating to the complexity of the scientific debate at the core of Lead Plaintiffs' allegations concerning the use of NT-proBNP as a surrogate endpoint in AL amyloidosis clinical trials, which would have rendered presentation to the Court and to a potential jury difficult.  *Id.* ¶23.  Notably, Co-Lead Counsel had the benefit of interviewing Dr. Kinney during their due diligence discovery.  He was poised, professorial, and explained the concepts relating to NEOD001 very well and convincingly.  At trial, he would

have a made a very good witness for the defense. *Id*. ¶47.

Even if Lead Plaintiffs were successful on the motion to dismiss, many of these same arguments could have been continued at summary judgment, trial, or on appeal, and, in the absence of any settlement, presumably would have been.

**(b)      Risks Related to Loss Causation and Damages**

Even if Defendants' liability were established, loss causation and damages remains a "complicated and uncertain process, typically involving conflicting expert opinion about the difference between the purchase price and the [shares] 'true' value absent the alleged fraud." *In re Global Crossing Sec. & ERISA Litig*., 225 F.R.D. 436, 459 (S.D.N.Y. 2004).  In order to resolve most of the disputed issues regarding loss causation and damages, among others, the Parties would have had to rely heavily on expert testimony.  Though Lead Plaintiffs' consulting damages expert estimated maximum class-wide aggregate damages of approximately $95.3 million to $530.7 million, depending on whether, at trial, the full Class Period and all three disclosures were established, Defendants and their experts would have made several credible arguments that the class is unable to recover for most or even some of these events.  Joint Decl. ¶¶28-35.

For example, Lead Plaintiffs anticipate that Defendants would have strenuously argued at the motion to dismiss stage, and thereafter, that the negative analyst report issued on November 8, 2017 did not contain "new" information sufficient to correct Defendants' alleged misstatements.  Specifically, Defendants' would have compared the Kerrisdale report issued on this date with a previously issued Muddy Waters Report that, they would argue, contained substantially the same allegations yet did not cause a statically significant stock price decline in the value of the Company's stock. *Compare* Am. Compl. ¶¶93-98 and ¶¶99-101; *see also Dalberth v. Xerox Corp.*, 766 F.3d 172, 182 (2d Cir. 2014) (affirming grant of summary

14

judgement where "the district court concluded that those two disclosures did not add any new information to the market, and as a result, Plaintiffs had not established a genuine dispute of material fact as to loss causation."); Joint Decl. ¶30.  Defendants would likely also put forth arguments that the resignation of Defendant Noonberg as Prothena's Chief Medical Officer on February 2, 2018 was unrelated to the ongoing NEOD001 trials and the alleged fraud.  They would likely point to the market reaction on that day and analyst speculation about the significance of Defendant Noonberg's resignation, rather than the disclosure of "new" fraud related information.  Joint Decl. ¶31; *see also Janbay v. Canadian Solar, Inc*., No. 10–cv–4430, 2012 WL 1080306, at *16 (S.D.N.Y. Mar. 30, 2012) (stating that "the raising of questions and speculation by analysts and commentators does not reveal any 'truth' about an alleged fraud...").

Taking into account the elimination of the two disclosures referenced above, Lead Plaintiffs' damages expert estimated maximum potential recoverable damages of approximately $407.9 million, with netting of pre-class period gains.  Joint Decl. ¶32.

Defendants would certainly also have argued that the class period could not begin until May 1, 2017, rather than October 15, 2015, when Defendants allegedly had access to blinded trial data contradicting their public statements.  If this scenario were credited by the Court or a jury, Lead Plaintiffs' expert estimated maximum potential recoverable damages of approximately $139 million, with netting of pre-class period gains.  Moreover, had Lead Plaintiffs been unable to establish scienter until October 1, 2017, the next likely date, recoverable damages would have been reduced further to $95.3 million. *Id*. ¶33.

While Co-Lead Counsel would work extensively with Lead Plaintiffs' damages expert with a view towards presenting compelling arguments to the jury and prevailing on these matters at trial, Defendants would have put forth well-qualified experts of their own who were likely to

opine at trial that the Settlement Class suffered little or no damages.  As Courts have long recognized, the substantial uncertainty as to which side's experts' view might be credited by the jury presents a serious litigation risk.  *See IMAX*, 283 F.R.D. at 193 ("[I]t is well established that damages calculations in securities class actions often descend into a battle of experts."); *Telik,* 576 F. Supp. 2d at 579-80 (in this "'battle of experts', it is virtually impossible to predict with any certainty which testimony would be credited, and ultimately, which damages would be found…"); *In re Global Crossing Sec. & ERISA Litig.*, 225 F.R.D. at 459 ("[P]roof of damages in securities cases is always difficult and invariably requires expert testimony which may, or may not be, accepted by a jury.").

Given all of these risks with respect to liability, loss causation, and damages, Lead Plaintiffs and Co-Lead Counsel respectfully submit that it is in the best interests of the Settlement Class to accept the certain and substantial benefit conferred by the Settlement.

### 5.    The Risks of Maintaining Class Certification

Although class certification had not yet been briefed in this case, Defendants would undoubtedly have raised vigorous challenges to class certification, and such disputes "could well devolve into yet another battle of the experts."   *Bear Stearns*, 909 F. Supp. 2d at 268. Additionally, class certification can be reviewed and modified at any time by the Court before final judgment.   *See* Fed. R. Civ. P. 23(c)(1)(C) ("An order that grants or denies class certification may be altered or amended before final judgment.").   Although Lead Plaintiffs believe there are strong grounds for certifying a litigation class, discussed in Lead Plaintiffs' motion for preliminary approval of the Settlement (ECF Nos. 41-43), the Settlement avoids any uncertainty with respect to class certification and the risks of maintaining certification of the Settlement Class through trial and on appeal.  *See Ebbert v. Nassau Cty.*, No. CV 05-5445 AKT, 2011 WL 6826121, at *12 (E.D.N.Y. Dec. 22, 2011) (risk of de-certification of the certified class

supported approval of Settlement); *Ingles v. Toro*, 438 F. Supp. 2d 203, 214 (S.D.N.Y. 2006).[4]

### 6.    The Ability of Defendants to Withstand a Greater Judgment

The ability of a defendant to pay a judgment greater than the amount offered in settlement is relevant to whether the settlement is fair.  *Grinnell*, 495 F.2d at 463.  Defendants' financial condition here strongly weighs in favor of approval of the Settlement.  *See, e.g.*, *Maley*, 186 F. Supp. 2d  at 365 ("given Del Global's dire financial condition, it is unlikely that the Company could withstand a substantial judgment"); *In re Global Crossing Sec. & ERISA Litig.*, 225 F.R.D. at 460 (ability to withstand a greater judgment supports final approval where the "main settlement funds available to the individuals are the insurance proceeds" which "would be largely consumed by defense costs if this litigation were to continue"); *Teachers' Ret. Sys. of La.,* 2004 WL 1087261, at *4 (likely depletion of insurance supports settlement approval).

Here, as set forth in the Joint Declaration (¶¶36-38), in light of the insurance available to Defendants, Prothena's limited revenue, significant debt, and dwindling cash reserves, there was a very real possibility that Lead Plaintiffs – even if they succeeded in continued litigation – would have recovered less than the Settlement, or nothing at all, at the point of a judgment favorable to the Settlement Class.   In contrast, pursuant to the Stipulation, the $15,750,000 Settlement Amount has already been deposited into the Escrow Account, and is earning interest. *See Prasker v. Asia Five Eight LLC*, No. 08 Civ. 5811(MGC), 2010 WL 476009, at *5 (S.D.N.Y. Jan. 6, 2010) (approving settlement and noting that "[t]he settlement eliminated the risk of

---

[4] In the Preliminary Approval Order (ECF No. 45), the Court preliminarily certified the Settlement Class for settlement purposes.  There have been no developments in the case that would undermine that determination and, for all the reasons stated in the Memorandum of Law in Support of Lead Plaintiffs' Unopposed to Motion for Preliminary Approval of Proposed Class Action Settlement (ECF No. 41), incorporated herein by reference, Lead Plaintiffs now request that the Court reiterate its prior certification of the Settlement Class pursuant to Fed. R. Civ. P. 23(a) and (b)(3), for settlement purposes, and the appointment of Lead Plaintiffs as Class Representatives and Labaton Sucharow and Levi & Korsinksy as Class Counsel.

collection by requiring Defendants to pay the Fund into escrow…").  Accordingly, Defendants'

ability to withstand a greater judgment strongly weighs in favor of approval of the Settlement.

> **7.    The Range of Reasonableness of the Settlement Amount
> in Light of the Best Possible Recovery and all the Attendant
> Risks of Litigation Support Approval of the Settlement**

The last two substantive factors courts consider are the range of reasonableness of the

settlement fund in light of (i) the best possible recovery and (ii) litigation risks.  In analyzing

these factors, the issue for the Court is not whether the settlement represents the best possible

recovery, but how the settlement relates to the strengths and weaknesses of the case.  The court

"consider[s] and weigh[s] the nature of the claim, the possible defenses, the situation of the

parties, and the exercise of business judgment in determining whether the proposed settlement is

reasonable."  *Grinnell*, 495 F.2d at 462.  Courts agree that the determination of a "reasonable"

settlement "is not susceptible of a mathematical equation yielding a particularized sum."  *In re*

*PaineWebber Ltd. P'ships Litig.*, 171 F.R.D. 104, 130 (S.D.N.Y. 1997), *aff'd*, 117 F.3d 721 (2d

Cir. 1997).  Instead, "in any case there is a range of reasonableness with respect to a

settlement…."  *Newman v. Stein*, 464 F.2d 689, 693 (2d Cir. 1972).

Here, according to analyses prepared by Lead Plaintiffs' consulting damages expert, the

Settlement represents a recovery of between approximately 3% and 16.5% of the class's possible

damages of approximately $95.3 million to $530.7 million.  Joint Decl. ¶¶29-33.  This recovery

falls well within the range of reasonableness that courts regularly approve in similar

circumstances.  *See, e.g.*, *In re Merrill Lynch & Co. Research Reports Sec. Litig.*, No. 02 MDL

1484 (JFK), 2007 WL 313474, at *10 (S.D.N.Y. Feb. 1, 2007) (approving $40.3 million

settlement representing approximately 6.25% of estimated damages and noting was at the

"higher end of the range of reasonableness of recovery in class actions securities litigation"); *In*

*re Merrill Lynch & Co. Research Reports Sec. Litig.*, 246 F.R.D. 156, 167 (S.D.N.Y. 2007)

(approving settlement that was "between approximately 3% and 7% of estimated damages [and] within the range of reasonableness for recovery in the settlement of large securities class actions"); *In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036, 1042 (N.D. Cal. 2008) ($13.75 million settlement yielding 6% of potential damages was "higher than the median percentage of investor losses recovered in recent shareholder class action settlements"); *Int'l Bhd of Elec. Workers Local 697 Pension Fund v. Int'l Game Tech., Inc.*, No. 3:09-cv-00419, 2012 WL 5199742, at *3 (D. Nev. Oct. 19, 2012) (approving $12.5 million settlement recovering 3.5% of maximum damages and noting that the amount is within the median recovery in securities class actions settled in the last few years).

The Settlement also presents a favorable recovery when compared to industry trends. The $15.75 million recovery is above the median settlement amount of $8.6 million for securities class actions between 1996 and 2017, is higher than the median recovery in 2018 of $11.3 million, and is higher than the $7.9 million median recovery in 2018 in cases that settled after a motion to dismiss was filed, but before a ruling.  *See* Laarni T. Bulan, Ellen M. Ryan, and Laura E. Simmons, *Securities Class Action Settlements – 2018 Review and Analysis*, at 1, 13 (Cornerstone Research 2019),  Ex. 3.

In sum, the *Grinnell* factors support approval of the Settlement.

### E.       Application of the Factors Identified in the Amendments to Rule 23(e)(2) Support Approval of the Settlement as Fair, Reasonable, and Adequate

The proposed Settlement also meets the criteria set forth in the recent amendments to Rule 23(e)(2), most of which are covered by the Second Circuit factors discussed above.

#### 1.       Lead Plaintiffs and Co-Lead Counsel Have Adequately Represented the Settlement Class

There can be little doubt that Lead Plaintiffs and Co-Lead Counsel have adequately represented the Settlement Class.

As set forth in the previously filed motion for Preliminary Approval of the Settlement and their motion seeking appointment as lead plaintiffs, Lead Plaintiffs, like all other members of the Settlement Class, acquired shares of Prothena during the Class Period, when its value was allegedly artificially inflated by false and misleading statements. Thus, the claims of the Settlement Class and Lead Plaintiffs would prevail or fail in unison, and the common objective of maximizing recovery from Defendants aligns the interests of Lead Plaintiffs and all members of the Settlement Class. *See, e.g., In re Polaroid ERISA Litig.*, 240 F.R.D. 65, 77 (S.D.N.Y. 2006) ("Where plaintiffs and class members share the common goal of maximizing recovery, there is no conflict of interest between the class representatives and other class members.").

Additionally, throughout the Action, Lead Plaintiffs had the benefit of the advice of knowledgeable counsel well-versed in shareholder class action litigation and securities fraud cases. Both Labaton Sucharow and Levi & Korsinsky have long and successful track records in such cases. *See* Ex. 5-D and 6-C.

### 2. The Settlement Is the Result of Arm's-Length Negotiations

As discussed in Section I.C., above, and the Joint Declaration, the Settlement was reached after arm's-length negotiations between counsel and overseen by an experienced Mediator. This factor clearly supports approval of the Settlement.

### 3. The Relief Provided to the Settlement Class Is Adequate

Section (i) of Rule 23(e)(2)(C), whether "the relief provided for the class is adequate, taking into account the costs, risks, and delay of trial and appeal," has been explained above.

Rule 23(e)(2)(C)(ii) considers whether the relief is adequate, taking into account the "effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims." As set forth below in Section II., discussing the proposed Plan of Allocation, the proceeds of the Settlement will be distributed to Settlement Class

Members who submit valid and timely claims. The Claims Administrator will calculate claimants' Recognized Losses using the transactional information provided by claimants in their Claim Forms, which can be mailed to the Claims Administrator, submitted online using the settlement website, or, for large investors, with hundreds of transactions, via e-mail to the Claims Administrator's electronic filing team. Because most securities are held in "street name" by the brokers that buy them on behalf of clients, the Claims Administrator, Co-Lead Counsel, and Defendants do not have Settlement Class Members' transactional data, and a claims process is required. Because the Settlement does not recover 100% of alleged damages, the Claims Administrator will determine each eligible claimant's *pro rata* share of the Net Settlement Fund based upon each claimant's total "Recognized Claim" compared to the aggregate Recognized Claims of all eligible claimants.

Once the Claims Administrator has processed submitted claims, notified claimants of deficiencies or ineligibility, processed responses, and made claim determinations, distributions will be made to eligible claimants in the form of checks and wire transfers. After an initial distribution of the Net Settlement Fund, if there is any balance remaining in the Net Settlement Fund after at least six (6) months from the date of initial distribution, Co-Lead Counsel will, if feasible and economical, re-distribute the balance among eligible claimants who have cashed their checks. These re-distributions will be repeated until the balance in the Net Settlement Fund is no longer feasible to distribute. *See* Stipulation ¶ 26. Any balance that still remains in the Net Settlement Fund after re-distribution(s), which is not feasible or economical to reallocate, after payment of any outstanding Notice and Administration Expenses or Taxes, will be contributed to the Council of Institutional Investors, or such other non-profit and non-sectarian organization(s)

approved by the Court.[5]

The terms of any proposed award of attorneys' fees, including timing of payment (Rule 23(e)(2)(C)(iii)), are discussed in Co-Lead Counsel's accompanying Fee and Expense Application.

Finally, Rule 23(e)(2)(C)(iv) asks the Court to consider the fairness of the proposed Settlement in light of any agreement required to be identified under Rule 23(e)(3).  The only agreements made by the Parties in connection with the Settlement are the June 10, 2018 Term Sheet, the Stipulation, and the confidential Supplemental Agreement, dated August 26, 2019, concerning the circumstances under which Defendants may terminate the Settlement based upon the number of exclusion requests.  *See* Stipulation ¶40.  It is standard to keep such agreements confidential so that a large investor, or a group of investors, cannot intentionally try to leverage a better recovery for themselves by threatening to opt out, at the expense of the class.  The Supplemental Agreement can be provided to the Court *in camera* or under seal.

## II.  THE PLAN OF ALLOCATION FOR THE PROCEEDS OF THE SETTLEMENT IS FAIR AND REASONABLE AND SHOULD BE APPROVED

A plan for allocating settlement proceeds, like the settlement itself, should be approved if it is fair, reasonable, and adequate.  *See IMAX*, 283 F.R.D. at 192; *Bear Stearns*, 909 F. Supp. 2d at 270.  A plan of allocation with a "rational basis" satisfies this requirement.  *FLAG Telecom*,

---

[5] CII is a nonprofit, nonpartisan association of pension funds and other employee benefit funds, foundations, and endowments with combined assets that exceed $3 trillion, which seeks to educate its members, policymakers, and the public about corporate governance, shareowner rights, and related investment issues.  *See* www.cii.org. CII has developed an extensive body of corporate governance best practices that many U.S. companies embrace and is vocal in endorsing policies on many investment-related issues through correspondence, amicus briefs and reports and publications.  CII has been approved as a *cy pres* beneficiary in many securities class actions, such as *In re Royal Ahold N.V. Sec. & ERISA Litig.*, No. 03-MD-1539 (D. Md.); *In re Genworth Fin., Inc. Sec. Litig.*, No. 14-cv-02392-AKH (S.D.N.Y.); and *In re Hewlett-Packard Co. Sec. Litig.*, Case No. SACV 11-1404 AG (RNBx) (C.D. Cal.).

2010 WL 4537550, at *21; *In re Initial Pub. Offering Sec. Litig.*, 671 F. Supp. 2d at 497.  A plan of allocation that reimburses class members based on the relative strength and value of their claims is reasonable.  *See IMAX*, 283 F.R.D. at 192.  However, a plan of allocation does not need to be tailored to fit each and every class member with "mathematical precision."  *PaineWebber*, 171 F.R.D. at 133.

Here, the proposed Plan of Allocation, which was developed by Co-Lead Counsel in consultation with Lead Plaintiffs' consulting damages expert, provides a fair and reasonable method to allocate the Net Settlement Fund among class members who submit valid Claim Forms.  The Plan is set forth in full in the Notice.  *See* Ex. 4-A at pp. 12-16.  It provides for the distribution of the Net Settlement Fund based upon each Settlement Class Member's "Recognized Claim," as calculated by the formulas described in the Notice.  In developing the Plan, Lead Plaintiffs' expert considered the amount of artificial inflation in the per share prices of Prothena ordinary shares that allegedly was proximately caused by Defendants' alleged false and misleading statements and omissions.  ¶¶58-59; Ex. 4-A at ¶52.  Lead Plaintiffs' expert calculated the estimated artificial inflation by considering share price changes in reaction to public disclosures.

SCS, as the Court-approved Claims Administrator, will determine each Authorized Claimant's *pro rata* share of the Net Settlement Fund based upon each Authorized Claimant's total Recognized Claim compared to the aggregate Recognized Claims of all Authorized Claimants, as calculated according to the Plan of Allocation.  A claimant's total Recognized Claim will depend on, among other things, when their shares were purchased and/or sold during the Class Period in relation to the disclosure dates alleged in the Action, whether the shares were held through or sold during the statutory 90-day look-back period, *see* 15 U.S.C. § 78u-4(e)

(providing methodology for limiting damages in securities fraud actions), and the value of the shares when they were sold or held.  Accordingly, the proposed Plan of Allocation is designed to fairly and rationally allocate the proceeds of this Settlement among the Settlement Class.

For these reasons, Co-Lead Counsel believe that the Plan of Allocation provides a fair and reasonable method to equitably allocate the Net Settlement Fund.  *See In re Giant Interactive Grp., Inc. Sec. Litig.*, 279 F.R.D. 151, 163 (S.D.N.Y. 2011) ("[i]n determining whether a plan of allocation is fair, courts look primarily to the opinion of counsel"); *In re Marsh ERISA Litig.*, 265 F.R.D. 128, 145 (S.D.N.Y. 2010) (same).  Moreover, as noted above, as of October 25, 2019, 28,397 copies of the Notice, which contains the Plan of Allocation and advises Settlement Class Members of their right to object to the proposed plan, have been sent to potential Settlement Class Members and their nominees (*see* Ex. 4 at ¶8) and, to date, no objections to the proposed plan have been received (*id*. ¶13).

## III.    NOTICE TO THE CLASS SATISFIED THE REQUIREMENTS OF RULE 23 AND DUE PROCESS

Lead Plaintiffs have provided the Settlement Class with notice of the proposed Settlement that satisfied all the requirements of Rule 23(e) and due process, which require that notice of a settlement be "reasonable"—*i.e.*, it must "fairly apprise the prospective members of the class of the terms of the proposed settlement and of the options that are open to them in connection with the proceedings." *Visa*, 396 F.3d at 114.  Both the substance of the Notice and the method of its dissemination to potential members of the Settlement Class satisfied these standards.

The Notice provided all of the necessary information for Settlement Class Members to make an informed decision regarding the Settlement, the Fee and Expense Application, and the Plan of Allocation. The Notice informed Settlement Class Members of, among other things: (1) the amount of the Settlement; (2) the reasons why the Parties are proposing the Settlement; (3)

the estimated average recovery per affected share of Prothena; (4) the maximum amount of attorneys' fees and expenses that will be sought; (5) the identity and contact information for the representatives of Co-Lead Counsel who are reasonably available to answer questions from Settlement Class Members concerning matters contained in the Notice; (6) the right of Settlement Class Members to object to the Settlement; (7) the binding effect of a judgment on Settlement Class Members; and (8) the dates and deadlines for certain Settlement-related events. *See* 15 U.S.C. § 78u-4(a)(7).  The Notice also contained the Plan of Allocation and provided Settlement Class Members with information about how to submit a Claim Form in order to be eligible to receive a distribution from the Net Settlement Fund.

In addition, SCS caused the Summary Settlement Notice to be published in *Investor's Business Daily* and to be released over the internet using *PR Newswire* on October 7, 2019.  Ex. 4 at ¶9.  SCS also created a webpage for this case, www.StrategicClaims.net, to provide members of the Settlement Class and other interested persons with information about the Settlement and the applicable deadlines, as well as access to copies of the Notice, the Claim Form, Stipulation, and the Preliminary Approval Order (*id.* ¶11), and Co-Lead Counsel posted copies of the Notice and Claim Form on their websites, Joint Decl. ¶53.

This combination of individual first-class mail to those who could be identified with reasonable effort, supplemented by notice in an appropriate publication, transmitted over a newswire, and set forth on internet websites, was "the best notice . . . practicable under the circumstances."  Fed. R. Civ. P. 23(c)(2)(B); *see, e.g.*, *In re Marsh & McLennan Cos. Sec. Litig.*, No. 04 Civ. 8144 (CM), 2009 WL 5178546, at *12-13 (S.D.N.Y. Dec. 23, 2009).

## CONCLUSION

For the foregoing reasons, Lead Plaintiffs respectfully request that the Court approve the proposed Settlement as fair, reasonable, and adequate and approve the Plan of Allocation as fair,

reasonable, and adequate.  Proposed orders will be submitted with Lead Plaintiffs' reply papers, after the deadlines for objections and seeking exclusion have passed.


DATED: October 28, 2019             **LABATON SUCHAROW LLP**

                                        */s/ Carol C. Villegas*
                                        Carol C. Villegas
                                        David J. Schwartz
                                        Alec T. Coquin
                                        140 Broadway
                                        New York, New York 10005
                                        Telephone: (212) 907-0700
                                        Facsimile: (212) 818-0477
                                        Emails: cvillegas@labaton.com
                                                   dschwartz@labaton.com
                                                   acoquin@labaton.com

                                        *Attorneys for Lead Plaintiff Granite Point*
                                        *Capital and the Class*

                                        **LEVI & KORSINSKY, LLP**
                                        Nicholas I. Porritt
                                        Adam M. Apton
                                        55 Broadway, 10th Floor
                                        New York, New York 10006
                                        Telephone: (212) 363-7500
                                        Facsimile: (212) 363-7171
                                        Email: nporritt@zlk.com
                                                   aapton@zlk.com

                                        *Attorneys for Lead Plaintiff Simon James*
                                        *and the Class*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on October 28, 2019, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all registered ECF participants.

<u>/s/ *Carol C. Villegas*</u>
CAROL C. VILLEGAS